```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3   * * * * * * * * * * *        *
                                  *
 4   UNITED STATES OF AMERICA,    *  Case No 6cr160(JBA)
                                  *
 5                 Government,    *
                                  *
 6          vs.                   *
                                  *
 7   EFRAIN JOHNSON,              *
                                  *  February 8, 2012
 8                 Defendant.     *
                                  *
 9   * * * * * * * * * * * *       *

10                    TRIAL TRANSCRIPT

11                       VOLUME I

12   BEFORE: THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

13

14   Appearances:
     FOR THE GOVERNMENT:      ALINA REYNOLDS, ESQ
15                            PETER MARKLE, ESQ.
                              United States Attorney's
16                            Office
                              1000 Lafayette Blvd
17                            Bridgeport, CT 06604

18

19   FOR THE DEFENDANT:       TODD BUSSERT, ESQ
                              FROST BUSSERT
20                            129 Church Street
                              New Haven, CT 06510
21

22
     Court Reporter:          Sharon Montini, RMR
23                            141 Church Street
                              New Haven, CT 06510
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

1              THE COURT:  Good morning, counsel.

2    Please be seated.  Our first order of business

3    before we begin the trial in U.S. v. Efrain Johnson

4    will be to hear you on the preliminary jury

5    instructions, but if you'll hold on just one moment.

6              All right, if there is no objection,

7    we'll proceed with your comment while Mr. Johnson is

8    being brought down.  Is that satisfactory?

9              MR. BUSSERT:  Yes, your Honor.

10             THE COURT:  All right, comment?

11             MS. REYNOLDS:  Your Honor, on page 12 of

12   the Court's preliminary charge at paragraph 3 there

13   was just a small typo in the first sentence, "the

14   government must prove beyond a reasonable doubt" and

15   then it says "is."

16             THE COURT:  Yes, okay.

17             MS. REYNOLDS:  And then at paragraph 4

18   at the bottom there we would propose that the Court

19   not charge or instruct the jury on the definition of

20   murder and just leave it, end it with the first

21   paragraph, because the Court doesn't go on to define

22   burglary or robbery or kidnapping, and we thought it

23   would be better just to leave it in general terms

24   for that element.

25             THE COURT:  It's not my intention, of

```
1    course, to give a full charge here, and so I have

2    actually been attempting to scale that down.

3              Would you have any objection to that,

4    Mr. Bussert?

5              MR. BUSSERT:  To removing that?

6              THE COURT:  Yes.

7              MR. BUSSERT:  No, your Honor.

8              THE COURT:  All right, we'll take that

9    out then.  And the jury will not be getting a copy

10   of this.

11             MS. REYNOLDS:  Okay.

12             THE COURT:  I will simply be reading it.

13   I want to orient them to some of the terms and

14   concepts at the beginning, and particularly because

15   they may be alluded to in your opening statements, I

16   don't know, but in any event, it's not particularly

17   intuitive, the counts that are being tried.

18             All right, anything else from the

19   government?

20             MS. REYNOLDS:  I think there were just a

21   few other typos.  On page 17, after it says

22   LinkedIn, YouTube or Twitter, that sentence just

23   didn't read right, "to communicate or receive from,

24   to anyone."  So, I don't know if the Court wants to

25   just say --
```

```
 1                    THE COURT:  I'll fix that.

 2                    MS. REYNOLDS:  And then in the next

 3     paragraph, about three sentences down where it says,

 4     "I'll instruct you again in greater detail," and

 5     then it has the word "including particularly."  I'm

 6     not sure if the Court wants that, but that's up to

 7     the Court, that sounded --

 8                    THE COURT:  All right.

 9                    MS. REYNOLDS: --  a little different.

10     And then that last sentence, "please bear the

11     principles I've given you in mind," and there is a

12     "will" there and "will keep."

13                    THE COURT:  Yes, thank you.

14                    MS. REYNOLDS:  I think that was all we

15     had, your Honor.

16                    THE COURT:  Yes, Mr. Bussert?

17                    MR. BUSSERT:  Yes, your Honor.  I think

18     more for the record than anything, we would object

19     generally to a reading of the indictment to the

20     extent that it essentially gives the government two

21     bites at the apple in terms of an opening.  Reading

22     the indictment such as it puts forth the

23     government's allegations to the jury and the

24     government's going to stand up a several minutes

25     later and make its opening argument, essentially
```

```
 1    reiterate these points and being able to rely on the

 2    fact it was provided in the first instance.

 3              And beyond that, and I think perhaps of

 4    greater concern, to the extent that it is read, the

 5    indictment, the quotations from the indictment are

 6    so long that I think it could be very confusing to

 7    the jury that as your Honor is reading through this

 8    to understand your Honor is still reading from the

 9    indictment, and the way this is worded it sounds as

10    if the Court is asserting what's alleged, realizing

11    there is a preface on page 4, but realizing --

12              THE COURT:  All right, so the long

13    excerpt that you --

14              MR. BUSSERT:  Starting on page 5.

15              THE COURT:  -- are concerned with is

16    starts on page 5?

17              MR. BUSSERT:  Yes, your Honor.  And I

18    think at a minimum perhaps if we could preface each

19    paragraph which is numbered on page 5, reading

20    through the numbered paragraphs of the indictment,

21    if we could say something to the effect, paragraph 1

22    of the indictment reads or alleges, so it's fairly

23    clear with each paragraph we are referring to the

24    indictment specifically.

25              Also I'm looking here -- your Honor, if
```

 1    you'd please just give me one second.  I believe on

 2    page 8, the Court's referencing paragraph 5A of the

 3    indictment, and I believe that paragraph of the

 4    indictment actually reads that it was Azikiwe Aquart

 5    and his associates that collected money, not the

 6    defendants globally, and so to the extent this is

 7    going to conform with the indictment, we'd ask that

 8    it do that.

 9          In terms of the elements of murder in aid

10    of racketeering, as to the third identified element

11    on page 12, it's our feeling that these instructions

12    as drafted aren't found in the model instructions,

13    this isn't consistent with the model instructions,

14    nor do we believe it's consistent with the case law,

15    specifically as to the independent contractor

16    language that is used.

17          THE COURT:  All right, so the

18    independent contractor issue is a theme and issue

19    that the defendant has throughout.

20          MR. BUSSERT:  Yes.

21          THE COURT:  And that is grounded in the

22    Court's view on Concepcion and the language of the

23    statute.  So that is simply an issue that you

24    preserve throughout.  But is it your belief that

25    element No. 3 is not an element of murder in aid of

1   racketeering, or is it your continuing objection to

2   the concept that one could be liable under this

3   statute as an independent contractor as the

4   statutory text sets out for pecuniary gain?

5            MR. BUSSERT:  In looking at this, your

6   Honor, if I could just back up before I answer that.

7   Based on your Honor's comments just a second ago,

8   would it be the Court's position that all of the

9   arguments on January 6th in preceding motions, and

10  your Honor has ruled upon those, have all been

11  preserved for the record and those objections would

12  carry over today, I don't need to reiterate those

13  specifically again?

14           THE COURT:  No, I don't think you need

15  to reiterate them.  If there is, however, a

16  development in trial, evidentiary or otherwise, that

17  casts your issues in a new light, I do want to hear

18  that.

19           MR. BUSSERT:  Yes.

20           THE COURT:  Now, if you look at the

21  Modern Federal Jury Instructions, 52-39, the third

22  element is position in the enterprise, and that is

23  where this came from.

24           The addition of -- do you have the model

25  instructions there, Mr. Bussert?

1           MR. BUSSERT:  I don't in front of me,

2    your Honor.  I do have what we filed, which I think

3    references those, in the authority portion, so I'm

4    looking at that, and it looks like we have quoted

5    from that.  There's language that we cited that I

6    don't see in the Court's instruction.  It is not --

7    again, because your Honor offers I think part of the

8    model instruction "held a position."

9           THE COURT:  So, let me just read this

10   and you can see what I have added in order to

11   clarify the role of this independent contractor

12   concept that I have previously held is a part of the

13   language of the statute and that I believe the

14   Second Circuit has implicitly recognized in its

15   footnote in Concepcion.

16           So, this says, "The third element the

17   government must establish beyond a reasonable doubt

18   is that the defendant had or was seeking a position

19   in the enterprise.  To establish this element, the

20   government must prove that the defendant was

21   actively engaged in promoting the illegal activities

22   of the enterprise."  I did not add at this early

23   stage, "it's not enough to prove that he was doing

24   business with the enterprise, the government must

25   prove he was actually a member of the enterprise."

1    We'll have to take that concept up in the charge,

2    but the concept I'm trying to advance here is that

3    the concept of promoting the illegal activities of

4    the racketeering enterprise comes by virtue of being

5    an independent contractor who commits a violent

6    crime in consideration of anything of pecuniary

7    value from the racketeering enterprise.

8            MR. BUSSERT:  See, your Honor, I

9    think -- I understand what the Court is attempting

10   to do here, kind of shoehorn in kind of the wrongful

11   holding in Concepcion, which I don't think speaks to

12   the promoting language in the model charge.  But I

13   think as phrased here, I think the thing we find

14   particularly problematic is this promoted the

15   illegal activities of the racketeering enterprise as

16   an independent contractor is only as to this

17   independent contractor language.  And if we look at

18   the pattern instruction, I mean I can -- what the

19   pattern instruction makes very clear is that the

20   person was actually a member of the enterprise,

21   which again gets back to the knowledge issue which

22   again gets to the promoting issue which again it is

23   the concern that the jury may infer because Mr.

24   Johnson's conduct, whatever they find that was,

25   helps promote the ends of the enterprise, even

1    unbeknownst to him, because he was part as an

2    independent contractor, he could be the held liable

3    under VCAR theory.  And our position would be that's

4    not the case, there has to be some knowledge of the

5    enterprise and that his activities were assisting

6    the enterprise, and it goes to the whole issue of

7    pecuniary gain and everything else.

8              And, again, the government has conceded

9    previously, and again as your Honor said, the

10   evidence may change, but the government has conceded

11   it doesn't have the evidence that Mr. Johnson knew

12   of the enterprise and it doesn't anticipate putting

13   on any evidence he knew of the enterprise.

14             THE COURT:  All right, and your draft

15   proposed charge is that Johnson -- Mr. Johnson knew

16   of and associated with the enterprise?

17             MR. BUSSERT:  Yeah.  I think then we'll

18   offer language in that final proposed paragraph

19   talking about a knowing association, then I think

20   that --

21             THE COURT:  As I indicated earlier, I'm

22   not trying to give the jurors a complete and nuanced

23   charge at this early stage, I would like very much

24   not to give them a misimpression, however.

25             MR. BUSSERT:  Your Honor, I mean, I

1    would have to concede, I mean, that my level of

2    experience in terms of doing this process with

3    preliminary instructions, what have you, is limited,

4    but to the extent I've had these cases, I've never

5    had the experience, at least I don't recall, giving

6    this complete a preliminary instruction getting into

7    all these elements.  I think we're getting into

8    these murky waters because the evidence isn't in

9    yet.

10            THE COURT:  The reason is that the

11    nature of these charges is somewhat complex.  I'm

12    just trying to expose the jury to some of the

13    outline of what they will be getting later on so

14    that there is some appreciation for what they're

15    listening to.  I acknowledge that a preliminary

16    charge is, in fact, just that.

17            Now, let me -- so let me ask the

18    government what your position is and whether or

19    not -- before I do that, Mr. Bussert, you are not

20    claiming that element No. 3 is to be omitted in its

21    entirety, are you?  You are -- if we put aside the

22    knowledge issue, which is another of your continuing

23    legal positions that thus far I have disagreed with,

24    is it sufficient to say that at this early stage

25    that they must -- the government must prove that the

1    defendant held a position or was seeking a position

2    or was associated with the racketeering enterprise,

3    period?  In other words, is some form of this, in

4    your view, an element or not?

5              MR. BUSSERT:  Subject to our previous

6    objection, but I think that some form -- I think

7    part of the problem we obviously encounter here is

8    that the pattern instruction I believe labels this

9    "position in the enterprise," so it presumes almost

10   that the defendant is alleged to have held a

11   position in the enterprise, and I think while the

12   government acknowledges it's seeking to pursue the

13   gain entrance, I think they've -- they've

14   effectively conceded that's probably not the

15   stronger of the two prongs they're pursuing in terms

16   of their theory of liability.  So, this is -- again,

17   I think that's why we had recast that in terms of

18   our proposed labelling in saying knowledge of the

19   existence of the enterprise as to this element,

20   because our reading of the case law, as to the other

21   possible theories with the position or gaining

22   entrance, all seems consistent of --

23             THE COURT:  Okay, but that reargues the

24   knowledge issue --

25             MR. BUSSERT:  It does.

```
1                    THE COURT:  --  we had before.
2                    MR. BUSSERT:  So when it says
3    "association" I understand what your Honor is
4    saying, it says "or associated with."  From our
5    concern -- and I'm realizing this is preliminary,
6    from the defense perspective we'd like the jury to,
7    in undergoing this process, if they're going to
8    learn -- we would submit these instructions as
9    written are fairly nuanced, perhaps not as nuanced
10   as the instructions they'll receive at the end of
11   the case, but to understand fairly clearly from our
12   perspective what association means under the law.
13                   THE COURT:  If, however, that is not
14   detailed, my question is, is it accurate to the --
15   as far as it goes, to say that the government must
16   prove the defendant held a position, was seeking a
17   position, or was associated with the enterprise?
18                   MR. BUSSERT:  I think we'd say it's
19   better than is drafted, your Honor.
20                   THE COURT:  Is that --
21                   MR. BUSSERT:  And we'd reserve our
22   objection otherwise.
23                   THE COURT:  Ms. Reynolds?
24                   MS. REYNOLDS:  I think that would be
25   fine with the government, and I think as your Honor
```

1    pointed out, that would pick up because the

2    indictment uses that word "associated with," and so

3    I think that would introduce that -- by including

4    that word in element 3 that would introduce that

5    word to the jury as well.

6              THE COURT:  All right, "was associated

7    with the racketeering enterprise" is an invitation

8    for further argument on the nuanced definition in

9    the final charge that I will hear, I am positive,

10   from Mr. Bussert.

11             All right, anything else before we

12   conclude our discussion about this substantive law

13   that's being charged?

14             MR. BUSSERT:  Your Honor, I would just

15   note for the record that the issue of the knowledge

16   we believe also applies to the fifth element of that

17   charge on top of page 13.  I'd just simply note that

18   for the record.

19             If I may just have one moment, your

20   Honor.  Your Honor, as to the fifth element of the

21   conspiracy charge found on page 14, we believe that

22   the case law talks about to maintain, gaining, et

23   cetera, it has to be the primary purpose, not just a

24   primary purpose, but the primary purpose of the

25   conspiracy.

1              THE COURT:  So, it's the language "at

2     least one" that you object to?

3              MR. BUSSERT:  I think it would be that

4     the defendants -- our position would be the

5     defendant's purpose in conspiring to murder another

6     individual -- or the defendant's primary purpose was

7     either to maintain or increase his position or as

8     consideration.

9              THE COURT:  Ms. Reynolds?

10             MS. REYNOLDS:  No, your Honor, I don't

11    think the case law suggests that.

12             THE COURT:  What about for the time

13    being that the element is characterized as that the

14    defendant's purpose in conspiring to murder was --

15    murder another individual was either to maintain or

16    as consideration?  Just do that for now?

17             MS. REYNOLDS:  I think that would be

18    fine, your Honor.

19             THE COURT:  And then we'll frame the

20    issue up about whether it should say the primary

21    motive or any such thing that I have actually not

22    examined the case law for, at least that I'm

23    recalling at this moment.

24             Anything further?

25             MR. BUSSERT:  Again, your Honor, just

1    for the record, your Honor, same page sub 3, just

2    the association issue arises there as well, so it

3    will probably be taken up at a later point as well.

4            THE COURT:  All right, the way it is

5    worded here would track the change that we made

6    earlier.

7            MR. BUSSERT:  I believe so.

8            THE COURT:  All right then, if there is

9    nothing further there, we have several other motions

10   that I'd like to just quickly look at.

11           Let's see, do I now have Dr. Carver's

12   report of January 31st?

13           MS. REYNOLDS:  I think we were going to

14   e-mail it to, your Honor.  I'd ask we e-mail it to

15   your clerk.

16           THE COURT:  And when will I get the

17   government's response to the defendant's motion in

18   limine to preclude Dr. Carver's testimony on -- as

19   violative of the confrontation clause?  When is

20   Dr. Carver currently intended --

21           MS. REYNOLDS:  Sometime next week, but

22   towards the end of next week.  So, he won't be going

23   on this week.

24           THE COURT:  All right, so by the end of

25   this week, please.

1          MS. REYNOLDS:  Yes, your Honor.

2          THE COURT:  Okay, I think it's an

3   important issue.

4          MS. REYNOLDS:  It is clearly an

5   important issue.

6          THE COURT:  And I think if in fact the

7   defendant's motion prevails, you are going to need

8   to be thinking about another witness.

9          MS. REYNOLDS:  Well, we have, your

10  Honor, and we have several proposals that we'll lay

11  out in our response in having him testify just from

12  the photographs, which he's prepared to do.  So

13  we'll lay that out in our response, your Honor.

14         THE COURT:  Okay.  With respect to other

15  acts evidence, I take it since there hasn't been

16  anything, at least the defendant represents that

17  there has been nothing turned over, that there isn't

18  going to be anything offered.  Is that correct?

19         MS. REYNOLDS:  That's correct, your

20  Honor, we don't anticipate having any other acts

21  evidence.  I wasn't sure what he was referring to.

22  I mean, obviously there is evidence of his marijuana

23  dealings, but that's part of the charged conduct.

24  So we don't consider that other acts evidence, so we

25  didn't specifically notice him of that, although he

1    has notice of that because it's the defendant's own

2    statements.

3              THE COURT:  But that's not what you

4    intended, Mr. Bussert, right?  I mean you just don't

5    want to be surprised with anything else.

6              MR. BUSSERT:  I think there were

7    discussions in the proffers, and obviously there is

8    the current pending federal charges involving other

9    drug activity and admissions he made, Mr. Johnson

10   made, with respect to other conduct unrelated to any

11   of this, historically and after the fact, completely

12   unrelated to this, and concerns there that somehow

13   the government may seek to introduce that type of

14   evidence.

15             THE COURT:  Okay, but what Ms. Reynolds

16   is saying is it's his marijuana activity that is of

17   course tied in with the allegations that Aquart gave

18   him free marijuana to do these -- to help him with

19   these murders.

20             MR. BUSSERT:  And I think they've --

21             THE COURT:  And that's not other acts

22   evidence.

23             MR. BUSSERT:  No, I don't think that's

24   actually pecuniary gain element, so --

25             THE COURT:  All right then,

1   understanding that, the motion can be granted on

2   agreement.  The presentence report issue, could I

3   have for in camera review what the presentence

4   reports on those people that will be the

5   government's witnesses and then I can take a look at

6   the material in paragraph 4 that the defendant

7   seeks, which may be -- let me start back.

8            Have you turned over to Mr. Bussert that

9   which was turned over to defense counsel in the

10  Azibo Aquart trial?

11           MS. REYNOLDS:  Yes, your Honor.

12           THE COURT:  So this is beyond that.

13           MS. REYNOLDS:  I think, yeah, he's

14  seeking things like the guidelines calculations, et

15  cetera, which did not fall under what we need to

16  turn over.  Those are probation officers'

17  evaluations of the guidelines.

18           THE COURT:  But you are looking for

19  Brady material.

20           MR. BUSSERT:  I'm looking for Brady

21  material as well as, your Honor, I think there could

22  be a situation in terms of the offense conduct where

23  depending on what an individual witness testifies to

24  where they've had an opportunity to review the

25  offense conduct section of the PSR and have had an

 1   opportunity to review that with counsel, an

 2   opportunity to raise any objections they had to that

 3   section, and if they don't do that, I think that's

 4   in the ordinary course an adoption by the defense of

 5   the report as drafted.  And so to the extent they

 6   take any issue with whatever was submitted or what

 7   they submitted, I think that's something we would

 8   like to have available to us.

 9           THE COURT:  Let me take a look, if I

10   may.

11           MS. REYNOLDS:  Your Honor, yes, and just

12   so the Court is aware, at the trial of Azibo Aquart

13   we had filed a motion under seal and we had attached

14   all of the PSRs, and your Honor had -- so I don't

15   know if your Honor still has it.  We can provide it

16   again.

17           THE COURT:  I'm sure we have it

18   somewhere.

19           MS. REYNOLDS:  But your Honor had

20   undergone that sort of review.

21           THE COURT:  I know, I was sort of

22   looking to you for ease.

23           MS. REYNOLDS:  Yes, ma'am.

24           THE COURT:  Okay, thank you.

25           MS. REYNOLDS:  We will provide that,

 1    your Honor.

 2                 THE COURT:  And then there is a motion

 3    in limine about the government's argument, in

 4    essence, saying the government can't claim that

 5    Johnson himself murdered any of these victims or

 6    that he actually knew of the existence of the

 7    racketeering enterprise given the government's prior

 8    representation.  Is there a response the government

 9    wishes to make?

10                 MS. REYNOLDS:  No, your Honor.  We're

11    aware of our obligations as far as arguments and --

12                 THE COURT:  Do you disagree with the

13    essence of the defendant's assertion that the

14    government can't claim that Johnson himself actually

15    murdered any of the three victims?

16                 MS. REYNOLDS:  We do not disagree with

17    that, your Honor.  Obviously we're going to argue

18    what the -- what we expect the evidence to show and

19    we certainly don't expect the evidence to show that

20    he actually murdered them.

21                 THE COURT:  All right.

22                 MS. REYNOLDS:  Rather than aided and

23    abetted.

24                 THE COURT:  All right.  And we've

25    already talked about his actual knowledge of the

1    existence of the racketeering enterprise.

2              MS. REYNOLDS:  Correct, your Honor.

3              THE COURT:  All right.  So given that

4    the government recognizes and agrees, it seems to me

5    the motion in limine is moot.

6              Could I see the notice and the reports of

7    the agents just for comparative purposes to see what

8    we're talking about here.

9              MS. REYNOLDS:  In which one, the next

10   one?

11             THE COURT:  This is No. 1042, motion for

12   production of agents' notes.

13             MS. REYNOLDS:  Well, we should note for

14   the record that we have provided defense counsel

15   with the agent notes for all the proffers for his

16   client, for the defendant.

17             THE COURT:  Okay.

18             MS. REYNOLDS:  And we thought that would

19   be appropriate, particularly if the defendant

20   intends to take the stand he should have all

21   statements, including notes.  So, we have provided

22   those already.

23             THE COURT:  Paragraph 1 talks about not

24   only Mr. Johnson's statements, but also proffer

25   sessions relating to witnesses against him.  As to

1    those people that the government is going to call,

2    would it be expeditious if I looked at the notes in

3    relation to those reports just to be familiar with

4    what we're talking about as an issue potentially?

5            MS. REYNOLDS:  Again, your Honor, just

6    going back to the last trial, because the issue was

7    framed up at Azibo Aquart's trial with the regard to

8    agent notes with regard to two cooperating

9    witnesses, because there were composite 302s, in

10   that motion, in response to that, the government had

11   agreed, itself, to review those notes and compare it

12   to the 302's, turn over anything that was

13   inconsistent or different, or even arguably so, and

14   we underwent that with regard to Frank Hodges, who

15   will be a witness at this case, so he, and Rodney

16   Womble, who will not be a witness at this trial.

17           With regard to all of the other

18   cooperating witnesses, it was our position, and it

19   is still our position, that the defense has been

20   provided with our 302s.  We have reviewed agent

21   notes as far as to see if there is any Brady or

22   Giglio potential, and don't believe that there is,

23   that everything contained in the 302s is consistent

24   with those agent notes and that we don't have an

25   obligation, absent some showing, that agent notes

```
1    need to be turned over for every witness for every

2    case.

3              THE COURT:  So what you are saying is

4    you've given Mr. Bussert Frankie Hodges' notes.

5              MS. REYNOLDS:  No, we've given him his

6    client's notes for all his proffer statements.

7              THE COURT:  Okay.

8              MS. REYNOLDS:  The defendant's own

9    proffers, the notes from those proffer sessions.

10   With regard to Frankie Hodges, we reviewed those

11   notes, Mr. Bussert has the 302, and I think the way

12   it was framed up last time was with regard just to

13   composite 302's because there may be an issue in

14   that case.

15             THE COURT:  That's what I thought you

16   were saying was Frankie Hodges 302 was a composite.

17             MS. REYNOLDS:  One of them is a

18   composite, yes, but we've reviewed those notes and

19   there is nothing inconsistent with the agent notes

20   and the 302.  So during the last trial we didn't

21   turn over the agent notes, we just represented that

22   the 302 was consistent, there is nothing to be

23   provided to the defense.

24             At this trial I'm happy, if the Court

25   wants those notes, we can provide them or we can,
```

1  you know -- I just don't see what the showing is as

2  far as turning over agent notes for every cooperator

3  for every proffer session.  It's not our practice to

4  turn over agent notes when we've provided the 302.

5  And here we even have sworn testimony from another

6  trial.

7           THE COURT:  Let's do this, for the time

8  being, if you don't mind, let me just take a look at

9  the Hodges' set and see if there's anything that is

10  triggered, and then we'll proceed from there.

11           Is Mr. Whittingham going to be testifying

12  today?

13           MS. REYNOLDS:  No, he's not, your Honor.

14           THE COURT:  All right, so we don't need

15  to get to the 911 call issue.

16           MS. REYNOLDS:  Well, I think counsel is

17  seeking to exclude the 911 call altogether.

18           THE COURT:  There seems to be an

19  alternative position, which is just including

20  Mr. Whittingham's call leaving out the dispatcher to

21  officers part.

22           MS. REYNOLDS:  Well, this is an issue.

23  Our first witness is the 911 operator.  Our first

24  piece of evidence is the 911 call.  And it's our

25  view that it comes in as an excited utterance, it's

1    a present sense impression.

2              THE COURT:  Okay, that's as to

3    Whittingham, not as to the dispatcher.  In other

4    words, if what is played is Government's

5    Exhibit 100B, pages 1, 2 and 3 through "don't hang

6    up," and then resuming on page 5 with

7    Mr. Whittingham's saying "hello" and going through

8    page 6, "Leroy, do you know who did this to your

9    mom?"  Because that's -- that is Whittingham and the

10   dispatcher, and the rest seems to be the dispatcher

11   and others who will not be testifying.  Is that

12   right?

13             MS. REYNOLDS:  Who will not be -- the

14   other dispatchers you mean?

15             THE COURT:  The other conversation is

16   others to -- the conversation of the dispatcher with

17   others.

18             MS. REYNOLDS:  I guess I'm not clear.

19   We're not offering that for the truth of the matter.

20   That's just -- I mean 911 calls are not even

21   considered testimonial, really, it's almost like a

22   business record.  I mean, this is the 911 call

23   keeping everything -- you know, she's going to

24   explain what she does when a call comes in.

25             THE COURT:  So, the concept that the 911

1    call is not testimony is a bit broad, but what you

2    are saying is this isn't offered for the truth of

3    anything, it's just the background of what this

4    communication was all about.

5              MS. REYNOLDS:  Correct, and it explains

6    the steps she takes and what she does as a 911

7    operator when a call comes in and explains why the

8    police then respond to that location.  And we don't

9    believe that that's overly prejudicial or any other

10   prong of Mr. Bussert's motion.

11             THE COURT:  Mr. Bussert?

12             MR. BUSSERT:  Yes, your Honor, I guess

13   my first question is, is Mr. Whittingham -- is the

14   government indicating he's going to testify at some

15   point.  Because I know they identified him as a

16   witness in the first few days.

17             MS. REYNOLDS:  We had expected him to

18   testify in the first few days; he's not going to in

19   the first few days, but we do hope to have him

20   testify at some point in the trial.

21             MR. BUSSERT:  Because I think as an

22   initial matter, your Honor, this call can't come in

23   without Mr. Whittingham to authenticate that's him

24   who called in.

25             THE COURT:  But, I mean, obviously they

1    can link it up.

2              MR. BUSSERT:  Presumably, but again --

3              THE COURT:  So, my question for you is,

4    with respect to this 911 call, if it's not offered

5    for the truth of the matter but simply how the 911

6    calls are taken and what happens and the mechanics

7    of it, why is it excludable?

8              MR. BUSSERT:  Again, your Honor, I think

9    I differ with the government.  This isn't just

10   simply a business record.  I mean, this is an out of

11   court statement and we believe it is offered for the

12   truth in terms of --

13             THE COURT:  We're going to have

14   apparently the 911 operator, Ms. Guadagno.

15             MS. REYNOLDS:  Guadagno.

16             THE COURT:  Guadagno?

17             MS. REYNOLDS:  Yes.

18             THE COURT:  So it will not be out of

19   court.  She will be here to testify.

20             MR. BUSSERT:  As to what she said.

21             THE COURT:  A conversation, however, is

22   like one hand clapping if you only hear one side of

23   it.  To the extent the other part is not offered for

24   the truth, but simply to make the context complete,

25   I don't see what the problem is.  If you want a

1   limiting instruction to the jury.

2           MR. BUSSERT:  I guess this also gets to

3   the core of the prejudice issue, your Honor, which

4   is if the operator is going to come in and say

5   something to the effect of, I'm a 911 operator, on

6   the morning of August 24th I received a call about

7   possible homicides at 215 Charles Street and police

8   were called and dispatched, that's pretty matter of

9   fact.  To play this call, particularly whereas the

10  government has conceded Mr. Johnson is not alleged

11  to have actually killed any of these individuals, is

12  particularly prejudicial to him.

13          THE COURT:  Okay, I don't quite

14  understand that last link where he is alleged to

15  have aided and abetted the murders.  I don't

16  understand why you think it's more prejudicial

17  because he's alleged to have aided and abetted

18  versus having committed himself.

19          MR. BUSSERT:  Well, I think in the

20  context of Mr. Whittingham's statements where, you

21  know, the operator is even trying to elicit this, do

22  you know who did it, do you know who did it, he's

23  like, yeah, I know who did it.  The idea is who did

24  it.

25          THE COURT:  The question that is raised

```
1    in my mind, Ms. Reynolds, is, is there -- you had

2    anticipated that Mr. Whittingham would testify in

3    the first few days.

4              MS. REYNOLDS:  We anticipated he'd be

5    our second witness, your Honor.

6              THE COURT:  Is there some possibility

7    he's not going to be your witness?

8              MS. REYNOLDS:  Well, we very much are

9    trying to get him on the stand.

10             THE COURT:  Which is all to say should

11   we leave the playing of the call to the time that he

12   testifies?

13             MS. REYNOLDS:  I don't understand that

14   ruling, your Honor.  911 calls come in all the time.

15             THE COURT:  It's not a ruling, it's a

16   question.

17             MS. REYNOLDS:  Well, so I guess the

18   answer would be no.  We want to start this case.  We

19   have a right to present our evidence in a certain

20   way.  This 911 call comes in under the rules of

21   evidence.  It explains why the police responded to

22   that location, it puts the events into context, it

23   explains what this case is.  You know, it sets the

24   stage for August 24th.

25             THE COURT:  I agree with that, and the
```

31

1   only question was, is that premise changed if

2   Mr. Whittingham doesn't testify.  But, why don't we

3   proceed.

4           If you'd like a limiting instruction,

5   Mr. Bussert, with respect to the testimony as being

6   background, as being contextual, but not offered as

7   any evidence of who committed the murders.  Yes?

8           MR. BUSSERT:  And, your Honor, we'd also

9   ask, and I don't know what the government intends to

10  do with the operator, but that there be no questions

11  to the effect this was Mr. Whittingham who placed

12  the call.  I think in the call there a reference to

13  Leroy, whatever the call may be, but the call I

14  believe should speak for itself and the operator

15  should not try to identify who the caller was.

16          THE COURT:  No, he gives his name.

17          MS. REYNOLDS:  He does, he gives his

18  full name.

19          THE COURT:  He is known as --

20          MS. REYNOLDS:  They call me Leroy, Leroy

21  Whittingham.  She's not going to identify him.

22  She's a 911 operator.

23          THE COURT:  That's fine.  Who then are

24  your witnesses for today and tomorrow?

25          MS. REYNOLDS:  Your Honor, we'll start

1    with Maria Gaudagno, 911 operator, and then go to

2    Rosanna Mendoza who was one of the EMTs who

3    responded to the scene.  Karen O'Donnell was her

4    partner.  She had testified at the last trial, but

5    she's in Afghanistan.  And then we have Sandra

6    Holliday who had testified at the last trial, she's

7    from Quantico, she prepared the model and the

8    graphics that we intend to use.  And then we have

9    crime scene unit Detective Joette Devan, and we

10   would anticipate that would get us at least through

11   today because we anticipate trying -- we have

12   numerous, numerous exhibits to put in through the

13   crime scene unit.

14           And after Joette Devan, if we need to

15   call Detective Paul Ortiz or Detective Ricky Vargas,

16   who were also part of the crime scene unit, then

17   we'll call them for any loose ends, as far as if

18   there are any objections to some of these exhibits

19   coming in, and then our first cooperating witness

20   would be Jackie Bryant.

21           THE COURT:  All right, okay.  Are we

22   ready now to proceed?

23           MR. BUSSERT:  Few quick things, your

24   Honor, if I may.  With respect to the agents' notes

25   I'm just going back to that.  The government did

1    provide notes with respect to Mr. Johnson's proffer

2    sessions.  Those I believe are all Agent Munger's

3    notes.  If memory serves, Sergeant John Gonzalez and

4    Officer Donaldson, or Detective Donaldson, was also

5    present -- were present as well, we did not receive

6    any of those notes.

7              THE COURT:  Could I ask you to take your

8    issue up with Ms. Reynolds first to see if there

9    remains an issue.

10             MR. BUSSERT:  I could do that.

11             THE COURT:  Because I'm sure we're not

12   going to get to any of them in the next few days and

13   we've kept the jury waiting already.

14             MR. BUSSERT:  One other quick thing,

15   because I am noting this in the record from the last

16   case, if your Honor could issue a sequestration

17   order.

18             THE COURT:  All right.

19             MR. BUSSERT:  I'd appreciate that.  I

20   realize the case agents may be present, but

21   otherwise.

22             THE COURT:  All right, with the

23   exception of the case agents, then all people who

24   will be witnesses in this case must not be in the

25   courtroom until and unless they have testified, and

1   even thereafter they're not to speak with anyone

2   else who may be a witness.

3          All right, anything further?  Are we

4   ready to begin?

5          Good morning, Mr. Johnson.

6          THE DEFENDANT:  Good morning, ma'am.

7          (Jury entered the courtroom.)

8          THE COURT:  Good morning, ladies and

9   gentlemen.  Please be seated.  I'm sorry that you

10  have been kept waiting.  We have been here long

11  before you got here working out some final details

12  and that has run into your time, and we apologize.

13  We are here to begin the trial of United States of

14  America v. Efrain Johnson.  Our first order of

15  business is for you to be sworn to your duties as

16  jurors in this case.  Will you kindly stand and

17  raise your right hand.

18          (Oath administered)

19          THE COURT:  Please be seated, ladies and

20  gentlemen.  Now, I am going to give you some

21  preliminary instructions.  They are preliminary even

22  though they may seem a little long, but my purpose

23  is to introduce you to some of the legal concepts

24  that will be at issue in the case so that you have

25  at least some context in which to be listening to

1    the evidence.  Let me renew the introductions for

2    you.  The government here is represented by

3    Assistant U.S. Attorneys Alina Reynolds and Peter

4    Markle, and Mr. Efrain Johnson is represented by

5    Attorney Todd Bussert, and Mr. Johnson is next to

6    Mr. Bussert.

7              All right.  It will be your duty to find

8    from the evidence what the facts are, and you are

9    the judges of the facts.  You then apply those facts

10   to the law as I will give it to you.  And you have

11   to follow that law whether you agree with it or not.

12   Please remember that at no time is anything that I

13   say or do during the trial to be taken by you as in

14   any way indicating what your verdict should be.

15   That will be your exclusive province.  My work will

16   be with respect to issues of law.

17             The terms "counsel," "attorneys,"

18   "lawyers," those all mean the same thing.  When you

19   hear reference to "The Court," it means the

20   presiding judge.

21             And I want to just touch on what will be

22   considered evidence from which you will be finding

23   the facts.  It will be the testimony of witnesses,

24   it will be documents, it will be other things that

25   are received into the record as exhibits.  It will

1   be either direct or circumstantial evidence.  Direct

2   evidence is direct proof of a fact, such as

3   testimony of an eyewitness.  Circumstantial evidence

4   is proof of one fact from which you can infer or

5   conclude that another fact exists.  And you can

6   consider both kinds of evidence, circumstantial as

7   well as direct evidence.  The law, as a general

8   matter, doesn't make a distinction between direct or

9   circumstantial evidence, just puts the

10  responsibility with you to weigh the evidence and

11  determine whether the government has proved guilt

12  beyond a reasonable doubt.  You will be deciding

13  which witnesses you believe, which witnesses you

14  don't believe, how much of any witness's testimony

15  you accept or reject, what weight you should give to

16  a witness's testimony.

17        But there are certain things that are not

18  evidence, and I want to point that out at the

19  beginning because they're not to be considered by

20  you.  The statements or the arguments or the

21  questions of the lawyers, or if I ask questions,

22  those are not -- that's not evidence because it's

23  the testimony of the witness, that's the evidence.

24  Questions that are put to witnesses are not

25  evidence, the answers are.  Objections to questions

are not evidence.  The lawyers have an obligation to make an objection when they believe the evidence is being offered improperly under our Federal Rules of Evidence.  Please do not be influenced by the objection or by my ruling on it; those rulings are matters of law.  If the objection is sustained, then the question should be ignored, if its overruled, then you treat the answer as you would any other. There may be instances in which you are instructed that a limited -- that an item is received for a limited purpose only.  You must follow that instruction.  There may be testimony that I direct you to exclude or disregard.  That will no longer be evidence and you must not consider it.  Of course, anything that you heard or have seen outside the courtroom is not evidence and must be disregarded. Please remember the oath that you just took, you are to decide the case solely on the evidence that's presented here in the courtroom.

        The law presumes the defendant to be innocent.  The burden of proving his guilt beyond a reasonable doubt, therefore, is on the government throughout the trial.  The defendant has no burden of proving his innocence or producing any evidence at all, and that means that the government must

38

1    prove the defendant's guilt, he does not have to

2    prove his innocence.  He may remain silent and

3    present no evidence if he elects to do so and you

4    may not draw any negative inference or any inference

5    of any sort from his election.  You must presume

6    that the defendant is innocent throughout the case

7    and throughout your deliberations until such time,

8    if any, you are satisfied that the government has

9    proved his guilt beyond a reasonable doubt.  If the

10   government does not, you must reach a verdict of not

11   guilty.  If the government does meet its burden of

12   proving guilt beyond a reasonable doubt that the

13   defendant is guilty, then you should reach a verdict

14   of guilty.

15          Now, the indictment, which starts the

16   case, is simply a statement of what the government

17   claims.  It's not evidence of any sort about the

18   allegations that are in the indictment.  And Mr.

19   Efrain Johnson has pled not guilty to the four

20   charges against him in the indictment, and,

21   therefore, the government's burden of proving each

22   of the elements of those four counts beyond a

23   reasonable doubt is triggered, and the purpose of

24   this trial is to give the government that forum.

25          I'm going to give you now a synopsis.

1    I'm going to tell you what the indictment says.

2    Please understand it is what is alleged, it is not,

3    in and of itself, any evidence, but it will give you

4    at least a preliminary introduction as to what has

5    been charged and what the government will attempt to

6    prove.

7              Before it charges the four counts, the

8    indictment begins with what it calls introduction to

9    all counts, and I'm going to read portions of that

10   introduction to you.

11             Paragraph one of the indictment alleges

12   that Efrain Johnson, also known as Pootney, the

13   defendant herein, together with Azibo Aquart, also

14   known as Azibo Smith, D, Dreddy, and Jumbo; Azikiwe

15   Aquart, also known as Zee and Ziggy; Rodney Womble,

16   also known as Big Man; John Taylor, also known as

17   Big Boy; Frankie Hodges, also known as Steve;

18   Juanita Hopkins, also known as Vanessa; Nathaniel

19   Grant, also known as Stone; Randi Washington, also

20   known as Bear; James Rucker, also known as Pops;

21   Sherrel Randolph, also known as Sherrel Jones; and

22   Judith Rivera, who are charged in separate

23   indictments, and others known and unknown to the

24   grand jury, were officers, members and associates of

25   a criminal organization referred to in this

 1   superseding indictment as the "Aquart Enterprise,"

 2   or the "enterprise," whose members and associates

 3   engaged in various acts of criminal activity

 4   including murder, conspiracy to murder, assault and

 5   narcotics trafficking.  The Aquart Enterprise

 6   operated primarily within the Charles Street

 7   Apartments located at 215 Charles Street,

 8   Bridgeport, Connecticut.

 9          Paragraph 2 of the indictment alleges the

10   Aquart Enterprise, including its leadership,

11   membership and associates, constituted an enterprise

12   as defined under Title 18, United States Code,

13   section 1959(b)(2), that is, a group of individuals

14   associated in fact which was engaged in, and the

15   activities of which affected, enterprise and foreign

16   commerce.  The enterprise constituted an ongoing

17   organization whose members functioned as a

18   continuing unit for a common purpose of achieving

19   the objectives of the enterprise.

20          The indictment continues in paragraph 3

21   by alleging Azibo Aquart founded and was the leader

22   of the enterprise whose members and associates

23   distributed cocaine base, primarily in Bridgeport,

24   Connecticut.  Azibo Aquart employed street-level

25   narcotics dealers, including Hodges and Hopkins,

among others, to sell drugs on behalf of the
enterprise.  Azibo Aquart employed Womble as a
lieutenant to provide the dealers with crack
cocaine, to collect proceeds and to supervise and to
maintain control over the day-to-day operations of
the enterprise.

Azikiwe Aquart was employed by Azibo
Aquart to supervise and maintain control over the
activities of the street -level dealers.

Azibo Aquart also recruited and employed
Grant, Washington and Taylor to act as lookouts to
warn members and associates of the enterprise of
police activity in and around the Charles Street
Apartments, as well as of the trafficking activity
of rival dealers that threatened the vitality of the
Aquart Enterprise.

Defendant Efrain Johnson associated with
and was recruited by Azibo Aquart to participate,
and he did participate, in the murders of Tina
Johnson, James Reid and Basil Williams in order that
Johnson could gain entrance to and maintain and
increase his position in the enterprise and as
consideration for a promise and an agreement to pay
anything of pecuniary value from the enterprise.

John Taylor also associated with, and was

1    recruited by Azibo Aquart to participate, and he did

2    participate, in the murders of Tina Johnson, James

3    Reid and Basil Williams in order that Taylor could

4    gain entrance to and maintain and increase his

5    position in the enterprise and as consideration for

6    a promise and an agreement to pay anything of

7    pecuniary value from the enterprise.

8              Paragraph 4 of the indictment continues.

9    The members and associates of the Aquart Enterprise

10   sought, among other things, to:  A, preserve and

11   protect the power, territory and profits of the

12   Aquart Enterprise through the use of intimidation,

13   violence and threats of violence; B, promote and

14   enhance the criminal activities of the Aquart

15   Enterprise and its members and associates; and C,

16   generate income for members and associates of the

17   Aquart Enterprise through the sale and distribution

18   of narcotics.

19             Paragraph 5 of the indictment alleges,

20   the members and associates of the Aquart Enterprise

21   carried out criminal activities in furtherance of

22   the conduct of the enterprise's affairs.  Defendant

23   Efrain Johnson and other members and associates of

24   the enterprise participated in the conduct of the

25   affairs of the enterprise by the following means and

1    methods, among others:  A, obtaining large

2    quantities of crack cocaine which were then

3    repackaged and distributed in retail quantities to

4    the street-level dealers at locations in and around

5    the Charles Street Apartments in Bridgeport,

6    Connecticut.  The members and associates distributed

7    the narcotics, after which Azikiwe Aquart and his

8    associates would collect payment of the narcotics

9    trafficking proceeds from the dealers employed by

10   the enterprise;

11            And, B, committing, attempting to commit

12   and threatening to commit acts of violence,

13   including murder, attempted murder and assault to

14   protect and expand the Aquart Enterprise's criminal

15   operations.  These acts of violence were often

16   perpetuated in a conspicuous manner in order to

17   maintain control over members of the enterprise and

18   to deter anyone who posed a threat to the continued

19   vitality and success of the criminal activities of

20   the enterprise.  In particular, in or about the

21   summer of 2005, the enterprise became involved in a

22   narcotics trafficking dispute with a rival over the

23   right to sell crack cocaine within the Charles

24   Street Apartments.  This dispute resulted in members

25   of the enterprise confronting their rival and her

1   associates.

2             So that completes that part of what is

3   alleged in the indictment which the government will

4   attempt to prove.

5             Now, we're going to look at Counts One,

6   Two, Three and Four against Mr. Johnson, which

7   charge him with violating Title 18, United States

8   Code, section 1959.  I'm going to read that statute

9   for you.

10            Whoever, as consideration for the receipt

11   of, or as consideration for a promise or agreement

12   to pay anything of pecuniary value from an

13   enterprise engaged in racketeering activity, or for

14   the purpose of gaining entrance to or maintaining or

15   increasing position in an enterprise engaged in

16   racketeering activity, murders, kidnaps, maims,

17   assaults with a dangerous weapon, commits assault

18   resulting in serious bodily injury upon, or

19   threatens to commit a crime of violence against any

20   individual, in violation of the laws of any state or

21   the United States, or attempts or conspires to do

22   so, shall be guilty of the crime.

23            Counts Two, Three and Four, charge Efrain

24   Johnson with the substantive crimes of murder in aid

25   of racketeering, and Count One charges him with

1    conspiracy to commit those substantive crimes.

2              Conspiracy is a separate stand-alone

3    crime.  I'm going to begin by giving you an overview

4    of the law that's applicable to Counts Two, Three

5    and Four, because I think it will be of assistance

6    to you in understanding the separate crime charged

7    of conspiracy to commit those crimes.

8              So, Counts Two, Three and Four each

9    charge the defendant with murder in aid of

10   racketeering.  The charge, which is the same for

11   each of the three victims, reads as follows.

12             Paragraph 9.  At various times relevant

13   to the Superseding Indictment, the Aquart

14   Enterprise, as more fully described above, and I

15   read that to you, constituted an enterprise as

16   defined under 1959(b)(2), that is, a group of

17   individuals associated in fact which was engaged in,

18   and the activities of which affected, enterprise and

19   foreign commerce.

20             Paragraph 10.  From in or about fall of

21   2004, to about August 2005, the above-described

22   enterprise, through its members and associates,

23   engaged in racketeering activity, namely narcotics

24   trafficking, in violation of 21, United States Code,

25   841(a)(1) and 846, and acts involving murder in

1    violation of the laws of the State of Connecticut.

2              Paragraph 11 from the indictment.  On or

3    about August 24, 2005, in the District of

4    Connecticut, Efrain Johnson, also known as Pootney,

5    the defendant herein, together with Azibo Aquart,

6    also known as Azibo Smith, D, Dreddy and Jumbo; and

7    Azikiwe Aquart, also known as Zee and Ziggy; and

8    John Taylor, who are charged in separate

9    indictments, as consideration for the receipt of,

10   and as consideration for promise and an agreement to

11   pay, anything of pecuniary value from the

12   enterprise, and for the purpose of gaining entrance

13   to and maintaining and increasing their position in

14   the enterprise, an enterprise engaged in

15   racketeering activity, did unlawfully, willfully and

16   knowingly murder Tina Johnson, Count Two, James

17   Reid, Count Three, and Basil Williams, Count Four,

18   in violation of Connecticut General Statutes and all

19   in violation of the federal statute Section

20   1959(a)(1) and Title 18, United States Code, Section

21   2.

22             To prove the offenses that are charged in

23   Counts Two, Three and Four, the government must

24   prove beyond a reasonable doubt five elements of the

25   offense, and I'm going to go through those five

elements in summary form.  At the end of the case I
will be giving you a much more detailed charge, you
will have it in writing, but this is simply to begin
familiarizing you with the work ahead.

So here are the five elements of the
charges of murder in aid of racketeering.  One, that
on or about the date charged, August 24, 2005, an
enterprise affecting interstate commerce existed.
An enterprise is any association or group of
individuals associated in fact which is engaged in,
or the activities of which affect, enterprise or
foreign commerce.

To establish that an enterprise existed,
the government must prove:  1, a common or shared
purpose of engaging in a course of conduct; 2, an
ongoing and continuing formal or informal
organization or structure; 3, core personnel who
functioned as a continuing unit; and 4, that the
organization has an existence separate and
independent from the racketeering activity.

Interstate commerce is commerce between
one state or another.  The enterprise's effect on
interstate or foreign commerce need not have been
substantial.  A minimal effect is sufficient if the
enterprise itself, or the racketeering activities

1    associated with it, affect interstate commerce.

2              So that's the first element that the

3    government must prove beyond a reasonable doubt.

4              The second is that the enterprise, as I

5    just defined it for you, was engaged in racketeering

6    activity.  The Racketeer Influenced and Corrupt

7    Organizations Act, called RICO, defines the term

8    "racketeering activity" to mean the commission of

9    certain crimes, including those charged in the

10   indictment; that the enterprise, through its members

11   and associates, engaged in racketeering activity

12   consisting of murder, in violation of Connecticut

13   law, conspiracy to murder, assault and narcotics

14   trafficking in violation of federal law.

15             That's the second element.

16             The third relates to the defendant's

17   position in the enterprise.  The government must

18   prove beyond a reasonable doubt that the defendant

19   held a position or was seeking a position or was

20   associated with the racketeering enterprise.

21             Four, that the defendant committed a

22   violent crime.  The government must prove that the

23   defendant, Efrain Johnson, intentionally murdered or

24   aided and abetted the murder of Tina Johnson, James

25   Reid, and/or Basil Williams, and/or caused their

1    deaths during a robbery, burglary or kidnapping or

2    an attempt to commit those crimes.

3            And fifth, with respect to the

4    defendant's purpose, the government must prove that

5    the defendant's purpose in committing the murder, or

6    aiding and abetting its commission, was for the

7    purpose of gaining entrance to the racketeering

8    enterprise or as consideration for the receipt of,

9    or as consideration for a promise or an agreement to

10   pay, anything of pecuniary value from the charged

11   enterprise.

12           So, those are the five elements of Counts

13   Two, Three and Four, which are the substantive

14   murders in aid of racketeering charges related to

15   each of the three victims.  So now I want to go on

16   and give you a broad definition of Count One, which

17   is conspiracy to commit murder in aid of

18   racketeering.

19           Count One specifically reads, paragraph

20   6, at various times relevant to the superseding

21   indictment, the Aquart Enterprise, as more fully

22   described in the paragraphs 1 through 5 that I read

23   to you, constituted an enterprise as defined under

24   the United States Code.

25           Paragraph 7, from in or about fall of

1    2004 to in or about August of 2005, the

2    above-described enterprise, through its members and

3    associates, engaged in racketeering activity, namely

4    narcotics trafficking, in violation of federal law,

5    and acts involving murder, in violation of

6    Connecticut state law.

7              Paragraph 8, in or about August of 2005,

8    and continuing to on or about August 24, 2005, in

9    the District of Connecticut, Efrain Johnson, also

10   known as Pootney, the defendant herein, together

11   with Azibo Aquart, also known as Azibo Smith, D,

12   Dreddy and Jumbo, and Azikiwe Aquart also known as

13   Zee and Ziggy, who are charged in a separate

14   indictment, as consideration for the receipt of, and

15   as consideration for a promise and an agreement to

16   pay, anything of pecuniary value from the

17   enterprise, and for the purpose of gaining entrance

18   to and maintaining and increasing his position in

19   the enterprise, an enterprise engaged in

20   racketeering activity, did unlawfully, willfully and

21   knowingly conspire to murder Tina Johnson and her

22   associates, in violation of Connecticut state law,

23   all in violation of federal law.

24              Let me just spell Aquart for you.

25   A-Q-U-A-R-T.  I'm pronouncing it Aquart, I'm

1     spelling it for you because people might be

2     pronouncing it differently during this trial.

3             The government must prove five elements

4     of the conspiracy charge:  1, that on or about the

5     date charged in Count One, August 24, 2005, an

6     enterprise affecting interstate commerce existed; 2,

7     that the enterprise was engaged in racketeering

8     activity; 3, that the defendant was associated with

9     or held a position, or was seeking to hold such a

10    position in the enterprise; 4, that the defendant

11    knowingly and willfully conspired with others to

12    murder another individual; and 5, that defendant's

13    purpose in conspiring to murder another individual

14    was either to maintain or increase his position in

15    the racketeering enterprise, or as consideration for

16    the receipt of something of pecuniary value from the

17    enterprise.

18            Now, this word "conspiracy" means a

19    combination or an agreement of two or more persons

20    to join together to attempt to accomplish some

21    unlawful purpose.  It's a kind of partnership in

22    criminal purposes in which each member becomes the

23    agent of every other member.  One can become a

24    member of a conspiracy without full knowledge of all

25    of the details of the unlawful scheme or the names

1    and identities of all of the other alleged

2    conspirators.  A conspiracy, as I indicated earlier,

3    is an offense separate from the actual commission of

4    any offense that may have been committed pursuant to

5    the conspiracy.

6          So the government must prove there was a

7    mutual understanding, spoken or unspoken, between

8    two or more people to cooperate with each other to

9    accomplish an unlawful act.  The government doesn't

10   have to show that the alleged members of the

11   conspiracy entered into any express or formal

12   agreement or directly stated between themselves the

13   details of the scheme or its objects or purpose, or

14   the precise means by which the object or purpose was

15   to be accomplished.  Moreover, the defendant need

16   not have been informed of all of the details, or the

17   scope, of the charged conspiracy in order to justify

18   inference of knowledge on his part.

19         Because Count one alleges only a

20   conspiracy to commit murder in aid of racketeering,

21   the government need not prove that the defendant

22   actually committed a murder.  The defendant must

23   prove that Efrain Johnson knowingly and

24   intentionally conspired with others to commit murder

25   and that one of the purposes for doing so was to

1    maintain or increase his position in the

2    racketeering enterprise, or as consideration for a

3    promise or agreement to pay anything of pecuniary

4    value from the enterprise.

5            That's all I'm going to tell you right

6    now about the substantive counts in the indictment.

7    I hope that gives you some framework for what is to

8    be presented to you.  Now, a few words about your

9    conduct as jurors.

10           Until the case is submitted to you at the

11   end of all of the evidence and after I have charged

12   you fully on the applicable law, you must not

13   discuss this case with anyone, even with your fellow

14   jurors.  You've been brought together ultimately to

15   discuss this case and deliberate among you, but

16   until you've heard all of the evidence, all of the

17   charge, the closing arguments of counsel, you must

18   not discuss it with each other.  There are two

19   reasons for that.

20           Number one, if -- because evidence is

21   presented to you in a line, if you will, and not a

22   total picture at one time, if you were to begin

23   discussing the case, you might prematurely make

24   decisions that would turn out to be either

25   inaccurate or erroneous in light of the overall

1    context of the testimony that you are to hear.  And

2    secondly, because the strength of the jury is the

3    deliberation of all 12 of the jurors together and

4    always at the same time.  So that if two or three of

5    you break off and have independent discussions, it

6    does not -- it is not deliberation.  So that is why

7    you must not discuss it even though you are

8    ultimately brought together for that purpose.

9         When the case is submitted to you, you

10   must discuss it only in your jury room and only with

11   your fellow jurors.  It's important you keep an open

12   mind throughout this trial, that you not decide any

13   case until the entire case has been submitted to you

14   under my instructions.

15        I'm going to remind you of the oath you

16   just took.  You do solemnly swear that you will

17   consider the matters in issue between the government

18   and the defendant according to the law as the judge

19   shall instruct you, and based upon the evidence

20   presented in court, and that you will render a true

21   and just verdict.  During the course of the trial

22   and until you have announced your verdict in court,

23   you will speak nothing to anyone of the case now

24   before the court, nor shall you permit any person to

25   speak to you concerning the same.  After your

```
1    verdict has been announced in court, you will speak
2    nothing -- you will speak to no one concerning the
3    deliberations or the vote of the jury or of any
4    individual juror other than yourself unless the
5    presiding judge gives you permission to do so.
6            So do not discuss this case amongst
7    yourselves, do not discuss this case with anyone.
8    When you are in your offices or at home and people
9    want to know what you are doing, you just simply say
10   you are a juror, you can't discuss it.  All right?
11           Second, because everybody uses the same
12   front entrance to the courthouse, it is possible you
13   will meet outside our courtroom the lawyers,
14   witnesses, court personnel.  Everyone may seem
15   distant and unfriendly you to, and that is what we
16   intend because you are not to have substantial
17   contact with anybody outside that's related to this
18   case outside the formal court setting.  So, if you
19   will kindly be aloof yourselves and not be offended
20   by any apparent aloofness on the part of any of us,
21   that will be as it will be.  The fairness of a trial
22   is not only in its substance, but also in its
23   appearances.  If you were to have any conversation
24   with a witness or a lawyer in this case, no matter
25   how innocent, it may give an impression or an
```

1    appearance of some improper communication or

2    influence.  So that's how everyone has to behave.

3    Please do not hold it against any party.

4            Third, very important, do not do any

5    research.  Do not make any investigation about the

6    case on your own.  Do not deviate from your normal

7    route to pass by any place of significance, and do

8    not do any Internet research.  You're going to

9    decide this case solely on what's presented to you

10   in this courtroom.  Do not use any electronic device

11   or media, whether it be your cell phone, your Smart

12   phone, your BlackBerry, your computer, Internet,

13   texting, IM, chat rooms, blogs, web sites, et

14   cetera, to communicate or to receive from anyone any

15   information about any aspect of this case or anybody

16   involved in this case.  Just do not do any research

17   until after you've been excused from the case.

18           All right, so these preliminary

19   instructions, I hope, will begin to orient you as

20   you hear the evidence.  You will later have

21   instructions in writing as well as orally in much

22   greater detail.  But please try to bear in mind the

23   principles I've given you both with respect to your

24   duty as jurors as well as the charges in the

25   indictment.  Keep an open mind until you have heard

1    the evidence and my final instructions.

2              You've been provided with notebooks.  You

3    certainly may take notes during this case.  They're

4    for your own personal use, they aren't to be given

5    or used by anybody else.  And you should not share

6    them or consider another juror's notes at any time.

7    When you have a recess, please leave your notebooks

8    on your chairs.  At the end of the day, please leave

9    them also on your chairs, Ms. Torday will collect

10   them, secure them, and then redistribute them.

11             We will begin our trial now with the

12   parties' opening statements.  After which, because

13   the government bears the burden of proof, it will

14   begin to present its evidence in support of the

15   charges that I have outlined to you.  After the

16   government has presented its evidence, the

17   government -- excuse me, the defendant may, but it

18   has no obligation to, present evidence.  And the

19   government, if the defendant does, the government

20   may have rebuttal evidence.  After that evidence is

21   in, I will then instruct you on the law, the lawyers

22   will then present their closing arguments to

23   summarize and interpret the evidence for you from

24   their standpoint, and after that you will then

25   retire to begin deliberating on your verdict of

```
 1    guilty or not guilty, which will be required to be

 2    unanimous.

 3              All right, we will start then.  I will

 4    call on the government for its opening statement.

 5              Mr. Markle.

 6              MR. MARKLE:  Thank you, your Honor.

 7              Good morning, ladies and gentlemen.

 8              THE COURT:  I'm not sure that microphone

 9    is on, Mr. Markle, would you touch the end of it.

10              MR. MARKLE:  I don't think it's hooked

11    up.

12              THE COURT:  All right, let's just speak

13    loudly, please.

14              And if you can't hear at any point,

15    ladies and gentlemen, please raise your hand.  This

16    evidence is being presented for you.  If you can't

17    hear it, it's wasted.  All right.

18              MR. MARKLE:  Good morning.  Ladies and

19    gentlemen, in a few moments the evidence in this

20    trial will commence and the witnesses will begin to

21    tell you what they found and what they did on

22    August 24, 2005, at apartment 101 at 215 Charles

23    Street in Bridgeport, Connecticut.  You will hear

24    about an open window, a screen outside on the

25    ground, screws on the table, duct tape, torn pieces
```

1    of latex gloves, a missing cell phone, a door

2    drilled shut from the inside, DNA, fingerprints,

3    blood splattered all over the room, and three

4    victims bound, beaten, bloodied, bludgeoned in their

5    own bedrooms.  People robbed of their possessions

6    and robbed of their lives, and the significance of

7    what is found and what is not found on August 24,

8    2005, in apartment 101 will be established over the

9    course of this trial.

10              You will begin at apartment 101 on

11   August 24th at the scene of the crime, and you will

12   view it through the eyes of those who were first to

13   respond.  And then you will be taken up one floor to

14   apartment 211, the hub of the drug enterprise, which

15   the testimony will establish was led by Azibo

16   Aquart, where the evidence will establish crack

17   cocaine is sold 24 hours a day, seven days a week.

18              The witnesses will introduce you to the

19   drug world and the violence associated with it.  A

20   world where ordinary items take on new and nefarious

21   meanings and uses.  You will learn from witnesses

22   how baggies, for instance, are used to hold crack,

23   not kids' sandwiches; how plastic containers are

24   used to store marijuana, not gumballs.  Witnesses

25   will tell you how they found or saw or used duct

60

```
1    tape, latex gloves, a drill, masks and bats,

2    ordinary items employed in unfamiliar and criminal

3    ways, according to those who were witness to their

4    usage.

5              And then you will return to apartment

6    101, the place where Leroy Whittingham saw that

7    morning what he will forever try to, but never will

8    be able to, forget, and you will view that scene

9    through the eyes of an eyewitness participant and a

10   number of forensic experts.  His mother, Tina

11   Johnson, as the evidence will establish, her wrists

12   were bound by duct tape, her ankles were bound by

13   duct tape, her mouth was wrapped with duct tape.

14             Tina Johnson, age 42, 251 pounds,

15   5'9 tall, and the medical examiners will tell you

16   that the cause of death was blunt traumatic head

17   injuries, and the manner of death was homicide.

18             And James Reid, similarly bound by duct

19   tape, age 40, 165 pounds, 5'6 tall, and the medical

20   examiner will tell you cause of death, blunt

21   traumatic head injuries, manner of death, homicide.

22             And Basil Williams, age 54, 139 pounds,

23   5'2 tall, bound with duct tape, cause of death,

24   blunt traumatic head injuries, manner of death,

25   homicide.
```

1          You will hear firsthand accounts from the

2    first to respond, EMT Rosanna Mendoza, and lead

3    crime scene investigator Joette Devan, who was

4    responsible for searching the scene and preserving

5    the evidence.  They will introduce you to the crime

6    scene and the physical and forensic evidence found

7    and collected at apartment 101.  Evidence,

8    photographs, descriptions, disturbing to view or

9    listen to, but critical to an understanding of what

10   took place in the early morning hours of August 24,

11   2005.

12          What will follow, ladies and gentlemen,

13   is not television, not CSI, not Law and Order.

14   There were no lights, there were no cameras, only

15   action, horrific action at apartment 101, 215

16   Charles Street on August 24th.

17          The crime scene investigators will

18   explain how they put their training and experience

19   into action that morning.  You will learn of the

20   protocol they followed and how they took three days

21   to investigate the scene, collect and secure the

22   evidence, photograph and preserve the crime scene.

23   And forensic experts will testify of the

24   significance of evidence seized over the course of

25   those three days, findings based on their expertise,

1  findings made and based on testing, analysis,

2  comparison, examination, and years of training and

3  experience.

4          And by the end of the trial, after you

5  have viewed the crime scene and the evidence through

6  the eyes of Mendoza, the EMT; the eyes of Joette

7  Devan, the lead crime scene investigator; the eyes

8  of the medical examiners; the eyes of John Taylor, a

9  participant in the murders, and you have heard the

10 testimony and findings of DNA forensic expert

11 Christine Roy, and the testimony and findings of

12 fingerprint expert John Pleckaitis, and the

13 testimony and findings of blood spatter expert Tom

14 Martin, and Special Agent Chris Munger of the FBI

15 tells you about admissions made by the defendant,

16 Efrain Johnson.  Lashika Johnson, the defendant's

17 sister, tells you that her brother admits to her

18 that he was there on August 24, 2005.  He was in

19 apartment 101, and there were four of them, and they

20 had bats, and she will testify and tell you that

21 following the murders they, her brother, the

22 defendant, Azibo Aquart and Azikiwe Aquart came to

23 her apartment.

24          After all of that testimony you will know

25 what happened leading up to, in the course of and

1    after the murders.  The evidence will allow you to

2    know what happened, how, and most importantly, who

3    committed and aided and abetted these murders.

4            But to learn why these murders were

5    committed, the witnesses, the evidence, the

6    testimony will lead you up one flight of stairs to

7    apartment 211, 215 Charles Street, and back in time

8    to the summer of 2004, because the testimony will

9    establish that it is then and it is there that the

10   events culminating in the murders of Tina, James and

11   Williams commenced.

12           The witnesses will establish that

13   apartment 211 was the epicenter of Azibo Aquart's

14   drug trafficking enterprise, and much of the

15   evidence in this case will focus on Azibo Aquart and

16   apartment 211 because, although Azibo Aquart is not

17   on trial, the government must establish that an

18   enterprise existed.  The evidence will establish

19   that he was the founder and undeniably, indisputably

20   the leader of the Aquart Enterprise, the enterprise

21   named in the indictment, an enterprise, a criminal

22   organization, which the witnesses will explain to

23   you engaged in murder and narcotic trafficking.  You

24   will learn of the enterprise and the members of it

25   and the defendant's association with it.

```
1              And the witnesses will establish that it

2    was an enterprise that some sought entrance into,

3    they wanted to join it.  Some sought to maintain

4    their place in it, they wanted to keep their job,

5    keep their position.  And some received value from

6    the enterprise, pecuniary value, payment in drugs

7    and/or money.

8              The witnesses, Jackie Bryant, Juanita

9    Hopkins, Frankie Hodges, Sherrel Randolph, Lashika

10   Johnson, John Taylor will testify that Azibo Aquart

11   supplied the drugs.  He decided who sold drugs in

12   and around the Charles Street Apartments, he amassed

13   the profits, and he decided what was to be done to

14   those who violated his rules.  And the witnesses

15   will establish that he is the catalyst for what

16   happened, what occurred on August 24th.  He was the

17   leader of the enterprise according to every witness

18   familiar with his drug operation.  And the evidence

19   will establish that these murders were committed on

20   behalf of that enterprise.

21             But you cannot be a leader, as the

22   evidence will demonstrate, if you do not have

23   followers.  And the witnesses will establish and

24   explain how his drug enterprise needed and had

25   workers, sellers, lieutenants, lookouts, enforcers.
```

1      Many of those workers they will testify and they

2      will tell you that they engaged in this criminal

3      activity for varied reasons:  Some did it out of

4      fear; some due to their own drug addiction; some for

5      greed, to gain or earn a position, or to enhance

6      their position in his drug enterprise; and some for

7      pecuniary gain, something, anything of value in the

8      form of drugs and/or money most often.

9              The witnesses will tell you that

10     customers entered and exited apartment 11 -- 211,

11     persons addicted to crack buying crack, persons

12     addicted to crack selling crack, every day of the

13     week at all hours, day and night.  And the witnesses

14     will inform you that sometimes sellers changed or a

15     lieutenant or an enforcer was replaced or workers

16     got arrested or the apartment was raided, but the

17     enterprise never stopped existing, functioning or

18     thriving.  And they will tell you that the leader,

19     Azibo Aquart, always remained the constant

20     denominator.

21             And you will learn from John Taylor,

22     Sherrel Randolph and Lashika Johnson, and the

23     defendant's own admissions, that the same was true

24     as to Azibo Aquart's marijuana trafficking.  The

25     evidence will establish that he supplied Lashika

1    Johnson, the defendant's sister; he supplied John

2    Taylor, the defendant's accomplice; and he supplied

3    the defendant himself, Efrain Johnson.

4              And the evidence will establish that

5    Taylor and Lashika and the defendant sold his

6    marijuana for profit, to make money.  The witnesses

7    will allow you to understand that to his sellers, to

8    the defendant, to Taylor, to Lashika, to Bryant,

9    Hopkins, Hodges, and to him, Azibo Aquart, drugs,

10   whether it was crack cocaine or marijuana, had

11   value.  For some it was valuable because, as they

12   will tell you, it fed their addiction.  For others,

13   they will testify, it was their means of income.

14             The evidence will establish that in

15   regard to the defendant, Azibo Aquart was his source

16   of supply, his marijuana connection, and in the

17   summer of 2005, his present and future means of

18   making money.  And the witnesses will testify about

19   this mutual dependency, customers needed the

20   enterprise's drugs, sellers sold and returned for

21   payment in drugs or money, and Azibo Aquart and the

22   enterprise profited as long as sales continued

23   unabated.  And the witnesses will explain in their

24   own words how the drug operation was premised on

25   violence, greed, profit and domination, and how

1  trusts and allegiances and loyalty came not from

2  doing good together, but from engaging in bad

3  together.

4          And the evidence will establish that a

5  rival competitor's threat to your operation or a

6  seller's breach of the rules may be relatively

7  insignificant, but it must be dealt with, and

8  although the compensation of the workers and the

9  amount of money or drugs they received is relatively

10  small, it is often sufficient in the drug world to

11  motivate persons to act, and their actions, as you

12  will learn from the evidence in this case, often

13  entailed violence.

14          Hopkins, Hodges, Randolph, Lashika,

15  Bryant and others will establish that the

16  enterprise, although not especially sophisticated,

17  was efficient, prolific and profitable.  They

18  supplied the product to a steady stream of customers

19  and they got their pay in drugs or in money, Aquart

20  got his drug profits, and all was good at 215

21  Charles Street until the summer of '05.

22          It is then, August of 2005, that the

23  evidence will establish that a person, subsequently

24  a victim, Tina Johnson, addicted to crack, who used

25  to buy crack from the Aquart organization, began to

1    sell small quantities of crack to support her own

2    habit.  And the evidence will show that despite the

3    fact that her drug sales did not come close to

4    rivaling Aquart's, it had to be addressed.  But Tina

5    would not be deterred, and despite efforts to

6    intimidate her, she refused to back down.  And the

7    evidence will show that for that, Azibo Aquart

8    decided she must die, and not only Tina, but her

9    boyfriend James and her friend Basil Williams.

10          The evidence will establish that the

11   competition was not greeted as a challenge, it was

12   not welcomed, it was eliminated.  A message had to

13   be sent that no one sells at 215 Charles Street

14   unless they are part of Azibo Aquart's enterprise.

15   Hodges, Bryant, Hopkins will tell you that, Taylor

16   will tell you that.

17          And the evidence will establish that he,

18   Aquart, enlisted, he recruited three people to help

19   him deliver the message.  Again, the leader needed

20   followers, people to help him carry out his mission.

21   John Taylor will tell you who was chosen for this

22   mission.  Taylor knows because Taylor was selected.

23   He was present.  He was one of them.  And he will

24   tell you that the other two were Azibo's brother,

25   Azikiwe Aquart, and the defendant, Efrain Johnson.

1          And John Taylor will bring you into the

2     heart of these murders because he was there.  He

3     will tell you how on August 24, 2005, he, along with

4     Azibo Aquart and Azikiwe Aquart and the defendant,

5     Efrain Johnson, all met in the underground garage at

6     the Charles Street building.  And there the four put

7     on latex gloves and masks and went upstairs to the

8     victims' apartment.  Azibo Aquart had a gun, Azikiwe

9     Aquart and Efrain Johnson, the defendant, had bats,

10    which the defendant, Efrain Johnson, had brought

11    with him, and Taylor's job was to take care of

12    Leroy, Tina's son, in the event he was found in the

13    apartment or came to the apartment.

14          And when they got to the apartment, he

15    will tell you the door was kicked in and the four

16    rushed inside.  Azibo Aquart pointed his gun at the

17    victims and demanded they get on the ground, and

18    then as Azibo Aquart and Azikiwe and Efrain Johnson

19    bound the victims with duct tape rendering them

20    defenseless, Taylor blocked the front door with

21    furniture and stood guard by the window of the

22    apartment to make sure nobody came, came in.

23          Taylor will tell you that shortly after

24    that he heard a horrible sound and he looked around

25    the corner and walked down the short hallway and he

saw Azibo Aquart hitting Tina Johnson over the head

with a baseball bat and he saw Azikiwe Aquart

striking James Reid with a baseball bat and he saw

the defendant standing at Basil's doorway as Basil

lay on the floor of his bedroom.

Ladies and gentlemen, you are not going

to like John Taylor.  He was part of this horrible

crime.  He was not caught until four and a half

years later after it was committed, and when he was

caught, he lied, and he lied again.  But he will

testify and he will tell you that he has now taken

responsibility for his role in these offenses.  He

has pled guilty to three counts of murder and he

will be here to testify about what he did, what the

defendant Efrain Johnson did, and what Azibo and

Azikiwe Aquart did.  The reality is you may not like

some or most of the witnesses put on by the

government.  They engaged in criminal acts, plain

and simple.  They're people who chose either through

greed or drug addiction to earn a living by selling

drugs and committing crimes.

These people are called cooperating

witnesses.  Some of them are here testifying

pursuant to cooperation agreements with the

government.  That means they're not testifying out

1    of the goodness of their hearts.  You will have

2    those agreements and they will tell you that they

3    hope their cooperation would allow the judge who

4    sentences them to give them less time in prison.

5            But it's important, critical to remember,

6    that trials are not about whether or not you like

7    the witness, trials are about whether or not you

8    believe the witness.  So, we invite you to listen

9    closely to their testimony, scrutinize it, compare

10   it to all of the other evidence in this case.  And

11   the evidence will establish that in late

12   August 2005, Azibo Aquart selected three persons to

13   aid and abet his criminal mission, John Taylor,

14   Azikiwe Aquart and defendant, Efrain Johnson.  Each

15   had earned his trust and now each would have a role

16   in the offense, in the home invasion and murders;

17   his brother, a lieutenant in the enterprise, the

18   evidence will show, and Taylor and Johnson, who had

19   sold his marijuana for months, Taylor who had

20   recently travelled south with him, and the

21   defendant, the brother of Azibo Aquart's girlfriend.

22   And John Taylor will tell you that those were the

23   four accomplices, the co-conspirators, the

24   participants.  Taylor, who pleaded guilty to three

25   counts of murder, he will tell you he was one of

1  them, as was Azikiwe Aquart, whose fingerprints are

2  found, according to fingerprint expert Pleckaitis,

3  in four places on two plastic bags laying next to

4  Basil Williams' fractured skull, and the DNA found

5  in apartment 101, according to forensic expert

6  Christine Roy, is consistent with him having left it

7  there.

8          And Azibo Aquart, was one of them, whose

9  own fingerprints are on duct tape attached to the

10 two bags bearing his brother's prints laying next to

11 Basil Williams' fractured skull.  And DNA is found

12 in apartment 101 consistent with him having left it

13 there, according to DNA expert Christine Roy.

14         And Efrain Johnson, the defendant, is

15 one of them, whose DNA is consistent with that left

16 and found inside a piece of a torn latex glove stuck

17 to the duct tape binding Tina Johnson's wrist.  The

18 same Efrain Johnson, who, according to cell phone

19 records, is in telephonic contact with Azibo Aquart

20 six times in the early morning hours of August 24,

21 2005, leading up to and immediately following the

22 murders.

23         The same Efrain Johnson, the defendant,

24 who was questioned by agents, as Special Agent Chris

25 Munger of the FBI will testify, on March 6, 2011,

and initially tells them he hasn't been to Charles

Street in eight or nine years.  And when told his

DNA was found there on August 24, 2005, the

defendant changes his story and tells them, I went

there the night before the murders, I knocked on the

door for Dreddy, who we know is Azibo Aquart, and I

argued with a woman and I spit on her.

And FBI Special Agent Munger will tell

you that he then informed the defendant that the DNA

was found in a torn piece of latex glove found in

the duct tape binding Tina's wrists.  And Special

Agent Munger will tell you the defendant paused and

then asked if he could start over and he began to

tell the truth, that he was there in apartment 101

on August 24, 2005, with Azibo Aquart and Azikiwe

Aquart and John Taylor, and he wore gloves and he

helped duct tape the lady.  But not the whole truth,

and you will know that because his own sister, the

defendant's sister, will tell you that he told her

more than he ever told the agents.

No one witness or piece of evidence will

establish the defendant's guilt beyond a reasonable

doubt.  But in the end, when you view the evidence

in its entirety, it will establish beyond a

reasonable doubt that on August 25, 2005, after an

1    unsuccessful effort to gain entry only days earlier,

2    four men, the same four men, returned to apartment

3    101.  And the witnesses and evidence will establish

4    that they did so at approximately 4:00 a.m. in the

5    morning, both times armed with bats provided by the

6    defendant, a gun carried by Azibo Aquart, and a

7    drill and duct tape.  Both times all four men wore

8    latex gloves, both times all four men wore masks,

9    and this time, the evidence will establish, they

10   forced their way in, they restrained the victims,

11   they attacked the victims and they left with the

12   victim's phone and money.  But they took much more,

13   they took the lives of Tina, James and Basil.

14           And in the final analysis the evidence

15   and testimony does not allow this case to remain a

16   mysterious who-done-it because the evidence and

17   testimony will establish that despite their efforts,

18   the defendant and his accomplices left evidence

19   behind on August 24.  Their gloves tore.  His, the

20   defendant's, and theirs, his accomplices', DNA was

21   left behind.  His accomplices' fingerprints were

22   left behind.  And subsequently the defendant himself

23   made admissions and witnesses cooperated allowing

24   you to enter their world and to see what took place

25   behind the door of apartment 211 and what took place

1    behind the door of apartment 101, and to see the

2    faces behind the masks worn by the intruders on

3    August 24, 2005.

4              And the witnesses, the physical evidence,

5    the forensic evidence, the admissions of the

6    defendant, the evidence, again, in its entirety,

7    will allow you to see behind those masks, and you

8    will see Azibo Aquart, Azikiwe Aquart, John Taylor

9    and the defendant, Efrain Johnson.

10             Ladies and gentlemen of the jury, in a

11   few minutes, following Attorney Bussert's opening,

12   the evidence will commence, and that is when the

13   facts will begin to be established, the proof which

14   you need to fulfill your oath as jurors, because

15   when attorney -- what Attorney Bussert says and what

16   I have said are not evidence, as her Honor has

17   instructed and cautioned you.  That is because we

18   were not there, we are not witnesses.  We, Assistant

19   U.S. Attorney Reynolds and I are not here as

20   witnesses, we are here, along with Special Agent

21   David Dillon and Special Agent Chris Munger of the

22   FBI, to represent the United States of America in

23   her Honor's courtroom.  It will be our

24   responsibility to present to you in this courtroom

25   the witnesses and evidence which establish the

1  defendant's guilt beyond a reasonable doubt.  We

2  will seek to introduce the evidence and ask the

3  questions which will elicit the answers, the facts

4  you need to properly carry out your duty.  And if we

5  do our job properly and you perform your duty

6  properly, according to your oath as jurors, you will

7  achieve justice, and that is what this trial is all

8  about.

9           Thank you.

10          THE COURT:  All right, thank you.

11 Mr. Bussert.

12          MR. BUSSERT:  Thank you, your Honor.

13 Your Honor, can I take objections at the break?

14          THE COURT:  Yes, at the break.

15          MR. BUSSERT:  Good morning.  There's no

16 question that Efrain Johnson was in the apartment at

17 Charles Street, apartment 101 at 215 Charles Street

18 in the morning hours of August 24, 2005.  He's told

19 federal prosecutors, these federal prosecutors, that

20 very fact time and time again.  This is not a case

21 about whether or not Efrain Johnson was present.

22          This is also not a case ultimately about

23 Azibo Aquart's enterprise, at least with respect to

24 Mr. Johnson.  We have no doubt that the government

25 will prove and establish that Azibo Aquart and

1    people working for him sold crack cocaine out of the

2    Charles Street Apartments.  What the government will

3    not show, and we don't anticipate will show, is that

4    Efrain Johnson had any knowledge of those crack

5    distribution activities.

6            And I say in part we believe it because,

7    again, Mr. Johnson has told the government this.

8    And I say we anticipate because the government gives

9    us discovery, gives me discovery as defense counsel,

10   helping me understand what these witnesses are going

11   to say, it's part of the normal trial process, and

12   nothing in that discovery, nothing to date,

13   indicates that a single witness will come in here

14   and say that Efrain Johnson had any involvement with

15   the crack distribution activities at the Charles

16   Street Apartments, had no knowledge, had no

17   involvement.

18           The first time that he was at the Charles

19   Street Apartments was on the early morning hours of

20   August 24, 2005.  The day before he had seen Azibo

21   Aquart.  He knew Azibo Aquart.  He purchased

22   marijuana from Azibo Aquart.  Why does the

23   government know this?  Because Efrain Johnson told

24   them this.  In terms of their dealings, what Efrain

25   did was buy small personal use quantities of

1    marijuana, and sometimes he would buy a little bit

2    more because, as you will hear from other

3    cooperating witnesses, when you use drugs, as Efrain

4    did, he smoked marijuana, you sometimes get a little

5    bit more and you go in with friends, you collect the

6    money, get a little bit extra for yourself,

7    essentially it pays for itself.  If you want to use

8    marijuana, why not get some extra so you can get it

9    for free.  He's explained this to them.

10            So, on August 23rd, 2005, Efrain was

11   getting some marijuana from Azibo, and Azibo said

12   here is a couple extra vials, these are like $20

13   vials, I need you to do me a favor tonight.  Efrain

14   said, sure, just give me a call and let me know.

15            Now, as the government's indicated,

16   Azibo also dated Efrain's sister Lashika.  So,

17   you'll hear evidence from Lashika.  The government

18   indicated that Lashika used to sell marijuana, much

19   larger quantities of marijuana, that Azibo gave her.

20   There is no claim, because it's not true, that

21   Efrain and his sister were working together with

22   Azibo.  Lashika Johnson's dealings with Azibo were

23   completely independent of Efrain Johnson.  Efrain

24   Johnson's dealings with Azibo Aquart in terms of

25   marijuana was completely independent of his

1    sister's.

2              But in terms of that communication, so

3    Azibo says to Efrain, I need you to do me a favor,

4    he says, fine.  That night Efrain does what he would

5    typically do, he went out drinking and getting high.

6    He went to a bar called The Yellow Bird.  He was

7    there with his sister Lashika Johnson, which I'm

8    sure you'll hear that testimony from her.  After

9    hours, after the bar closed down, the group,

10   Lashika, Efrain and a group of friends, got in the

11   cars and drove to the Denny's on I-95.  I'm sure

12   many of you have driven down to Milford, seen the

13   Denny's on the side of the road, at least back then.

14             They were there and they were all

15   hanging out at the bar, as young people do often

16   after they had gone out drinking, having fun, they

17   were talking about the nightlife and whatever else,

18   and Lashika Johnson got a call, and it was Azibo

19   Aquart.

20             Azibo said, I need to talk to Efrain.

21   She put Efrain on the phone.  He said, I need to see

22   you, I need you to do me a favor.  So, Efrain went.

23   This is pretty late, but for Efrain that's not

24   uncommon.  He didn't work full-time.  He didn't have

25   a nine to five job.  He cared for his children

during the day, and at night he would drink and get
high.  And, again, as his sister will tell you, he
had a very difficult time sleeping, he's had that
for a very long time.

But Efrain went along, he met up with
Azibo, and they drove over to Charles.  And Azibo
kind of led the way.  Efrain drove, and they went to
Charles Street.  They get in the car, they get out,
they park on the street.  They meet up with John
Taylor and Azikiwe Aquart.  He had actually seen,
Efrain had seen this other vehicle, he wasn't sure
who was in it, but it was Azikiwe and John Taylor.
They parked separately at the apartment building,
They meet outside of the apartments, they go inside.
Efrain is drunk, he's a little high, he goes inside,
he follows the group around up and down these
stairs.  You'll hear about this.

So, they finally get up outside the door
of apartment 101, and Azibo says, put on some
gloves, go knock on the door, I need you to knock on
the door.  Efrain is a little scared, as I think
most people would be at this point, and he does what
he's asked, and the door opens, because, again,
Efrain wasn't known to people at Charles Street, he
wasn't known to Tina Johnson, he wasn't known to

1    anybody that worked for Azibo Aquart.  So, there's a

2    reason why you need somebody like Efrain Johnson to

3    help you when you want to get into the apartment to

4    do what you want to do.

5            He knocks on the door and there's a rush

6    behind him.  The next thing he knows, bodies are

7    flying in and these gentleman -- the government

8    speaks of John Taylor, he's 6'4, 400 hundred pounds,

9    he's a big guy, and Azibo's not that large, but

10   these are well-built guys.  And they push in the

11   apartment and the two men, Azibo Aquart and Azikiwe

12   Aquart, go pushing back, they see a man in the

13   hallway, and Efrain sees them push him back in the

14   bedrooms.  And Tina Johnson is standing there in the

15   living room.  And John Taylor is there and Tina

16   Johnson, as you will hear, he was being very vocal,

17   she was being very vocal, and John Taylor hit her in

18   the head and said "shut up."  And when she wouldn't

19   shut up, John Taylor pulls something out, Efrain

20   doesn't know what it is, he told the government, he

21   explained it sounded like a metal object because the

22   next thing you know John Taylor's hand comes down

23   and strikes her in the head, and he hears a ping,

24   and he knows things are getting bad.

25            At that point Taylor turns to him and

1    says, here is some duct tape, tape her up, as he's

2    standing over her, as Taylor is standing over her.

3    So, Efrain does as he's told, he tapes up her hands,

4    and at that moment the glove rips and they find the

5    DNA evidence.  In fact, the evidence will show the

6    best DNA evidence the government has in this case is

7    that piece of glove that they subsequently found

8    inside the tape of Tina's Johnson's wrist.

9            So, he tapes up her wrist and he starts

10   to tape up her feet as he's told, Taylor is standing

11   over him and instructing him to do it, and Taylor is

12   getting frustrated because Efrain is not going fast

13   enough.  So, he pushes Efrain aside, he says, I'll

14   do it.  Efrain steps back, kind of surveys the

15   situation, says, this is not my scene, and walks

16   out.

17           There is no question he was there.  He

18   was not there to murder anybody, he was not there to

19   hurt anybody, and he left as soon as he could, and

20   went out to his car and waited for Azibo Aquart.

21           At that point he was fearful what Azibo

22   Aquart would do to him if he didn't wait, because

23   Azibo Aquart knows him, he knows his sister, he

24   knows the family, so he just went out in the car and

25   waited.  Azibo Aquart comes out eventually, gets

1    into the car, they drive, and they drive back to

2    Efrain's sister's apartment.  They drive back to

3    Lashika's apartment.  And you'll hear that from

4    Lashika as well.  The gentlemen come in.  And

5    Azikiwe and John Taylor are there as well.  Azibo

6    directs all of the men there to take off their

7    clothes, they put them in a bag, he has Lashika

8    dispose of the clothes.

9              Now, the government said, and this is

10   accurate, that Efrain gave a statement upon being

11   arrested in March of 2011.  He was arrested on

12   March 6, 2011, and he gave a statement at that time.

13   We anticipate that the government will introduce

14   that statement through Agent Munger, as Attorney

15   Markle said.  Mr. Johnson also gave statements on

16   March 7 the following --

17             MS. REYNOLDS:  Objection.

18             MR. MARKLE:  Your Honor, I'm going to

19   object to this.  May we approach?

20             THE COURT:  Yes.

21             (Sidebar conference)

22             THE COURT:  Your objection?

23             MS. REYNOLDS:  Your Honor, we filed a

24   motion on this.  Those are proffer statements.  We

25   are not going to get into them unless and until that

1    door is opened.  It's not relevant that he proffered

2    with us, it's not relevant that he tried to

3    cooperate.  Those statements only come in to rebut

4    something presented at trial, they don't just come

5    in through counsel's argument.  There has to be a

6    ruling by the Court, and that's why we had alerted

7    the Court to that issue in a filing last week.  We

8    did not get any response from counsel.  The proffers

9    are simply not in evidence at this point.

10            THE COURT:  All right, I'm going to

11   sustain the objection.

12            MR. BUSSERT:  Well --

13            THE COURT:  That will be left to

14   rebuttal.

15            MR. BUSSERT:  I would offer this, your

16   Honor, which is Mr. Johnson bears the burden of

17   obviously proving that he had these meetings, but he

18   can testify as to these meetings and that evidence

19   can be established through that.  Now, if the

20   government wants to come back and say there is no

21   evidence of these meetings, that's fine, but --

22            THE COURT:  No, but I think the point is

23   that you are asserting this as the government's

24   case, and it's not.  It may never be the

25   government's case.  At most it would be the

85

1  government's rebuttal case.

2              MR. BUSSERT:  Here is the thing, your

3  Honor.  John Taylor -- when the government filed a

4  criminal complaint against John Taylor, they did not

5  do it under seal and they did not redact out

6  Mr. Johnson's name when they filed a criminal

7  complaint in North Carolina, got an arrest warrant--

8  excuse me, when they filed the affidavit in support

9  of the arrest warrant in North Carolina, they filed

10  the affidavit, they identified the fact Mr. Johnson

11  had been cooperating, had been providing information

12  identifying the fourth individual, and that is what

13  led them to Mr. Taylor, and that came through these

14  proffer sessions.

15             THE COURT:  Okay, I'm not quite sure I

16  understand how that makes the proffers relevant in

17  this case, in the government's case, in which the

18  government says they're not offering the proffer

19  statements because they can't unless and until the

20  defendant testifies.

21             MR. BUSSERT:  With respect to that, your

22  Honor, and I think the government is essentially

23  trying to have it both ways, which is they cite to

24  the one provision of the proffer, that is I believe

25  paragraph 8, which talks about rebuttal; however, if

1    you look at, I think paragraph 9, which is the

2    standard provision in the proffer agreements, if

3    it's found, and I think this is the government's

4    position, that Efrain Johnson lied during the

5    proffers, any protections are null and void.

6              So, I mean it wants -- it intentionally

7    wants to limit what it's saying it's going to offer

8    by just relying on his confession, because they feel

9    that's enough to essentially implicate him, without

10   giving the full scope of the statements and

11   preventing any discussion in that regard.  And I

12   think we're free to be able to question when Agent

13   Munger gets up to try to elicit, in terms of what

14   was told to the agents, I think the full scope of

15   what Mr. Johnson said to them is available to us,

16   not just on the March 6th statement when he was --

17   the post-arrest statement when he was without

18   counsel, but every time he spoke to the government I

19   think Agent Munger was present, and I think all of

20   that is fair game.

21             MR. MARKLE:  If he wants to testify.

22             MR. BUSSERT:  Regardless if he wants to

23   testify.

24             MR. MARKLE:  Certainly it's hearsay.

25             THE COURT:  Okay, I'm going to sustain

1    the objection.  You are certainly going to have the

2    opportunity to make all your arguments in closing

3    that will be based on what the evidence that came in

4    actually was.  Because the government isn't offering

5    the proffer statements in its case-in-chief, I'm

6    going to ask you to not refer to that in your

7    opening statements because it may never be evidence

8    and the jury shouldn't be hearing argument or

9    statements alluding to it at this point.

10             MR. BUSSERT:  Are you saying then we're

11   precluded at this point -- is your Honor ruling

12   we're precluded when we cross-examine Agent Munger?

13             THE COURT:  No, I'm sustaining your

14   objection as to opening statements; that's all

15   that's before me.

16             (Sidebar concluded)

17             MR. BUSSERT:  If you listen to what I've

18   said here and compare that to what Attorney Markle

19   said, realizing that what I've said is not evidence,

20   and the same is true of what the government said,

21   and you will hear the evidence presented and be the

22   ultimate fact-finders in this case, but one thing

23   you may note is that there is a difference in the

24   events as described.  And the key aspect of that,

25   and really the key aspect of this case, is the

88

```
 1   government's case largely rises and falls on the

 2   credibility of the word of John Taylor.  As the

 3   government said, John Taylor was not found first on

 4   time, and the reason John Taylor was found was

 5   because Mr. Johnson told the government from the

 6   outset --

 7             MS. REYNOLDS:  Objection, your Honor.

 8             THE COURT:  Sustained.

 9             MR. BUSSERT:  As Attorney Markle

10   indicated in his opening, you will hear testimony

11   from Agent Munger about Mr. Johnson's March 6th

12   statement upon his arrest and what will be offered

13   with respect to that, and in that statement he told

14   the government, he told law enforcement, that there

15   were four individuals present.  The fourth

16   individual in question is John Taylor.  And as

17   Mr. Markle just told you, John Taylor is a liar.

18   He's an admitted liar.  But he's the reason that

19   we're here, and without his version of events we

20   wouldn't be here.

21             There will be a lot of evidence in this

22   case.  I will probably ask -- even though I've

23   conceded that some of the allegations in here,

24   really in this case, aren't at issue in terms of

25   being able to prove it, I anticipate asking
```

1    questions of most of the witnesses.  The reason for

2    that is, one, it's our right, but also your

3    deliberations will be informed I think more fully by

4    having a better understanding of what these

5    witnesses have to say.

6              But at the end of the day, there is one

7    person who has more at stake here than perhaps

8    anybody, and that's John Taylor.  John Taylor, as

9    you will hear, has pled guilty to life in prison.

10   And the government is relying on him and he's

11   relying on the government to get a reduction in that

12   sentence.

13             Attorney Markle said in his opening, I

14   think this is fairly prophetic, that trials are not

15   about whether or not you like the witness, it is

16   whether you believe the witness.  And I agree with

17   Attorney Markle that when all of the evidence is in,

18   justice will be done and you will render the

19   appropriate verdict.

20             Thank you.

21             THE COURT:  Thank you.  All right,

22   ladies and gentlemen, we're going to take a

23   15-minute recess.  Don't discuss the case, leave

24   your notebooks here, we will be back at 11:15.

25             (Jury leaves the courtroom.)

1            THE COURT:  All right, counsel, we'll

2    take a ten-minute recess and then I'll entertain

3    your objections, Mr. Bussert, and anything else.

4            Thank you very much.  We'll stand in

5    recess.

6            (Recess)

7            THE COURT:  All right, Mr. Bussert, your

8    objections?

9            MR. BUSSERT:  Yes, your Honor.  I'll

10   just leave aside I guess -- I'll note generally the

11   inappropriate argumentative nature of Mr. Markle's

12   opening given the Court's clear admonition it's

13   supposed to provide a roadmap, but the greater

14   concern is the argument, as I understand, given the

15   evidence, the government's trying to now allege that

16   the enterprise involved distribution of the

17   marijuana, which clearly is not charged in any

18   version of the indictment.  I think at most there

19   was some discussion about Azibo Aquart and Efrain

20   having direct dealings with marijuana.  I believe

21   that was in the first -- the first superseding

22   indictment with the original capital charges, but

23   that was subsequently removed, and clearly, as

24   charged in the current version of the indictment for

25   which we're on trial, I think your Honor raised this

1    with the government on the January 6th hearing,

2    isn't this a crack enterprise, and I believe the

3    answer then was yes.

4              So, I think this is a variance from the

5    indictment.  I think it's clearly an indication of

6    the government's intent moving forward in terms of

7    trying to prove this case up.

8              We'd ask that, A, that the government not

9    be allowed to argue further in that regard, and B,

10   that the jury be instructed to disregard that

11   argument with respect to this case.

12             THE COURT:  All right, Mr. Markle.

13             MR. MARKLE:  Your Honor, I didn't say

14   that the marijuana trafficking was part of the

15   enterprise, I said that there was a similar

16   relationship between Azibo Aquart and Lashika

17   Johnson and John Taylor and the defendant involving

18   marijuana trafficking, but not as part of the

19   enterprise.

20             THE COURT:  All right, so the government

21   is not claiming that.

22             MR. MARKLE:  The government is not

23   claiming that.

24             THE COURT:  I'm going to admonish the

25   jury that arguments of counsel or statements of

1    counsel are not evidence in any event, just to

2    remind them in case they may have forgotten, and

3    then I think we should proceed.

4              I think that clarifies, Mr. Bussert, your

5    concern that the government is not varying the

6    indictment, is not claiming marijuana trafficking as

7    part of the enterprise, and we can proceed.  Yes?

8              MR. BUSSERT:  I would just note, your

9    Honor, to the extent this issue comes up again in

10   terms of any of the government's questioning,

11   depending obviously how it's phrased, or in its

12   closing arguments, we would be seeking a mistrial

13   because I think the clear import of what Mr. Markle

14   was saying was Efrain Johnson's motivation in terms

15   of dealing with marijuana with Azibo Aquart was

16   analogous to the Charles Street and, therefore, the

17   motivations is really analogous when they're really

18   apples and oranges.

19             MR. MARKLE:  Your Honor, I don't know

20   what an anticipatory motion for mistrial --

21             THE COURT:  No, I think he's just

22   predicting.

23             MR. MARKLE:  But I --

24             THE COURT:  I do not consider I have

25   anything before me.

```
1              MR. MARKLE:  I do think it's fair to

2    draw an analogy between the relationship that

3    someone has with their marijuana source of supply

4    compared with the relationship someone might have

5    with their crack cocaine source of supply, so I will

6    tread carefully, but I don't know if that will never

7    be discussed.

8              THE COURT:  When you the say an analogy,

9    what do you mean?

10             MR. MARKLE:  As I attempted to argue,

11   your Honor, there's still the same -- I mean, I was

12   just trying to show that there would be witnesses

13   who would talk about a crack operation and the

14   sellers need suppliers and suppliers need sellers

15   and sellers need customers and customers need

16   sellers, and the same is true for the marijuana

17   trafficking.  I was just trying to show that even

18   though somebody might be talking about one

19   particular drug, the relationship rings true for

20   whatever drug brings those two people together.  And

21   I was, again, not trying to claim that that was part

22   of the enterprise, it was just a similar

23   relationship and the dependency.

24             THE COURT:  Okay.

25             MR. MARKLE:  Thank you.
```

```
1              (Jury entered the courtroom.)

2              THE COURT:  Please, ladies and

3    gentlemen.  Will government please call its first

4    witness.

5              MS. REYNOLDS:  Yes, your Honor, the

6    government is ready to begin presenting evidence in

7    this case, and at this time call its first witness,

8    Maria Guadagno.

9              THE COURT:  All right, ma'am, if you

10   will remain standing.  When you get to the witness

11   stand, raise your right hand, the oath will be

12   administered to you.

13              M A R I A   G U A D A G N O,

14   Having first been duly sworn, was examined and

15   testified as follows:

16              THE WITNESS:  Maria Guadagno,

17   Bridgeport, Connecticut.

18              THE COURT:  Please spell your last name.

19              THE WITNESS:  G-U-A-D-A-G-N-O.

20              THE COURT:  Thank you.  You may proceed.

21              MS. REYNOLDS:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MS. REYNOLDS:

24        Q.   Where do you work?

25        A.   I work for the Bridgeport Public Safety
```

1   Department.

2        Q.   And what do you do there, Ms. Guadagno?

3        A.   I'm a 911 operator, telecommunicator,

4   dispatcher.

5        Q.   And how long have you been in 911

6   communication?

7        A.   Twenty-five and a half years.

8        Q.   And can you describe what your duties and

9   responsibilities are and have been for 25 years as a

10  911 communications -- in the 911 communications

11  department?

12       A.   I answer the phones, I dispatch for fire

13  and police, I do stolen cars.  And I work eight to

14  four, the day shift.

15       Q.   And have you always worked the day shift?

16       A.   Yes.  In the beginning we used to rotate.

17       Q.   And this 911 communications department

18  works 24 hours a day?

19       A.   Yes.

20       Q.   So, there are others who do the night shift

21  obviously?

22       A.   Right.

23       Q.   And did you receive any specialized

24  training prior to and throughout the years as you've

25  been working as a 911 operator?

1    A.    Yes.

2    Q.    And can you describe for the ladies and

3    gentlemen of the jury what some of the training is

4    that you had throughout your career?

5    A.    Well, I just completed the fire training.

6    The police dispatching, that goes with the call

7    taking, and enter everything into the computer as

8    the calls come in.

9    Q.    And has the 911 communications department

10   moved to a new location?

11   A.    Yes.

12   Q.    And does that involve hopefully better

13   technology?

14   A.    Better technology, yes.

15   Q.    And, again, you've been trained on the job

16   throughout your career?

17   A.    Uh-huh (indicating affirmatively).

18   Q.    Correct?  Can you describe for the jury

19   what the technical process is.  I think you touched

20   upon it, you said you take down information, but

21   what happens?  What do you do when a 911 call comes

22   in to you?

23   A.    You get their location, their name, phone

24   number and a summary of what's happening to the

25   caller that's calling.

1    Q.   And do you -- does that information get

2    recorded, the audio?

3    A.   Yes.

4    Q.   And is there also a printout or

5    computerized printout that goes along with that

6    audiotape of the call?

7    A.   Yes.

8    Q.   And how does the information on the

9    computer printout get there?

10   A.   It gives the location, name, phone number

11   and a brief summary of what you are putting in

12   there.

13   Q.   So you, yourself, do input information also

14   to the computer?

15   A.   Yes.

16   Q.   As you receive the call and afterwards?

17   A.   Uh-huh (indicating affirmatively).

18   Q.   Yes?

19   A.   Yes.

20   Q.   All right.  I'm going to draw your

21   attention now to the summer, August, of 2005, and

22   ask you, in August of 2005, you were also working at

23   that time as a 911 operator?

24   A.   Yes.

25   Q.   And, specifically, I'm going to draw your

1    attention to August 24th of 2005.  Were you working

2    that day?

3        A.    Yes.

4        Q.    What shift were you working?

5        A.    The day shift.

6        Q.    And what are the hours for the day shift?

7        A.    Eight to four.

8        Q.    And on that day, August 24th, during your

9    shift, did you answer a 911 call that came in that

10   morning from the area of Charles Street and Main

11   Street in Bridgeport?

12       A.    Yes.

13       Q.    I'm going to ask you -- I'm going to hand

14   up --

15            MS. REYNOLDS:  Your Honor, if I could

16   approach.  I was going to hand up what's been marked

17   as Government's Exhibit 100, 100A, 100B.

18            THE COURT:  You may.

19       Q.    And let me just ask you, prior to coming

20   here today to testify, have you had the opportunity

21   to review the 911 call that you received that

22   morning on August 24th of 2005?

23       A.    Yes.

24       Q.    And did you also while you were listening

25   to that 911 call have an opportunity to review

1    transcript that was prepared of that 911 call?

2        A.    Yes.

3        Q.    And let me show you then Government's

4    Exhibit -- showing you first Government's

5    Exhibit 100, which is an audio of the 911 call.

6    Does this contain a copy of the 911 call you said on

7    August 24th of 2005?

8        A.    Yes.

9        Q.    And then showing you Government's

10   Exhibit 100A, do you recognize what that is?

11       A.    That's the computer printout.

12       Q.    Okay.

13       A.    From that day.

14       Q.    Okay, from that day and the call that's

15   contained on Government Exhibit 100?

16       A.    Yes.

17       Q.    And then showing you Government's

18   Exhibit 100B, do you recognize what this is?

19       A.    The conversation between me and the caller.

20       Q.    Is this a transcript of that conversation?

21       A.    Yes.

22       Q.    Okay.  And is this a copy of the transcript

23   that you reviewed in connection with the phone call

24   on Government's Exhibit 100?

25       A.    Yes.

1                MS. REYNOLDS:  Your Honor, at this time

2    I would move just as full exhibits Government's

3    Exhibit 100, which is the audiotape of the 911 call,

4    and Government's Exhibit 100A, which is the

5    computerized printout of that call.  And then with

6    regard to 100B, we've just marked it for

7    identification and would ask that we be permitted to

8    provide it to the jury when we play the call.

9                THE COURT:  All right, you may proceed.

10               MR. BUSSERT:  Your Honor, the previous

11   objection, I'm unclear on the Court's ruling with

12   respect to beyond the actual call coming in, some of

13   the collateral information.

14               THE COURT:  The prior ruling has been

15   that the audio and the computerized printout that's

16   100A, based on the witness's testimony that

17   establishes what it is and how it was prepared by

18   her, is that it may come in.  It is not coming in

19   for the truth of the matter as to in any way be

20   evidence of who committed the murders, it is being

21   permitted to be brought in as contextual or

22   historical only.

23               So, I advise the jury that these two

24   things are for that limited purpose.  When you

25   receive what purports to be a transcription of the

1    tape, it is the audio that you will hear that is the

2    evidence.  If you think the transcription is

3    different from what you hear, it's the audio that is

4    the evidence.

5              MS. REYNOLDS:  Thank you, your Honor.

6              At this time we would play for the jury

7    Government's Exhibit 100, which is the 911 call.

8    And if we could just pass out copies of a transcript

9    that's been demarked Government's Exhibit 100B, just

10   for assistance to the jury, but we're not moving

11   that into evidence.

12              (Tape played)

13   Q.    Ms. Guadagno, during that phone call at one

14   point you were attempting to get the caller's phone

15   number, correct?

16   A.    Correct.

17   Q.    So you could call him back?

18   A.    Right.

19   Q.    And you indicated that with regard to

20   Government's Exhibit 100A, that was a computer

21   printout of the information you were able to obtain

22   during the 911 call?

23   A.    Yes.

24   Q.    And just showing you that exhibit again,

25   100A, and asking you to take a look at the top

1  there, is there a phone number listed that

2  corresponds to the caller, Leroy?

3       A.   Yes.

4       Q.   And what has that phone number?

5       A.   996-2047.

6            MS. REYNOLDS:  Your Honor, I have no

7  further questions at this time.

8            THE COURT:  All right,

9  cross-examination.

10  CROSS-EXAMINATION.

11  BY MR. BUSSERT:

12       Q.   Ma'am, would you agree that this call seems

13  to concern a murder or murders?

14       A.   Well, in the beginning he was hysterical,

15  so it was hard to understand what he was trying to

16  tell me, but afterwards, yes.

17       Q.   Is this the first time you've gotten a call

18  like this as a 911 operator?

19       A.   No.

20       Q.   How often does this happen?

21       A.   Pretty often.

22       Q.   Other violent crimes?

23       A.   Yes.

24       Q.   And how long have you been doing this?

25       A.   I'm sorry.

1     Q.    How long have you been doing this?

2     A.    Twenty-five and a half years.

3     Q.    Because in listening to that call you

4  seemed very calm throughout.

5     A.    Well, after so many years you tend to be

6  calm.

7     Q.    So, there is a certain degree of

8  professionalism with your job?

9     A.    Right.

10    Q.    And your job, as you testified to on

11 direct, was to get the facts, correct?

12    A.    Yes.

13    Q.    And you couldn't get caught up in the heat

14 of the moment, you had to do your job?

15    A.    Correct.

16    Q.    And in terms of -- there were descriptions

17 about how the victims appeared, correct?

18    A.    Yes.  But I didn't get that -- there were

19 two operators involved, myself being the first one,

20 and then the second one that got the other

21 information, the second operator.

22    Q.    Do you know where that operator was

23 located?  Was it in the building with you?

24    A.    Yes, in the same room.

25    Q.    So, fair to say neither of you actually saw

what had occurred?

     A.    I don't know what you mean.

     Q.    You couldn't look over in Charles Street
and see inside the apartment?

     A.    No.

     Q.    And you don't know where the person called
in, where they were standing when they saw this
stuff?

     A.    Just from what he told me.

     Q.    He told you what he saw?

     A.    Right.

     Q.    But not where he was when he saw it?

     A.    He said he was near Domino's pizza and the
bank and all that.  So, I was trying to narrow down
where he was.

     Q.    Okay.  But in terms of -- the bodies were
in an apartment in Charles Street, correct?

     A.    Correct.

     Q.    And you don't know how he got into that
apartment, how he saw the bodies or anything like
that?

     A.    No, not -- no.

               THE COURT:  Any redirect?

               MS. REYNOLDS:  No, your Honor.

               THE COURT:  Thank you, then,

1    Ms. Guadagno.  Thank you.  You are excused.

2              Will government please call its next

3    witness.

4              MR. MARKLE:  Yes, your Honor.  The

5    government would call Rosanna Mendoza.

6              R O S A N N A   M E N D O Z A,

7    Having first been duly sworn, was examined and

8    testified as follows:

9              THE WITNESS:  Rosanna Mendoza,

10   m-e-n-d-o-z-a, Petaluma, California.

11             THE COURT:  All right, you may proceed.

12   DIRECT EXAMINATION

13   BY MR. MARKLE:

14      Q.   Good morning, Ms. Mendoza.  Ms. Mendoza,

15   can you tell us how you are currently employed.

16      A.   Currently I'm a flight nurse.

17      Q.   And what is a flight nurse?

18      A.   You work in the air, so either on a

19   helicopter or on a plane.

20      Q.   And as a nurse?

21      A.   As a nurse.

22      Q.   And so is that to transport patients from

23   emergency -- from scenes of emergency to hospitals

24   or from hospital to hospital or --

25      A.   Both.

```
 1       Q.    Both?

 2       A.    Both.  The helicopter does scenes more.

 3       Q.    So you have to accompany a patient that

 4   needs somebody on board to attend to him or her?

 5       A.    Yes.

 6       Q.    And for how long have you been doing that?

 7       A.    I got hired there in August.

 8       Q.    And you said in the air.  Is that in an

 9   airplane, helicopter?

10       A.    Yes.

11       Q.    Both?

12       A.    Both.

13       Q.    And prior to that, how were you employed?

14       A.    I did -- I did critical care transport on

15   an ambulance as a nurse.  That's patient, hospital

16   to hospital or --

17       Q.    Is that basically the same work, but on the

18   ground?

19       A.    Correct.

20       Q.    And for how long did you do that?

21       A.    Well, I'm still part-time, but I started in

22   September of 2009.

23       Q.    And prior to that how were you employed?

24       A.    I was --

25       Q.    You are doing that in California?
```

1      A.    Yes, that's what I'm doing in California.

2      Q.    So, you are presently in California and

3  came back for the trial?

4      A.    Correct.

5      Q.    Before that how were you employed?

6      A.    So I was in Connecticut and I worked both

7  at Saint V, St. Vincent's Medical Center in

8  Bridgeport, as a nurse, in the emergency department,

9  and at that point prior I was a part-time AMR,

10 paramedic.

11     Q.    What is AMR?

12     A.    American Medical Response, ambulance

13 company.

14     Q.    And you were a paramedic with that company?

15     A.    Yes.

16     Q.    And when did you begin working there?

17     A.    I began working there August of 1998.

18     Q.    And you continued, I think you said, until

19 September of '09?

20     A.    Until when I left Connecticut, yes.

21     Q.    And as a paramedic with AMR, what were your

22 responsibilities?

23     A.    To provide safe and rapid transport for

24 people, for patients that needed advanced care.

25     Q.    So, what training did you have to be a

1    paramedic with AMR?

2        A.    I took the paramedic program from Norwalk

3    Community College.

4        Q.    And do you have to be licensed or certified

5    to consider yourself to be a paramedic?

6        A.    Yes, you have to be licensed, and it's

7    registered on the state, state websites.

8        Q.    And did you achieve that licensing?

9        A.    Yes.

10       Q.    And when you say schooling, is that a

11   three-month, six months?  How long?

12       A.    It was one year.

13       Q.    Twelve months?

14       A.    For me, uh-huh (indicating affirmatively).

15       Q.    And does that include, I think what you had

16   mentioned to me previously, as ride time?

17       A.    Yes, that includes ride time on the

18   ambulance with other -- with seasoned paramedics.

19       Q.    So that's like on-the-job training?

20       A.    Yes.

21       Q.    And do you also have to perform hours in

22   emergency rooms or at ICUs?

23       A.    Yes, many.

24       Q.    Many?

25       A.    Many, many, many hours.

 1        Q.    Is there a required amount of hours or --

 2        A.    Yes, there was.  I think in the emergency

 3   department it was over 300 hours and the ride time

 4   it was over 300 hours.

 5        Q.    And once you achieve all that or have done

 6   all that, are you then licensed or is there still

 7   another hurdle?

 8        A.    Well, we have to take our written exam at

 9   the end of the whole program.

10        Q.    So you take a final written exam?

11        A.    A final written.

12        Q.    And is there an oral exam as well?

13        A.    Yes, you have to pass the written to sit

14   for your oral boards, and then you have to pass your

15   oral boards to be able to sit for the state exam.

16        Q.    And do you -- now that you -- so back then

17   you got your paramedic license?

18        A.    Correct.

19        Q.    Do you have to take -- do you have to

20   continue to take courses to maintain that license?

21        A.    Yes, you have to -- as a paramedic we have

22   to do 72 hours of continuing education units in two

23   years.

24        Q.    And have you done that?

25        A.    Consistently, yes.

1      Q.    So, you are still a paramedic?

2      A.    I'm still a Connecticut paramedic, yes.

3      Q.    And also between the time you were in

4  Connecticut and you were California, were you

5  anywhere else doing work?

6      A.    I was in Afghanistan.

7      Q.    And in what capacity were you in

8  Afghanistan?

9      A.    I'm a Navy nurse officer.

10     Q.    So you were an officer in the Navy?

11     A.    I am, yes.

12     Q.    And you were a nurse?

13     A.    Yes, I acted as emergency nurse.

14     Q.    And as an emergency or trauma nurse in the

15  Navy in Afghanistan, what kind of work did you do?

16     A.    My work, trauma nursing in the ER and also

17  in ICU.

18     Q.    Caring for military officers?

19     A.    Caring for everybody.  Our people and not

20  our people.

21     Q.    Now, directing your attention to August of

22  2005, were you here in Bridgeport -- were you in

23  Bridgeport?

24     A.    Yes.

25     Q.    And you indicated you were working for AMR.

1    Do you recall that?

2         A.    Yes.

3         Q.    And do you recall on August 24, 2005, being

4    dispatched to an emergency situation?

5         A.    Yes.

6         Q.    And do you recall where that was?  Well,

7    where were you when you received that call?

8         A.    We were at St. Vincent's Medical Center.

9         Q.    When you say "we," who are you referring

10   to?

11        A.    Well, me and my partner.  You always work

12   with a partner.

13        Q.    Is your partner always the same person?

14        A.    It's not always the same person.

15        Q.    And on this day or -- was it in the morning

16   or night; do you remember?

17        A.    I remember it to be day, morning.

18        Q.    And do you remember that morning who your

19   partner was?

20        A.    Yes.

21        Q.    And who was that?

22        A.    Karen O'Donnell.

23        Q.    And you were at the hospital having -- do

24   you recall what you were doing at the hospital at

25   that time?

1    A.    Maybe preparing our stretcher.

2    Q.    No --

3    A.    I don't have a recollection.

4    Q.    Clear recollection?

5    A.    A complete recollection, no.

6    Q.    Were you responsible for responding to

7    trauma scenes or scenes of violence or car

8    accidents?

9    A.    Anything.  Anything we were dispatched to

10   we needed to go to.

11   Q.    In what area?

12   A.    We definitely covered Bridgeport and

13   Fairfield.  And then we do like a mutual dispatch or

14   paramedic intersect with Trumbull, Monroe,

15   Stratford.

16   Q.    So, it's primarily Bridgeport and

17   Fairfield, but if there is an emergency that

18   requires additional help, you'll go there?

19   A.    Yes.

20   Q.    And in your approximately seven years

21   working in Bridgeport, had you responded to a number

22   of trauma scenes?

23   A.    Yes.

24   Q.    Scenes involving trauma?

25   A.    Yes.

1    Q.    About how many calls a year would you go

2    to?

3    A.    It varied, but approximately on average I

4    would say around seven, eight hundred a year.

5    Q.    So, more than one a day?

6    A.    Sometimes, yes.  Sometimes very many,

7    multiple.

8    Q.    Now, we're talking crime scenes, accident

9    scenes?

10   A.    Yes.

11   Q.    Every kind of injury possible?

12   A.    Yes.

13   Q.    Or emergency?

14   A.    Yes.

15   Q.    And had you ever prior to August 24, 2005

16   responded to a scene where three people had been

17   killed?

18          MR. BUSSERT:  Objection, relevance.

19          THE COURT:  Sustained.

20   Q.    Do you remember August 24, 2005?

21   A.    Yes.

22   Q.    Do you remember going to a certain location

23   on that morning?

24   A.    Yes.

25   Q.    Do you remember what that location was?

1     A.    Yes, it was Charles Street.

2     Q.    And why do you remember going there?

3     A.    We got dispatched.

4     Q.    And why does it stand out in your mind some

5  seven years ago?

6     A.    Because we refer to it always -- or I still

7  refer to it as the triple homicides.

8     Q.    You found three people eventually there?

9     A.    Correct.

10    Q.    When you first arrived there -- well, how

11 long did it take you to get there from the hospital

12 where you were to the Charles Street apartment?

13    A.    Maybe two minutes.  It's right up Main

14 Street.  So...

15    Q.    And what kind of vehicle are you and Karen

16 O'Donnell in?

17    A.    In an ambulance, van ambulance.

18    Q.    And is it marked?

19    A.    Yes.

20    Q.    And does it have lights and sirens?

21    A.    Lights and sirens and they were on.

22    Q.    And are you -- are you dressed in any

23 particular gear?

24    A.    The uniform was, you know, collared shirt

25 with pockets in the front, it was blue, and you had

1   your patches that said paramedic -- or mine said

2   paramedic and blue-like BDU pants.

3       Q.    And do you wear -- as you approached the

4   scene or get to the scene, do you wear or not wear

5   gloves?

6       A.    Yes.  It's different for every person, but

7   I do.  I put on gloves.

8       Q.    On August 24, 2005, do you recall putting

9   on gloves?

10      A.    Yes.

11      Q.    And do you recall what color the gloves

12  were?

13      A.    The color of our gloves at AMR are blue, or

14  were blue at the time.

15      Q.    And when you arrived there at 215 Charles

16  Street, did you immediately find the location, or

17  was there some difficulty?

18      A.    I recall that we got dispatched to the

19  Domino's, so when we were coming down Main Street,

20  Domino's is a little bit across the way from

21  Charles, but then people were waving us into

22  Charles.

23      Q.    And did you go to where those people were?

24      A.    So then we followed where the people were

25  calling us to.

```
 1        Q.    And once you pulled into that area of 215
 2   Charles Street, in and around 215 Charles Street,
 3   did anyone come to your ambulance?
 4        A.    I noticed that someone came to the driver's
 5   side, my partner's side.
 6        Q.    And did you see that person?
 7        A.    I don't recall seeing the person.
 8        Q.    Do you remember him -- was it a male or
 9   female?
10        A.    I learned later it was a man.
11        Q.    You didn't even see to know?
12        A.    I didn't at that time, no, I didn't.
13        Q.    Did you see him later on that morning?
14        A.    Yes.
15        Q.    And did he -- was he having a conversation
16   with your partner, Karen O'Donnell?
17        A.    I don't know if I would call it a
18   conversation, but he was telling her to hurry up.
19        Q.    Do you recall what he said, if anything?
20             MR. BUSSERT:  Objection, it calls for
21   hearsay.
22             MR. MARKLE:  Again, your Honor, it's not
23   offered for the truth, it's offered to show why they
24   responded.
25             THE COURT:  I'm going to permit it.
```

1    Q.    Do you recall what he said?

2    A.    "Hurry up, my mother is dead" or "my mother

3    is hurt."

4    Q.    "Hurry up" and something about his mom

5    needing --

6    A.    Yes.

7    Q.    In trouble?

8    A.    Absolutely.

9    Q.    You don't remember the exact words?

10   A.    No, I don't because it wasn't to me.

11   Q.    And what did you and your partner do at

12   that time?

13   A.    So, my partner followed him and I went to

14   the side of the ambulance and I grabbed the

15   equipment.

16   Q.    So your partner and this male person went

17   towards the apartment building first?

18   A.    Correct.

19   Q.    Okay.  I'm going to show you what's been

20   marked Government's Exhibit 102, ask you if you

21   recognize this photograph?

22   A.    Yes, yes.

23   Q.    And what do you recognize that to be?

24   A.    That was the front of the building that we

25   parked in front of.

1      Q.    That's the building you responded to on

2  August 24, 2005?

3      A.    Yes.

4            MR. MARKLE:   I would offer that as a

5  full exhibit.

6            MR. BUSSERT:   No objection, your Honor.

7            THE COURT:   Full exhibit.

8      Q.    Now that the jury can see it, what is that?

9      A.    That's the building that we entered, that

10  we parked in front of.

11      Q.    And you said you went to the rear of the

12  ambulance?

13      A.    I went to the side of the ambulance.

14      Q.    Side of the ambulance.  What was the

15  purpose of that?

16      A.    To grab the bags and the equipment that we

17  needed to go in with.

18      Q.    So, you go in with certain gear?

19      A.    Yes.

20      Q.    Just briefly, what do you take in?

21      A.    The oxygen bag, the monitor, and another

22  bag that has a whole bunch of equipment, paramedic

23  bag, first aid bag, ALS bag.

24      Q.    Are you carrying like two or three bags?

25      A.    Three.

1    Q.    Three bags?

2    A.    Well, one is monitor, and two bags.

3    Q.    And did you proceed -- so your partner was

4  ahead of you with the male?

5    A.    Yes.

6    Q.    And did you -- do you see where you entered

7  that building?

8    A.    Yeah, up the stairs.

9    Q.    And the stairs are, as you look at it, to

10  the left under the tree?

11    A.    Yep, yes.

12    Q.    Is that fair to say?

13    A.    Yes.

14    Q.    All right.  And as you went up those

15  stairs, did you have sight of your partner and the

16  male, or not?

17    A.    As I went up the stairs, physically I did

18  not have any more sight of my partner, no.

19    Q.    Do you know how they got into apartment

20  101?  Do you know?

21    A.    I know now.

22    Q.    Did you know then?

23    A.    No, I didn't.

24    Q.    Did you see them enter apartment 101?

25    A.    I did not.

1      Q.    And while you tried to -- attempted --

2  well, as you started going up those stairs, did

3  anything delay your entry into the apartment?

4      A.    Well, the fact that I was carrying all of

5  the gear I kind of -- it wasn't centered right, so a

6  bag fell and I kind of tripped and fell.

7      Q.    Not to embarrass you, you had a lot of gear

8  on you?

9      A.    Yes.  Yeah.

10      Q.    But eventually you made your way into

11  apartment 101?

12      A.    Yes.

13      Q.    And when you entered, how did you enter?

14  Was the door shut, locked, open?

15      A.    It was open.

16      Q.    You didn't have to force your way in?

17      A.    No.

18      Q.    And do you recall when you entered what you

19  first saw?

20      A.    A bright apartment.  A bright apartment.

21      Q.    And do you walk into a kitchen area, a

22  bedroom, a living room?

23      A.    It was a living room area.

24      Q.    I'm going to show you what's been marked

25  Exhibit 117E and ask you if you recognize that,

1    what's depicted in that photograph?

2        A.   Yes.

3        Q.   And is that a true and accurate picture of

4    the room you entered into on August 24, 2005?

5        A.   Yes.

6              MR. MARKLE:  Government would offer

7    117E, your Honor.

8              MR. BUSSERT:  No objection.

9              THE COURT:  Full exhibit.

10       Q.   And Ms. Mendoza, again, now the jury can

11   see it, is that the room that you entered into?

12       A.   Yes.

13       Q.   Can you recall at this time whether the

14   furniture was in the position it is shown in the

15   photograph?

16       A.   I can't recall.

17       Q.   But you do recall a room that size, that

18   room?

19       A.   Yes.  Rectangular, yes.

20       Q.   And you said there was sunshine coming in

21   through, obviously, the window in the back?

22       A.   Yes, very bright, I remember that.

23       Q.   And in that room, do you recall -- did you

24   attend to anyone in that room, what I'll call the

25   living room?

```
 1        A.    No.

 2        Q.    Did you see any person in that room as you

 3   entered?

 4        A.    No.

 5        Q.    Anybody on the ground?

 6        A.    No.

 7        Q.    Anybody on the couch?

 8        A.    No.

 9        Q.    Anybody on the chair?

10        A.    No.

11        Q.    Okay.  Did you observe anything that made

12   you think there is somebody in here I needed to

13   treat?

14        A.    No.  Which is why we didn't.

15        Q.    Okay.  And once you were, looked at that,

16   you had no trouble seeing that entire room; is that

17   correct?

18        A.    Correct.

19        Q.    Did you proceed to go anywhere else in that

20   apartment?

21        A.    Well, yes.  We needed to find the people we

22   needed to help, or the person we needed to help.

23        Q.    So, did you go down a small hallway?

24        A.    Yes.  Yes, we --

25        Q.    Tell us where you went.
```

1    A.    So we continued -- so, you know, on quick

2    scan, there is nobody there, and so you continue

3    towards the back of the house to find the person or

4    people who you are called for.  So, we continued

5    down a little hallway towards the rooms.

6              MR. MARKLE:  I'm not sure if I misspoke

7    on the prior exhibit.  Sorry to interrupt, but it

8    was 117E, your Honor.

9              THE COURT:  Yes.

10             MR. MARKLE:  I wasn't sure if I said

11   that.

12             THE COURT:  Yes.

13   Q.    So, I'm going to show you what's a

14   photograph 117J, and ask you if you recognize what's

15   depicted in that photograph?

16   A.    Yes.

17   Q.    And is that a true and accurate depiction

18   of the hallway you are talking about that you

19   started to go down?

20   A.    Yes.

21   Q.    And do you recall whether or not that couch

22   that's depicted in that photograph was present?

23   A.    Yes.

24   Q.    How do you remember that?

25   A.    Well, because it was an obstacle for us to

```
 1   get past, especially with all of the our equipment.

 2               MR. MARKLE:  We'd offer 117J at this

 3   time, your Honor.

 4               MR. BUSSERT:  No objection.

 5               THE COURT:  Full exhibit.

 6        Q.   Now, again, the jurors can see that.

 7          So, Ms. Mendoza, from where that photograph

 8   is taken, would that be about where you started to

 9   walk down that hallway?

10        A.   Yes.  Yes.

11        Q.   Talking about a hallway of -- how many

12   steps would it take you to get down that hallway?

13        A.   Normal steps without the couch in there?

14   Five.  Four, five.

15        Q.   A short hallway?

16        A.   Yes, it's short.

17        Q.   And that couch, which is on its -- it looks

18   like it's on its side?

19        A.   Yes.

20        Q.   Is that how you found it?

21        A.   Yes.

22        Q.   You didn't put it there?

23        A.   No.

24        Q.   You didn't move it after you came in or

25   when you went in?
```

```
1      A.    No.

2      Q.    And that's the couch you maneuvered around?

3      A.    Yes.

4      Q.    And just past that, it's hard to see in

5  that photograph, but what's past the couch?

6      A.    Well, the room -- well, a bedroom, I guess.

7  So, I know it to be a bedroom.  But, a bedroom.

8      Q.    Okay.  Let me show you Exhibit 116D and ask

9  you if you recognize that photograph?

10     A.    Yes.

11     Q.    Is that a true and accurate depiction of

12 really the same hallway looking into the same

13 bedrooms?

14     A.    Yes.

15           MR. MARKLE:  And the government would

16 offer 116D, your Honor.

17           MR. BUSSERT:  No objection, your Honor.

18           THE COURT:  Full exhibit.

19     Q.    And, again, the photograph, 116D,

20 Ms. Mendoza, would be approximately -- it would be

21 almost at the end of the couch or love seat or

22 whatever that is in the hallway?

23     A.    Yes.

24     Q.    And you are looking into what are two what?

25     A.    Bedrooms.
```

1      Q.    And did you proceed to go into either of

2   those bedrooms?

3      A.    Yes.  When -- yes.

4      Q.    Which one did you go into?

5      A.    The one on the left.

6      Q.    So, as we look at Government's

7   Exhibit 116D, the one to the left closest to the

8   couch?

9      A.    Correct.

10     Q.    And was anyone else in that room when you

11  entered it?

12     A.    Our patients, or our potential -- the

13  people.

14     Q.    Did you see the male who came to your

15  ambulance in that room at any time?

16     A.    Yeah, I -- no.

17     Q.    Did you see your partner, Karen O'Donnell,

18  in that room?

19     A.    She was at that point behind me.

20     Q.    So, you were the first, to your knowledge,

21  upon your arrival to go into that room?

22     A.    Correct.

23     Q.    And what did you see when you entered that

24  room that I just took off the screen?

25     A.    So, I saw two people head to head, like

1    around a bed at the base and the side of a bed.

2        Q.    And were they on the bed or on the ground

3    or standing up?  How were they?

4        A.    They were laying on the floor of the room.

5        Q.    I'm going to show you Government's

6    Exhibit 121-10 and ask you if you recognize what's

7    depicted in that photograph.

8        A.    Yes.

9        Q.    And is that a true and accurate depiction

10   of what you saw when you entered that bedroom that

11   you described on the left side of the house?

12       A.    Yes.

13               MR. MARKLE:  The government would offer

14   121-10, your Honor.

15               MR. BUSSERT:  No objection, your Honor.

16               THE COURT:  Full exhibit.

17       Q.    Now, Ms. Mendoza, looking at Government

18   121-10, at the bottom right, do you recognize that

19   person?

20       A.    Yes.

21       Q.    And was that the -- was that a male or

22   female?  It's hard to see in the photograph?

23       A.    Female.

24       Q.    And is that the position she was in when

25   you entered that room?

1      A.    Yes.

2      Q.    Did you move her in any way?

3      A.    I did not.

4      Q.    And above her appears to be a man lying on

5  the ground face down.   Is that correct?

6      A.    That is correct.

7      Q.    And is that how he was found?

8      A.    That's how I saw him.

9      Q.    And, again, because of -- I mean, there is

10 a lot of red matter in the photograph.   When you saw

11 that, what is that?

12     A.    Blood.

13     Q.    And when you saw this woman, it appears

14 that there is something around her mouth and on the

15 top of her forehead.   Do you recognize those items?

16     A.    Yes.

17     Q.    And what is that?

18     A.    Duct tape.

19     Q.    And did you put that there?

20     A.    No.

21     Q.    Was that how you found her?

22     A.    Yes.

23     Q.    And was it just one little piece of duct

24 tape around her mouth, or how was it wrapped?

25     A.    No, it was wrapped around multiple times.

1    Q.    Could you tell whether it was loose or

2    tight?

3    A.    Oh, it was really tight.

4    Q.    It wasn't just inadvertently over her

5    mouth?

6    A.    No.

7    Q.    Was it around her entire --

8    A.    Yes, it was around.

9    Q.    -- head?  Yes?

10   A.    Yes.

11   Q.    Now, what did you do upon seeing these two

12   persons laying there in that position?

13   A.    So, because of your training you are

14   always -- you want to take care of the patient, but

15   you also want to be conscious of what you are

16   walking into.  I was --

17   Q.    Are you trained to attempt to preserve a

18   scene if there might be any violence --

19   A.    Yes.

20   Q.    -- involved?  No matter what?

21   A.    Yes, we're always --

22   Q.    Right?

23   A.    Yes, always -- even, you know -- yes, all

24   the time.  If it's a shooting, sometimes I remember

25   hearing cops say "don't step on the shells" and we

1    do our best.

2        Q.    So, whether it appears to be a crime, is a

3    crime, is an accident, you do your best not to alter

4    the scene?

5        A.    We try our best.

6        Q.    But your first obligation and

7    responsibility is what?

8        A.    Is taking care of the patient.

9        Q.    So, if that means moving them or moving

10   evidence, you'll do that?

11       A.    Absolutely.

12       Q.    All right.  So, now as to the woman, I'll

13   call her Tina, you didn't know her name, did you?

14       A.    No.

15       Q.    What, if anything, did you do?

16       A.    So, you know, to come up to this scene, it

17   was pretty -- a big deal.  So, completely stopped

18   and thought I didn't want to go in there because it

19   was a complete crime scene.  So, I stopped, and then

20   I, you know, got back in my brain and said, "I have

21   to do my job."  So, I went in and I touched her on

22   her right shoulder and felt that she was kind of

23   warmish.  So that's a further indication to --

24   you've got to continue doing your job.

25       Q.    So, the fact that she was warm to the touch

```
 1   meant she may still be viable?
 2        A.    Yes.
 3        Q.    Savable?
 4        A.    Yes.
 5        Q.    So, was there a police officer in the room
 6   or in the area?
 7        A.    Yes.  Absolutely, yes.
 8        Q.    Was he outside the room?
 9        A.    He was against the couch, yeah.
10        Q.    Okay, in the hallway?
11        A.    Yes.
12        Q.    And where was your gear at that time?
13        A.    It was out, not in the room.  It was on the
14   couch, on the floor.
15        Q.    So, it's really just you and the two
16   victims in that room?
17        A.    Yes.
18        Q.    So, when you saw that she was warm, what
19   did you do to see if there was anything you could do
20   to save her life?
21        A.    So, then I had to think about how this was
22   going to work with still trying to preserve as much
23   as I could, and I just remember thinking I'm going
24   to have to cut this tape off because it's not like
25   it was going to be movable.  And then -- so I
```

```
1   started compressions for CPR, because after you've
2   been doing this for a while you kind of know that
3   they're not breathing or they don't have a pulse, so
4   you just start with compressions.  I did a couple
5   compressions and then I realized that she's hard,
6   she was hard, and that's not normal.
7       Q.   More than not normal, what does that mean
8   to you?
9       A.   Okay, so -- okay, so when you are doing
10  compressions to a person, a person's body is very
11  malleable, but if they've been dead for a while
12  there is a thing called rigor mortis, and if you
13  start doing compressions against a rigor mortis
14  chest, you know the difference.
15      Q.   And rigor mortis is like a stiffness?
16      A.   Like a stiffness.
17      Q.   And you felt that?
18      A.   I definitely felt that.
19      Q.   And did you see injuries to her head?
20      A.   I saw -- yeah, I saw this.  There is a lot
21  of blood and a lot of swelling.
22      Q.   Where did you see the injuries, what
23  portion of her body?
24      A.   I didn't investigate the rest of her body,
25  but I definitely saw it on her head, face.
```

1      Q.    And when you did the CPR, how did you --

2   let me show you Exhibit 124 and ask you if that

3   would help you show where you stood over the female

4   victim when you did the CPR?

5      A.    So --

6      Q.    Does that -- first of all, does that help

7   you show where you stood?

8      A.    Yes.

9          MR. MARKLE:   Government would offer 124,

10  your Honor.

11         MR. BUSSERT:   No objection, your Honor.

12         THE COURT:   Full exhibit.

13     Q.    So, looking at Government's Exhibit 124, it

14  appears at the bottom of the picture that there is a

15  mattress there.  Is that correct?

16     A.    Yes.

17     Q.    And on that mattress, do you see any items?

18     A.    Yes.

19     Q.    And did you know what those were?

20     A.    I remember it to be a ring.

21     Q.    You remember a ring?

22     A.    A ring.

23     Q.    And was it on the mattress when you were

24  there?

25     A.    Yes.

1    Q.   And where did you stand so that you could

2    administer CPR, or attempt to, as to the woman?

3    A.   So, still conscious of the fact that I want

4    to kind of preserve everything as best I can, I

5    don't really want to move or step on anything, so my

6    left boot was to the left of her.

7    Q.   As we look --

8    A.   I mean, I'm sorry, was to the right of her

9    because it's on her right.

10    Q.   I'm going to show you another exhibit,

11    121-9 and ask if that even helps more.  Whichever

12    one is better for you to describe or show the ladies

13    and gentlemen where you were standing.

14    A.   The first one, 121-10 is better.

15    Q.   Okay.

16    A.   So my left boot is by her -- if you want to

17    put that one up.

18    Q.   Yep.

19    A.   Okay, so my left boot is near her right

20    breast and -- oh, okay, cool.

21    Q.   That helps, thanks.  You can stand up, just

22    keep your voice up.

23    A.   So my left boot was here.

24    Q.   You are pointing to the upper left portion

25    of the picture as we look at it?

1    A.    Yes.

2    Q.    Okay.

3    A.    And I kind of straddled her and I put my

4  right boot on the mattress.

5    Q.    Okay.  And that's when you noticed the ring

6  on the mattress?

7    A.    I noticed it prior.

8    Q.    You can have a seat.

9         And you were able to -- and so those were

10 the only items you touched, the floor on the one

11 side and her and the mattress on the other?

12    A.    And the ring.

13    Q.    The ring moved?

14    A.    The ring moved.

15    Q.    Did you move anything else in that room, to

16 your knowledge?

17    A.    No.

18    Q.    Did you have to pick up any sheet, blanket,

19 mattress?

20    A.    No.

21    Q.    You didn't move anything?

22    A.    No.

23    Q.    Bodies?

24    A.    No.

25    Q.    The only body you moved was just --

1     A.    From the compressions.  Yes, nope.

2     Q.    Now, after you attended to her, when you

3  felt the rigor, did you determine that you cannot

4  save her life?

5     A.    Yes.  That was easy.

6     Q.    Did you do anything further to attempt to?

7     A.    No.

8     Q.    And you indicated, and the picture

9  obviously shows, there is a male victim next to her

10 face down.  Did you do anything in regards to the

11 male victim?

12    A.    No.

13    Q.    And why was that?

14    A.    So, during training you're trained to,

15 especially conscious of the crime scene, that if you

16 see injuries that are incompatible with life, that

17 you don't even try with them, try and help them.

18    Q.    And did you see injuries on the male victim

19 incompatible with life?

20    A.    Yes.

21    Q.    And what was that?

22    A.    So, in my estimation at that time it was

23 brain matter, I estimated to be brain matter next to

24 his head.

25    Q.    So, in the pool of blood you saw what you

1   believed to be brain matter?

2       A.   Yeah, I saw chunks, so I believed it to be.

3       Q.   Not to add to it, but if you see brain

4   matter, then somebody is not viable?

5       A.   Correct.

6       Q.   And -- okay.  Did you notice anything about

7   the hands, wrists, ankles, legs of the female

8   victim?

9       A.   Yes.

10      Q.   And what did you notice?

11      A.   I noticed -- well, I noticed that her

12  ankles were bound.

13      Q.   I'm going to show you -- did you see her

14  hands?

15      A.   No.

16      Q.   Showing you Government's Exhibit 121-6, is

17  that a true and accurate depiction of her ankles as

18  you saw them?

19      A.   Yes.

20           MR. MARKLE:  I would offer 121-6, your

21  Honor.

22           MR. BUSSERT:  No objection, your Honor.

23           THE COURT:  Full exhibit.

24      Q.   And, again, there is a placard with a 7

25  next to it.  That obviously wasn't there when you

1    saw her, right?

2       A.   Yes, correct.

3       Q.   That's from police investigators?

4       A.   Sure.

5       Q.   Is the taping of her ankles depicted in

6    121-6 exactly how you recall seeing her ankles?

7       A.   How I recall it, sure.

8       Q.   You didn't do anything to add to the tape,

9    take away the tape, change the tape?

10      A.   No.

11      Q.   You didn't touch her legs or ankles at all?

12      A.   No.

13      Q.   And as to the male victim in that same

14   room, do you recall anything about his ankles,

15   wrists, head?

16      A.   I remember seeing that his hands were bound

17   behind him.

18      Q.   I'm going to show you --

19      A.   Or towards his back.

20      Q.   I'll show you two photographs, 122-1 and

21   122-5 and ask you if they are true and accurate

22   depictions of the duct-taped hands of the male

23   victim in that bedroom.

24      A.   Yes.

25              MR. MARKLE:  Government would offer

1    122-1 and 122-5, your Honor.

2              MR. BUSSERT:  No objection.

3              THE COURT:  Full exhibit.

4       Q.   Now, 122-1 is a -- just describe what that

5    is.

6       A.   It's his posterior and his hands are bound

7    with duct tape.

8       Q.   And his wrists are bound or his hands are

9    bound there in the back of him or in front of him?

10      A.   They're behind him, so on his back.

11      Q.   And 122-5, is that just a close-up of the

12   same bound hands?

13      A.   Yes.

14      Q.   And, again, that's how you saw the

15   duct-taped hands of this male victim in that room?

16      A.   Yes.

17      Q.   And you didn't alter it in any way?

18      A.   No.

19      Q.   And this is the same individual who we see

20   with bound wrists who you said that there was brain

21   matter and was not compatible with life?

22      A.   Yes.

23      Q.   Now, after you made that determination, did

24   you leave the apartment or was there additional work

25   for you to do?

1    A.    Well, we were going to go to leave because
2    there was really no need for us to do anything, so,
3    then that's when my partner noticed in the other
4    bedroom someone else.

5    Q.    And that's the bedroom that was just to the
6    right of the one you just came out of?

7    A.    Correct.

8    Q.    And do you know whether your partner -- did
9    she go in that room?

10   A.    She had gone in that room.

11   Q.    And do you know if anyone else had gone in
12   that room?

13   A.    I don't know if anyone else had gone in.

14   Q.    To your knowledge, your partner went in and
15   you don't know anyone else?

16   A.    Correct.

17   Q.    Did you go in that room?

18   A.    I only went into just the entranceway area.

19   Q.    And did you see anyone in that room besides
20   your partner?

21   A.    Yes.

22   Q.    And what did you see?

23   A.    We saw another guy who was bound.

24   Q.    You saw a male?

25   A.    Yeah.  Yes.

1    Q.    And where did you see him?

2    A.    He was on the floor.  He was on the floor.

3    Q.    I'm going to show you 1116E and ask you if

4    this is a true and accurate depiction of what you

5    saw as you looked in that second bedroom.

6    A.    Yeah.  Yes.

7         MR. MARKLE:  The government would offer

8    1116E, your Honor.

9         THE COURT:  No objection.

10        MR. BUSSERT:  No objection.

11        THE COURT:  Full exhibit.

12   Q.    So, Ms. Mendoza in 1116E, we are looking

13   from the doorway, the photographer is basically

14   standing at the doorway and looking into that second

15   bedroom; is that correct?

16   A.    Yes.

17   Q.    And was there anything significant about

18   the person's ankles?

19   A.    Well, yes, they were bound along with his

20   hand, his wrists.

21   Q.    And you observed his ankles bound as they

22   are depicted in 1116E?

23   A.    Yes.

24   Q.    And did you observe his hands as they were

25   bound?

1    A.    Yes.

2    Q.    I'm going to show you Government's 120-6

3 and ask you if that's a better view of the ankles as

4 you saw them bound on this person?

5    A.    Sure, yes.

6         MR. MARKLE:   Government would offer

7 120-6, your Honor.

8         MR. BUSSERT:   Can I voir dire on that,

9 your Honor, if I could?

10         THE COURT:   You may.

11 VOIR DIRE EXAMINATION

12 BY MR. BUSSERT:

13    Q.    Ma'am, you said I think a moment ago you

14 didn't actually walk into the room; is that correct?

15    A.    I walked into the entranceway.

16    Q.    Did you walk beyond this point that's

17 depicted in the picture we're looking at right now?

18    A.    No, but I definitely -- the camera is just

19 going to do what the camera does, your eyes and the

20 way you can manipulate your head, I definitely saw

21 his head.

22    Q.    But in terms of the photo you were just

23 shown, were you standing over the feet in the way

24 that's depicted in that photograph?

25    A.    Yes.

1    Q.   You were.  You actually stepped into the

2  room?

3    A.   Yes, I stepped into the entranceway of the

4  room, yes.

5         MR. BUSSERT:  Okay.  Thank you.  No

6  objection, your Honor.

7         THE COURT:  Full exhibit.

8  CONTINUED DIRECT EXAMINATION

9  BY MR. MARKLE:

10   Q.   So, 120-6, which I'm showing to the jury,

11 is a view of the victim in the second bedroom,

12 ankles as you saw them taped?

13   A.   Yes.

14   Q.   And that is a true and accurate photograph

15 of how you found him?

16   A.   Yes.

17   Q.   Any doubt in your mind?

18   A.   No.  No, I remember he was bound.

19   Q.   And the placard obviously, again, was not

20 there at the time?

21   A.   Right.

22   Q.   And you indicated that you saw into the

23 room and could see that -- what else could you see

24 about that person?

25   A.   So, we saw -- or I saw that his legs were

1  bound.  So now, because we saw the other people, now

2  we're looking for that as well.  So, we saw that he

3  was bound in his feet and he was bound in his head

4  and his arms, and he also had a whole bunch of tape

5  on his head.

6        MR. BUSSERT:  Objection.  Just ask the

7  witness to testify to what she saw and not what we

8  saw in terms of what her partner may have seen.

9        THE COURT:  When you say "we" do you

10  mean you?

11        THE WITNESS:  Well, I had corrected

12  myself --

13        THE COURT:  Okay.

14        THE WITNESS:  In saying "we."  So, yes,

15  I am saying I.

16    Q.   Did you see the victim's hands?

17    A.   Yes.

18    Q.   Did you see the victim's wrists?

19    A.   Yes.

20    Q.   And how were they?

21    A.   They were bound.

22    Q.   And with one little piece of tape or a lot

23  of tape?

24    A.   No.  Again, it was wrapped multiple times.

25    Q.   And did you, not Karen, not anyone else,

1   did you see the victim's head?

2        A.    Yes.

3        Q.    And how was his head?

4        A.    Completely covered by duct tape.

5        Q.    Showing you Government's Exhibit 120-1, is

6   that a true and accurate depiction of the wrists and

7   head of the victim in the second bedroom?

8        A.    Yes.

9              MR. MARKLE:  I would offer 120-1, your

10  Honor.

11             MR. BUSSERT:  No objection.

12             THE COURT:  Full exhibit.

13       Q.    So, at the bottom of 120-1, Ms. Mendoza,

14  that is the -- what is that?

15       A.    His back and his hands are bound and his

16  head is completely wrapped.

17       Q.    And did you touch his body in any way?

18       A.    I kind of moved his legs a little bit with

19  my foot.

20       Q.    Was that inadvertent or was there a reason

21  to do that?

22       A.    That was --I mean, again, we are now -- now

23  we completely know those other two people are not

24  viable, so we -- I definitely assumed the same for

25  this gentleman, so I kind of just wanted to see if

```
 1    he was stiff, when I moved his leg if I could feel

 2    the stiffness, and I did.

 3         Q.   And there was stiffness?

 4         A.   And there was stiffness.

 5         Q.   So, it confirmed what you thought?

 6         A.   Exactly, and not having to enter to do

 7    anything other.

 8         Q.   And as to the -- in 120-1, the wrapping of

 9    duct tape around what appears to be the head, is

10    that how you saw the victim in the second bedroom

11    when you entered?

12         A.   Yes.

13         Q.   And, again, did you alter or change or do

14    anything to the duct tape around his head?

15         A.   No.

16         Q.   It appears that there is an area where his

17    nose is not covered.  Did you do that?

18         A.   I never -- I didn't even notice that --

19         Q.   So that was not something --

20         A.   -- that day.

21         Q.   -- something you did?

22         A.   No.

23         Q.   And then I'm going to show you 120-5, and

24    again ask you if that's a true and accurate

25    depiction of the victim's wrists at the time you saw
```

1    them?

2        A.    Yes.

3               MR. MARKLE:  I would offer 120-5, your

4    Honor.

5               MR. BUSSERT:  Your Honor, we're starting

6    to get into 403(b) -- or 403 territory.  I would

7    just offer that objection.

8               THE COURT:  Is there an objection?

9               MR. MARKLE:  It is the last photograph I

10   have, your Honor, and it is a close-up.

11              THE COURT:  All right.  This is a

12   close-up of the wrist?

13              MR. MARKLE:  Yes.

14              THE COURT:  It's a full exhibit.

15              MR. MARKLE:   Thank you.

16       Q.   Again, Ms. Mendoza, absent the placards

17   that obviously were not there, is that a better view

18   of the --

19       A.    That's a better view, yes.

20       Q.    And, again, what does that show?

21       A.    His wrists and apparently up to his elbows

22   bound.

23       Q.    And was the duct tape on all three of the

24   victims that you found, was it the same color?

25       A.    Yes, it was silver duct tape.  Yes.

1      Q.   So, is it fair to say that as to the second

2   bedroom, other than touch the victim's legs, you

3   touched no items in that room?

4      A.   Yes, I did not.

5      Q.   So, if anything was moved in that room, it

6   was not moved by you?

7      A.   Correct.

8      Q.   Whether it was a couch, a bed, a mattress,

9   a bag, anything?

10      A.   Correct.

11      Q.   And in regards to the gloves that you wear,

12   did you have to remove your gloves or leave your

13   gloves?  What did you do with the gloves you wore in

14   the course of this?

15      A.   Well, I don't physically recall, but after

16   seven years of doing this, what we do is we take

17   them off and we bring them out with us.  We'll try

18   to always take all of our garbage out of any scene

19   whether it's crime or not.  So, we don't want to

20   leave garbage behind.

21      Q.   And after you went into that second

22   bedroom, did you have to attend to anybody else at

23   the scene on August 24, 2005?

24      A.   No.

25      Q.   So you had identified three people that

1   were not compatible with life?

2       A.   Correct.

3       Q.   And then where did you go?

4       A.   And then we left the apartment and, I don't

5   know, continued with our shift.

6       Q.   Okay.  And are there reports you have to

7   prepare once you've responded --

8       A.   Yes.

9       Q.   -- to such a scene?

10      A.   Yes.

11      Q.   And did you do that along with your

12  partner?

13      A.   Yes.

14      Q.   And did a supervisor, by the way, come to

15  the scene?

16      A.   Yes.

17      Q.   While you were still there?

18      A.   Yes.  I had called for backup.  When I was

19  falling up the stairs I had called for backup

20  because I had heard my partner yell back there is

21  more than one.

22      Q.   And was there a belief at one time that the

23  victims had been shot?

24      A.   Well, yes, we got dispatched to the

25  shooting.

1    Q.    But that's not your job, to determine how

2  they were injured, it's to treat it?

3    A.    Correct.  We just get a better, like an --

4  at least you know what you are going to go to.

5    Q.    Right.  You want to have some idea?

6    A.    Correct.

7    Q.    But it could be right, it could be wrong?

8    A.    Yes, exactly.  It was not always right,

9  correct.

10          MR. MARKLE:  I think I have no further

11  questions.  Thank you very much.

12          THE COURT:  Cross examination.

13          MR. BUSSERT:  Your Honor, is it all

14  right if I just mark the exhibits myself here, your

15  Honor?

16          THE COURT:  Yes.

17          MR. BUSSERT:  Start with A.

18  CROSS-EXAMINATION

19  BY MR. BUSSERT:

20    Q.    Ma'am, I'm going to show you what's been

21  marked on your screen to your right there as

22  Defendant's A.  Do you recognize that?

23    A.    It's the wall like -- it's the wall in the

24  apartment.

25    Q.    Would that be the exterior part?  Is that

1    the doorway?  Does that look like the door to the

2    apartment?

3        A.   Yes, it looks like the entranceway.

4        Q.   And that's a fair and accurate

5    representation of how it appeared when you arrived

6    at the apartment that day?

7        A.   Yes.

8             MR. BUSSERT:  Your Honor, we'd offer

9    this, Defendant's A.

10            MR. MARKLE:  No objection.

11            THE COURT:  Full exhibit.

12       Q.   So, I think you had testified earlier that

13   when you arrived at the scene your partner went up

14   first, correct?

15       A.   She had gone in first.

16       Q.   And you were kind of pulling up behind with

17   all of the gear?

18       A.   Uh-huh (indicating affirmatively).

19       Q.   And you didn't see anybody when you went in

20   the apartment and the door was opened, correct?

21       A.   Correct.

22       Q.   So, this is pretty much how it looked when

23   you walked in?

24       A.   Sure, yes.

25       Q.   And then you were shown a photograph of a

1  couch, correct, earlier?

2      A.   Of the room, yes.

3      Q.   Of the living room, I believe, correct?

4      A.   Yes.

5      Q.   That was the first room you walked into?

6      A.   Yes.

7      Q.   I'm going to show you again on your little

8  screen there what's been marked as Defendant's B.

9  Do you recognize that?

10     A.   Yes.

11     Q.   What is that?

12     A.   That's the view from the window area of the

13 living room -- of the first room -- of the room you

14 entered into.

15     Q.   So, the other side of the room,

16 essentially?

17     A.   Correct.

18         MR. BUSSERT:  Your Honor, we'd offer

19 this as Defendant's B.

20         MR. MARKLE:  No objection.

21         THE COURT:  Full exhibit.

22     Q.   Okay, so we just saw the entranceway, and

23 then this is the door as it appears from the inside

24 already being open; is that correct?

25     A.   Yes.

1    Q.   And do you recall, was the couch situated
2    like that when you walked in?

3    A.   Yes.  Again, there's -- yes.

4    Q.   And as we're viewing this photo, as we're
5    looking straight onto it, the couch is on the
6    right-hand side of the photo, is that accurate, the
7    hallway leading to the back bedrooms is on the
8    right-hand side of that photograph?

9    A.   Yes.

10   Q.   Walking through that door and then down the
11   hallway?

12   A.   Yes.  You continue, come around the back of
13   the couch a little bit and then go up the hallway.

14   Q.   I'm going to ask if we can pull up 117J.
15   This has previously been admitted as Government
16   117J.  It should pop up here in a second.

17        Do you want to look on the screen there.

18        And this was the couch you said was in
19   the hallway, correct?

20   A.   Yes, yes.

21   Q.   And this was here when you went in the
22   apartment, correct?

23   A.   Yes.

24   Q.   You said you had to maneuver around this?

25   A.   Yes.

1      Q.    Was that easy to do or were you able to

2  just kind of walk right by?

3      A.    No, I have to walk sideways.

4      Q.    If you don't mind my asking, how tall are

5  you?

6      A.    5'6 and a half.

7      Q.    How much do you weigh?

8      A.    Now?

9      Q.    Then.

10     A.    Yeah, right.   Then 160.

11     Q.    So, average-sized woman, and you were able

12  to maneuver around the --

13     A.    Yes.

14     Q.    Now, I think you testified on direct that

15  when you walked initially to the bedrooms -- I'm not

16  trying to coach you or anything -- but you were

17  taken aback by what you saw?

18     A.    Yes, fair to say.

19     Q.    Had to gather yourself for a second?

20     A.    For a second.

21     Q.    And then your professionalism kicked in?

22     A.    Correct.

23     Q.    You said in addition to being a paramedic,

24  you were a nurse in the ER?

25     A.    Not at the time.

1    Q.   Not at the time?

2    A.   No.

3    Q.   But you are now?

4    A.   Correct.

5    Q.   How long have you been working in kind of

6    first responder, nursing, emergency-type situations?

7    A.   Since 1996.

8    Q.   How many dead bodies would you estimate

9    you've seen over your career?

10   A.   To that time?

11   Q.   No, to today?

12   A.   To today?  God, more than 700.

13   Q.   And I would assume it doesn't get any

14   easier anytime you see them?

15   A.   No.

16   Q.   But, again, I think you said you gathered

17   yourself, you realized you had a job to do and you

18   went about the work that you were there for?

19   A.   Correct.

20   Q.   Kind of put your emotions on the back

21   burner and did your job?

22   A.   Yes.

23   Q.   When we look at these photos of the three

24   individuals in the apartment, fair to say that they

25   look like they had been killed?

1    A.    Yes.

2    Q.    Either then or now, you don't know who was

3 present when that occurred, correct, when these

4 killings occurred?

5    A.    No.

6    Q.    You don't know this gentleman at all?

7    A.    No.

8    Q.    Never seen him before in your life?

9    A.    No.

10   Q.    You don't know where he was when those

11 people were killed?

12   A.    No.

13   Q.    In terms of being kind of shocked about

14 this scene, did you get the sense whoever did this

15 may have been like a scary individual?

16            MR. MARKLE:  Objection, your Honor.

17            THE COURT:  Sustained.

18   Q.    This was a pretty --

19            THE COURT:  Do you want to rephrase?

20   Q.    This was a pretty violent scene, correct?

21   A.    Yes, yes.

22   Q.    And you never actually met the person who

23 killed these people, the persons?

24   A.    No.

25            MR. BUSSERT:  Thank you.  No further

1    questions.

2                    THE COURT:  Thank you.  Put those on the

3    table in front where we're going to put the

4    evidence.  Thank you.  Redirect.

5    REDIRECT EXAMINATION

6    BY MR. MARKLE:

7        Q.    Ms. Mendoza, do you know a person by the

8    name of Azibo Aquart?

9        A.    No.

10       Q.    Do you know a person by the name of Azikiwe

11   Aquart?

12       A.    No.

13       Q.    Do you know a person by the name of John

14   Taylor?

15       A.    I do, actually.

16       Q.    Is the John Taylor you know incarcerated?

17       A.    No.

18       Q.    Do you know if one or two or three of those

19   persons were in that apartment on August 24, 2005,

20   prior to your arrival?

21       A.    I don't know.

22       Q.    So just like you don't know where the

23   defendant was, you don't know where any of them

24   were?

25       A.    Correct.

1        Q.   You just know who was there when you got

2     there and who was there when you left?

3        A.   Sure.  Yes.

4             MR. MARKLE:  Thank you.

5     RECROSS-EXAMINATION

6     BY MR. BUSSERT:

7        Q.   Okay, so you don't know Azibo Aquart?

8        A.   I don't.

9        Q.   Is it fair to say that whoever did this,

10    these killings that were depicted in the pictures,

11    you wouldn't really want to be around them; is that

12    fair to say?

13       A.   That is fair to say.

14       Q.   It's scary?

15       A.   Yes.

16             MR. BUSSERT:  Thank you.

17             THE COURT:  All right, if there is

18    nothing further, thank you.  And you are excused,

19    Ms. Mendoza.  You may step down.

20             All right, Ms. Reynolds, do you want to

21    present your next witness or do you want to -- shall

22    we take lunch and do that after lunch?

23             MS. REYNOLDS:  It's up to the Court.

24    Whatever.  We can do either one.  The next witness

25    shouldn't be very long, so if the Court wants to

1    proceed.

2              THE COURT:  All right, let's take the

3    next witness and then we'll have lunch.

4              MS. REYNOLDS:  Your Honor, at this time

5    the government calls Sandra Holliday.

6              MR. BUSSERT:  Your Honor, while the

7    witness is coming in, could we be heard at sidebar?

8              THE COURT:  Yes.

9              (Sidebar conference.)

10             THE COURT:  Yes?

11             MR. BUSSERT:  I think this issue came up

12   in Mr. Aquart's case which is, as I understand it,

13   this is the model and also the computer graphics.

14   And as I understand, the government did provide a

15   copy of, which I reviewed, the computer disk.  At

16   least one of the screens, let's say, has different

17   dots and if you click on the dots you can see the

18   photographs.

19             I think what your Honor did in the

20   Aquart case, which we have no objection to, is to

21   admit this provisionally in terms of it being tied

22   in with the pictures that actually depicted, with

23   the exhibits first being admitted before that

24   exhibit is used as full, and then beyond that, and

25   because that may take a little bit of time, we would

1    object and ask that the exhibit be redacted.

2              I think there is a screen -- there is a

3    screen, as your Honor may recall, that shows

4    apartment 101 and then the two apartments upstairs,

5    and then when you highlight apartment 101 it

6    actually has written on there "murder scene" and

7    then upstairs it says, like, "drug dealing," and the

8    other one says "lookout."  And clearly that's

9    testimonial in nature and I think it's a little

10   superfluous to the extent there is some testimony

11   about what these locations were.

12             MS. REYNOLDS:  I can shortcut that.  I'm

13   not going to highlight and/or click on any of the

14   photos, I'm simply introducing the exhibit through

15   this witness.  She created them.

16             THE COURT:  So the description will be

17   that if you clicked on this you would get the

18   photos, but we're not going to have the photos.

19             MS. REYNOLDS:  Correct.

20             MR. BUSSERT:  But again, in terms of the

21   descriptions, at some point the jury is going to

22   have the disk and be free to do what they will with

23   it and it would be our position that the disk can

24   and should be redacted to take out those descriptors

25   and just say apartment 101 or apartment -- whatever

1   the second floor apartments are, and leave it at

2   that.  I think the evidence will establish what went

3   on in those apartments and should be sufficient.

4   It's not on here.

5           MS. REYNOLDS:  Well, this is what I'm

6   going to put into evidence.  That's the printout of

7   the disk, and I think this has what the jury will be

8   provided.  We have no objection.  They're not going

9   to be looking at the disk in the jury room.  We have

10  no objection as to this part.

11          THE COURT:  Is the disk itself coming in

12  as an exhibit?

13          MS. REYNOLDS:  Yes, your Honor.

14          THE COURT:  All right, let's take a look

15  at that at some point that's convenient and see

16  what's on there.  If in fact they wish to look at

17  that disk --

18          MS. REYNOLDS:  Just so the record -- to

19  explain to the Court, to make it easier, what I've

20  done is print out each one of the graphics, a hard

21  copy, so that is what we would propose the jury

22  should actually have in the jury room as opposed to

23  the disk.  If they want to view the disk --

24          THE COURT:  That may be a solution, but

25  why don't you just take a look at the disk and see

1   what would be there if they wanted to see the disk,

2   and then we can see if there is any further

3   adjustment that needs to be made.

4           MR. BUSSERT:  Sorry, but if I may just

5   essentially have, like, a voir dire question, if I

6   can just do that on cross.  It's going to be very

7   limited.

8           THE COURT:  That's fine.

9           (Sidebar concluded)

10          THE COURT:  All right, is Ms. Holliday

11  here?

12          MS. REYNOLDS:  We're getting her right

13  now.  Yes, she's here, your Honor.

14          THE COURT:  All right.  Ms. Holliday,

15  when you get to the witness stand, please remain

16  standing so the oath can be administered.

17          S A N D R A   H O L L I D A Y,

18  Having first been duly sworn, was examined and

19  testified as follows:

20          THE WITNESS:  My name is Sandra

21  Holliday, h-o-l-l-i-d-a-y, and I am from

22  Fredericksburg, Virginia.

23          THE COURT:  You may proceed.

24          MS. REYNOLDS:  Thank you, your Honor.

25  DIRECT EXAMINATION

BY MS. REYNOLDS:

Q.   Ms. Holliday, where do you work?

A.   I work in the FBI laboratory in the operational projects unit.

Q.   How long have you worked in the operational projects unit of the FBI lab?

A.   Since 1990.

Q.   And what is your current position with that unit, the operations unit?

A.   I'm a visual information specialist.

THE COURT:   Could you please push the microphone over closer to you or --

THE WITNESS:   Okay?

THE COURT:   I don't know, let me hear you.

Q.   What do you do there?

A.   I am a visual information specialist.

Q.   And can you describe what your duties are and responsibilities are as a visual operations specialist?

A.   We do 2D and 3D to-scale drawings of the various crime scenes.

Q.   And how long have you been doing that with the FBI in this position?

A.   This position, since 1990.

1    Q.    Prior to joining the operational projects

2    division of the lab, were you employed at the FBI?

3    A.    Yes, I've been employed at the FBI since

4    1979.

5    Q.    And what are some of the jobs you've held

6    at the FBI throughout your career there?

7    A.    I was a clerk in the documents unit, and

8    then I worked in civil rights, and then I worked in

9    the inspection division as a secretary.

10   Q.    And then getting back to your current

11   position, you mentioned that you work on exhibits to

12   scale, correct, for different cases?

13   A.    Yes.

14   Q.    Can you just describe with a little more

15   specificity what types of cases you work on and what

16   types of exhibits you prepare?

17   A.    We work on all types of cases.  I do to

18   scale drawings of various crime scenes, placing

19   evidence in those from drawings made at the scene.

20   Either we will go out and do the drawings or

21   sometimes we get them from our ERT team who sends

22   them in.

23   Q.    Are these digital drawings?

24   A.    Yes.

25   Q.    Did you have occasion to work on the 911

1    investigation?

2        A.    Yes, I did.

3        Q.    And so approximately how many cases have

4    you worked on since joining the operational projects

5    unit?

6        A.    Numerous cases.  I worked on the unibomber

7    case, I worked on the Oklahoma City bombing, I

8    worked on the Jasper dragging case, various others.

9        Q.    Did there come a time -- well, let me ask

10   you this:  Approximately how many other people work

11   with you in that unit?

12       A.    We have approximately 38 employees now.

13       Q.    And is one of the other departments or

14   units, do they also create three-dimensional

15   models --

16       A.    Yes.

17       Q.    -- of different crime scenes?

18       A.    Yes.

19       Q.    Yes?

20       A.    Full scale model.

21       Q.    And you work with them?

22       A.    Yes.

23       Q.    So, let me then draw your attention to when

24   you became involved in this case and ask you if you

25   were asked to assist the FBI and the Bridgeport

1    Police Department in an investigation of a murder

2    that took place in August 2005?

3        A.   Yes, correct.

4        Q.   And did you -- were you initially assigned

5    to the case?

6        A.   No, I was not, another employee was, but

7    she was transferred out of the unit, so then the

8    case was transferred to me.

9        Q.   And did you have occasion to travel to

10   Bridgeport, Connecticut?

11       A.   Yes, we did, because when we received the

12   blueprints, the front entrance was different from

13   what we could see on the photographs and the

14   drawings, so we had to go up there to establish what

15   had changed and to take measurements of that, those

16   renovations, put them in the drawing.

17       Q.   When you say "we," who were you working

18   with on this case?

19       A.   Cletis Spitznagel.

20       Q.   And what were his duties or

21   responsibilities?

22       A.   He actually made the physical model.  So he

23   took the plans and put them into Autocad and then

24   created the model from that.

25       Q.   And when we're talking about the model and

1    the drawings that you and Cletis prepared, that's

2    with regard to the apartment building at 215 Charles

3    Street in Bridgeport, Connecticut?

4        A.   Correct?

5        Q.   And that's where you and Cletis traveled?

6        A.   Yes, we did.

7        Q.   And did you also have occasion to meet with

8    Special Agent Munger and Detective Donaldson and

9    Detective Joette Devan of the Bridgeport Police

10   Department in connection with your work on this

11   case?

12       A.   Yes, we did.

13       Q.   Did you also receive from them and from the

14   Bridgeport Police Department and the FBI numerous

15   crime scene photographs and other materials to

16   assist you in preparing the drawings and the model?

17       A.   Yes.

18       Q.   You indicated that you travelled to

19   Connecticut with your colleague and took some

20   measurements.  Did you have occasion to take

21   measurements of the height of the ceiling -- let me

22   ask you this:  Did you also prepare exhibits with

23   regard to an apartment inside 215 Charles Street?

24       A.   Yes, I did.

25       Q.   And was that apartment 101 on the first

1  floor?

2      A.   Yes.

3      Q.   And when you travelled to 215 Charles

4  Street as part of your duties, did you take

5  measurements of the height from the floor to the

6  ceiling of apartment 101?

7      A.   Yes, they were on the blueprints, but we

8  just wanted to verify that they were correct.

9      Q.   And do you recall what the height was from

10  floor to ceiling for apartment 101 at 215 Charles

11  Street?

12      A.   It was 9'3 7/8 inches.

13      Q.   In connection with your work over at 215

14  Charles Street in Bridgeport, did you also obtain an

15  aerial photograph of the apartment building located

16  there?

17      A.   No, we did not have an aerial photograph.

18  The photograph I used was taken from Google maps.

19      Q.   So, that's how you got the aerial.  All

20  right, so can you describe, once you have all of

21  these materials, photographs, diagrams, blueprints,

22  measurements, what it was that you did with those

23  materials?

24      A.   I take them into a computer-aided design

25  software program, Autocad, and then just build it to

1  scale and use it in various ways in an interactive

2  exhibit using an Adobe Flash.

3           MS. REYNOLDS:  Your Honor, may I

4  approach?

5           THE COURT:  You may.

6      Q.   Handing you what's been marked as

7  Government's Exhibit 101A and also 101A-1, 101A-2,

8  and 101A-3.  Do you recognize -- first of all,

9  starting with 101A, do you recognize that CD?

10     A.   Yes, that's the CD I prepared.

11     Q.   How is it you are able to recognize that?

12     A.   I initialed and dated it.

13     Q.   So, you viewed the contents of this CD and

14  this contains the diagrams and drawings that you

15  prepared in this case?

16     A.   Correct.

17     Q.   And then taking a look at 101A-1, 2 and 3,

18  what are these?

19     A.   These are the to-scale drawings of the

20  apartment, the whole apartment building and of the

21  particular apartment 101.

22     Q.   And 101A?

23     A.   Is the aerial photograph.

24     Q.   And are these fair and accurate photocopies

25  of what's contained on 101A, the disk?

1       A.    Yes.

2               MS. REYNOLDS:   Your Honor, at this time

3    I would move as full exhibits 101A, 101A-1, 101A-2

4    and 101A-3.

5               MR. BUSSERT:   Your Honor, with respect

6    to 101A, which is the disk, it would be the same

7    objection as was noted at sidebar, it's premature,

8    but as to the other three, there is no objection.

9               THE COURT:   All right, so that will be

10   provisionally admitted and subject to its

11   supplemental photography, and the other is admitted

12   in full.  Okay.

13      Q.    Taking a look at your screen there and

14   showing you what's been admitted as 101A-1, is this

15   the aerial photograph that you obtained from the

16   Google Maps?

17      A.    That's correct.

18      Q.    And is this building that's located in the

19   middle of the photograph, is that the building that

20   you went to?  That's 215 Charles Street?

21      A.    Yes.

22      Q.    And then taking a look at Government's

23   Exhibit 101A-2, tell us what it was that you did

24   here.

25      A.    Those are a copy of the blueprints to-scale

1    drawing.

2         Q.   So, you obtained the blueprints and then

3    you did to-scale drawings --

4         A.   Right.

5         Q.   -- of the layout of the apartments?

6         A.   Correct.

7         Q.   As they were at 215 Charles Street,

8    correct?

9         A.   Correct.

10        Q.   And then taking a look at Government's

11   Exhibit 101A-3, what is this?

12        A.   That's a to-scale drawing of unit 101 in

13   the apartment.

14        Q.   And on this there are several blue dots

15   with numbers.  Can you just tell us what happens

16   if -- well, what those represent and how that works?

17        A.   They represent the crime scene photos that

18   were taken by the police department and taken from

19   their drawings.

20        Q.   So, you obtained some crime scene

21   photographs from the police department when you were

22   preparing Government's Exhibit 101A-3?

23        A.   Correct.

24        Q.   And what would happen if we had the disk,

25   if you were to click on to one of those numbers,

1    what happens?

2         A.    The photo that corresponds with that number

3    would appear.

4         Q.    And, again, this is just a diagram of

5    apartment 101 that corresponds with the Bridgeport

6    police's crime scene unit investigation, correct?

7         A.    Correct.

8         Q.    And then just a couple more questions.  You

9    indicated that your colleague Cletis Spitznagel --

10   is it really Spitznagel?

11        A.    Yes, it is.

12        Q.    He assisted in preparations of a to-scale

13   model of the apartment building at 215 Charles

14   Street, correct?

15        A.    Correct.

16        Q.    And have you had occasion to take a look at

17   the model that's being wheeled in right now?

18        A.    Yes.

19             MS. REYNOLDS:  Your Honor, at this time

20   we would move as a full exhibit Government's

21   Exhibit 101.

22             MR. BUSSERT:  Your Honor, perhaps this

23   might be a good time to take break, but -- I knew it

24   existed, but I never actually have seen this.

25             THE COURT:  Why don't you do the direct

1   examination and then you can do both your voir dire

2   and cross-examination after lunch.  How about we do

3   it that way?

4           MR. BUSSERT:  Sounds good.  Thank you.

5      Q.   All right.  And, again, with regard to the

6   model, that was prepared by your colleague and that

7   was based on the blueprints and it's a model of --

8           MR. BUSSERT:  Objection, leading.

9      Q.   Well, what is it a model of?  I think we've

10   already established that.

11      A.   It's an actual physical 3D model of the

12   apartment building from the blueprints we received.

13           MS. REYNOLDS:  I have nothing further at

14   this time, your Honor.

15           THE COURT:  All right, why don't we go

16   to lunch.  Why don't we be back at 25 past.

17           Please leave your notebooks here, please

18   don't discuss the case, and we'll resume with

19   cross-examination of Ms. Holliday when you return.

20              (Jury exited the courtroom.)

21           THE COURT:  All right.  May I ask that

22   the transcript from the 911 call be collected.

23           MS. REYNOLDS:  Yes, we'll do that.

24           THE COURT:  And is there anything else

25   before we break for lunch?

```
1                    MR. BUSSERT:  No, your Honor.

2                    MS. REYNOLDS:  No, your Honor.

3                    THE COURT:  Very good, we'll stand in

4    recess.

5                    (Recess)

6                    THE COURT:  Please be seated.  Is Ms.

7    Holliday here?  Could we bring her back.

8                    MS. REYNOLDS:  Yes.

9                    THE COURT:  Thank you.  And is there

10   anything before we begin cross-examination, Mr.

11   Bussert?

12                   MR. BUSSERT:  No, your Honor.

13                   (Jury entered the courtroom.)

14                   THE COURT:  All right, ladies and

15   gentlemen, please be seated.  We'll continue with

16   cross-examination by Bussert of Ms. Holliday.  You

17   may proceed.

18                   MR. BUSSERT:  Thank you.

19   CROSS-EXAMINATION

20   BY MR. BUSSERT:

21      Q.   Ma'am, am I correct you are a federal

22   agent?  Is that correct?

23      A.   No, I am not.

24      Q.   You are not a federal agent.  So, what

25   exactly is your job title?
```

```
1       A.    Visual information specialist.

2       Q.    For what department?

3       A.    I work in the --

4             THE COURT:  Could you move that

5   microphone over, Mr. Bussert.

6       A.    I work in the operational projects unit for

7   the FBI laboratory.

8       Q.    So, you work for the Federal Bureau of

9   Investigation?

10      A.    Correct.

11      Q.    And you've been creating these types of

12  exhibits you talked about on direct for how long?

13      A.    Since 1990.

14      Q.    So, 22 years now, or 21 years?

15      A.    Yes.

16      Q.    What's the general purpose and why do you

17  create these exhibits?

18      A.    They are used at trial to demonstrate

19  either line of sight or witnesses who testify what

20  went on at the scene.

21      Q.    Would you agree -- I mean, is the accuracy

22  of these exhibits, is this important?

23      A.    Yes.

24      Q.    So you make every effort to be accurate?

25      A.    Yes.
```

1    Q.    I'm going to show you what's been marked as

2    Government 101A-1.  This is the one you testified to

3    on direct, correct?

4    A.    Yes.

5    Q.    I believe you testified this image was

6    actually taken from Google Maps?

7    A.    Correct.

8    Q.    Do you remember, or do you recall, when you

9    downloaded the image, approximately?

10   A.    Probably late 2010, early 2011.

11   Q.    And do you know when Google Maps, which is

12   some kind of satellite or something, captured this

13   image?  Do you know when this photo was actually

14   taken?

15   A.    No, I don't.  Well, it has a date when we

16   take it off of there, but it's initially there when

17   we downloaded it.

18   Q.    But when it was actually physically taken,

19   you don't know that?

20   A.    No, we don't.

21   Q.    So, there is no claim this image was taken

22   on August 24, 2005?

23   A.    No.

24   Q.    Any of the vehicles depicted here weren't

25   present at that time?

1    A.    No.

2    Q.    And you said you actually went to these

3    apartments?

4    A.    Correct.

5    Q.    Now, if you could look at the image there

6    on the bottom left-hand corner I'm point to with my

7    finger, this little building here, do you recognize

8    that as the diner that's on the corner?  Do you see

9    that diner when you went out to the location?

10   A.    I didn't really pay attention.  We were at

11   the actual apartment, the building.

12   Q.    Okay.  Now, I'm going to turn attention to

13   Exhibit 101A-2.  You said this is a to-scale

14   rendition of the interior of the apartment building;

15   is that correct?

16   A.    Correct.

17   Q.    Now, as we're looking at this image, it's

18   flat, correct?

19   A.    Correct, it's 2D.

20   Q.    So, it looks like it's depicting one floor,

21   correct?

22   A.    Yes, it's depicting the first floor.

23   Q.    It's depicting the first floor or the

24   second floor?  I ask this because on the top part if

25   we look in the center it says "unit 211, second

1    floor," correct?

2        A.    Yes, but that unit is directly --

3        Q.    If I can just finish.  On the bottom right

4    it says "unit 202, second floor," correct?

5        A.    Correct.

6        Q.    And then on the top it says "unit 101,"

7    correct?

8        A.    Correct.

9        Q.    And that's where the crime at issue in this

10   case, that's where that occurred, correct?

11       A.    Correct.

12       Q.    So, essentially for this image, correct me

13   if I'm wrong, but for this top right corner where it

14   says "unit 101," that's the second floor, and then

15   kind of unit 101 is kind of cut through and looking

16   at unit 101?

17       A.    Correct.  They're both the same layout on

18   the separate floors.  The apartments are the same

19   layout.

20       Q.    In terms of the wall configuration and

21   things like that?

22       A.    Yes.

23       Q.    And this is, for the record, Exhibit

24   101A-3, Government 101A-3, correct?

25       A.    Correct.

1     Q.    You made this?

2     A.    Yes.

3     Q.    Now, I think you testified on direct these

4     little blue dots are photographs, correct?  They

5     represent photographs that were used?

6     A.    Correct.

7     Q.    So, you took -- you were provided crime

8     scene photos, correct?

9     A.    Correct.

10    Q.    From that and from visiting the site you

11    then recreated this kind of graphic display of what

12    the apartment looked like?

13    A.    Yes.  The dots were placed according to the

14    original crime scene sketch done by the police

15    department.  We didn't actually physically measure

16    them and put them there, they were placed by the

17    crime scene diagram that we received from the police

18    department.

19    Q.    Do the dots, do the numbers on the dots

20    represent the markers that were placed?  I think the

21    jury has --

22    A.    Yes.

23    Q.    -- has seen some of these yellow markers.

24    A.    Yes.

25    Q.    So, if there were a photograph showing that

1    marker number --

2         A.   Correct.

3         Q.   -- it would correspond to that?

4         A.   Correct.

5         Q.   And, again, this was the scene as it was

6    found by emergency responder personnel, correct?

7         A.   And the police department, yes.

8         Q.   So, like this couch, this couch with the

9    dot No. 13, it may not have been located there,

10   let's say, the day before?

11        A.   Correct.

12        Q.   And if we look into this hallway here, this

13   yellow image, it looks like a love seat.  That may

14   not have been there the day before, correct?

15        A.   Correct.

16        Q.   You don't know one way or the other?

17        A.   No.

18        Q.   Now, if we look at the yellow love seat,

19   fair to say that it looks like it's been turned on

20   its side?

21        A.   Yes.

22        Q.   And the bottom, what would be the bottom of

23   the love seat typically if it was sitting on the

24   ground, is turned up and close to the wall on the

25   right-hand side?

```
1        A.    Correct.

2        Q.    And then the left side there is some space

3   between the top of the love seat, which is the back,

4   it's turned over, and the wall of the left-hand

5   side?

6        A.    Yes.

7        Q.    Now I want to show you, if we can, this

8   photo, this image 101A-3.  There is really no space

9   on the right-hand side.  There is a little gap,

10  correct?  The larger space is on the left?

11       A.    Correct.

12       Q.    Now, I want to show you what's been

13  previously admitted as Exhibit 117J, okay.  Does

14  this look like the love seat we're talking about,

15  the actual image of it?

16       A.    Yes.

17       Q.    And if we look on the left-hand side of the

18  hallway, there is absolutely no space, correct, the

19  couch is up against the wall?

20       A.    Yes.

21       Q.    And the space to pass is on the right-hand

22  side?

23       A.    Yes.

24       Q.    It's fair to say if we go back to 101A-3,

25  this may not be completely to scale or perfectly
```

1    located in terms of that couch in that image; is

2    that fair to say?

3        A.   That's correct.  It was just placed there

4    according to the drawing I was provided by the

5    police department.

6        Q.   Turning your attention back to 117J, have

7    you ever seen this image before?

8        A.   It might have been among the other crime

9    scene photographs, but the photos that I dealt with

10   only had the evidence markers in them.  I was

11   provided a disk of photos, but I only dealt with the

12   photos that had the particular evidence markers in

13   them.

14       Q.   Do you know what happened -- well,

15   actually, strike that.

16            So, are you saying that there was no

17   marker on this couch?

18       A.   No, there is no evidence marker in that

19   photograph.  So, in reviewing all of the other

20   photographs, I just picked out the ones, used the

21   ones that had the actual evidence markers.

22       Q.   And you were asked on direct about other

23   cases you've testified in, correct?

24       A.   Yes.

25       Q.   And I think you were asked -- you were

1   specifically asked did you work on 9/11, and you

2   said yes?

3        A.   Yes, I did.

4        Q.   And then you volunteered, you said, the

5   Oklahoma City bombing case?

6        A.   Yes.

7        Q.   And the dragging case; is that correct?

8        A.   Yes.

9        Q.   That's three cases, correct?

10        A.   Yes.

11        Q.   That you've named.  About how many cases

12   have you worked on since you've been doing this in

13   your 22-year career?

14        A.   That would be hard to say because it will

15   depend on the case.  Like the unibomber case was the

16   only case I worked on for two years because the

17   exhibits were so large.  It was 469 exhibits in

18   that.

19        Q.   Okay.

20        A.   So, it's hard to say from year to year on

21   average what I am assigned.

22        Q.   What would you the say total is?  Over 100?

23        A.   I would say yes.

24        Q.   Over 200 in 22 years?

25        A.   Yes.

1    Q.   And so the cases that you named on direct

2  aren't necessarily representative of all of the

3  cases, those are more high profile cases, correct?

4    A.   Those are the larger cases that I've

5  worked.

6    Q.   And the cases that the jurors might be more

7  the familiar with, correct?

8    A.   Yes.

9    Q.   Have a little bit more gravitas, correct?

10    A.   Yes.

11              MR. BUSSERT:  Thank you.

12              THE COURT:  Redirect?

13              MS. REYNOLDS:  I would just ask, your

14  Honor, was there any objection to moving in

15  Government's Exhibit 101?

16              MR. BUSSERT:  Your Honor, we would

17  object.  Obviously this witness didn't actually

18  create the exhibit.  We haven't had an

19  opportunity -- I don't think we've been provided a

20  copy of the blueprints relied upon in creating it.

21              THE COURT:  Why don't we take up the

22  objection that you have at the next recess.  We will

23  hold 101A -- it's 2, right?  No.  Yes.  What is --

24              MS. REYNOLDS:  101 is the model.

25              THE COURT:  101 is the model.

```
1                   MS. REYNOLDS:  Yes.

2                   THE COURT:  Let's just hold it for ID,

3     let me hear Mr. Bussert more fully on his objection,

4     but not on the jury's time, and let's move on.

5                   Is there anything further for Ms.

6     Holliday?

7                   MS. REYNOLDS:  Just one question, your

8     Honor.

9     REDIRECT EXAMINATION

10    BY MS. REYNOLDS:

11         Q.   You were asked a few questions about

12    101A-2.  On the disk that you prepared there's

13    also -- well, can you describe what else is

14    contained with regard to the layout of the

15    apartments on the disk?

16                  MR. BUSSERT:  Objection, your Honor.

17    That is not in evidence, that disk.

18                  MS. REYNOLDS:  Well, it relates to

19    explaining why she's only showing one floor here.

20         Q.   Did you prepare a diagram --

21                  MR. BUSSERT:  Objection, your Honor.

22                  THE COURT:  Wait a second.  Why don't

23    you reask the question in terms of what may be on a

24    disk in just general subject matter terms, if that's

25    your point, and then we can go from there.
```

1          MS. REYNOLDS:  Yes, your Honor.

2     Q.   With regard to the diagram that you

3   prepared showing the layout, which is in 101A-2,

4   which is in evidence, was there another part to that

5   diagram?

6     A.   Yes.

7     Q.   And is that contained on a disk?

8     A.   Yes.

9     Q.   And what is that diagram of?

10    A.   It's an interactive part.  When you scroll

11   over it, it will show more information.

12    Q.   It kind of highlights the separate floors,

13   correct?

14    A.   Correct.

15          MS. REYNOLDS:  Nothing further, your

16   Honor.

17          THE COURT:  Anything further?

18          MR. BUSSERT:  No, your Honor.

19          THE COURT:  All right, thank you, Ms.

20   Holliday.  You are excused.  You may step down.

21          Will the government please call its next

22   witness.

23          MS. REYNOLDS:  Your Honor, the

24   government calls Detective Joette Devan.

25          THE COURT:  Detective Devan, please

```
1    remain standing, please raise your right hand.
2                    J O E T T E   D E V A N,
3    Having first been duly sworn, was examined and
4    testified as follows:
5              THE WITNESS:  Joette Devan, d-e-v-a-n,
6    Stratford, Connecticut.
7              THE COURT:  You may proceed.
8              MS. REYNOLDS:  Thank you, your Honor.
9    DIRECT EXAMINATION.
10   BY MS. REYNOLDS:
11        Q.    Good afternoon, Detective.
12        A.    Hello.
13        Q.    Where do you work?
14        A.    Bridgeport Police Department.
15        Q.    What is your current assignment with the
16   Bridgeport Police Department?
17        A.    I'm a detective in the crime scene unit.
18             THE COURT:  Could you pull the
19   microphone down towards your mouth, please.
20             MR. BUSSERT:  Your Honor, if I could,
21   could we move Exhibit 101, please?  It's not a full
22   exhibit.  Just put it to the side?
23             MS. REYNOLDS:  We'll do that, your
24   Honor.  The agent will move it back to where it was.
25   Thank you.
```

1      Q.    Detective, how long have you been a

2  detective with the crime scene unit in Bridgeport

3  PD?

4      A.    I've been in the crime scene unit since

5  2004.

6      Q.    And how long have you been a police

7  officer?

8      A.    In just about three weeks, 15 years.

9      Q.    And always with the Bridgeport PD?

10     A.    Yes.

11     Q.    Can you the briefly describe what some of

12  your other assignments were with the Bridgeport PD

13  prior to joining the crime scene unit?

14     A.    Prior to the crime scene unit, for two

15  years I was in general investigations, the detective

16  bureau, and for five years prior to that I was a

17  patrol officer.

18     Q.    Can you describe for the members of the

19  jury what your duties and responsibilities are now

20  as a member of the crime scene unit?

21     A.    The crime scene unit responds as requested

22  to crime scenes to process and document the scenes.

23     Q.    And what types of cases do you respond to?

24     A.    We always respond to homicide cases, and

25  then depending on the severity or complexity of

1    other cases, we respond to anything we're requested

2    to respond to.

3        Q.    Did you receive any specialized training in

4    order to join the crime scene unit?

5        A.    Well, once I was accepted into the crime

6    scene unit, yes, then I had quite a significant

7    amount of specialized training.

8        Q.    Can you describe what some of the courses

9    are and some of the specialized training is that

10   you've received over the years as you've been a

11   detective with the crime scene unit.

12       A.    Crime scene processing, evidence detection,

13   evidence processing, evidence collection.  Also

14   crime scene reconstruction, shooting reconstruction,

15   blood pattern recognition, blood pattern analysis,

16   latent evidence, including fingerprints, fingerprint

17   ID, fingerprint comparison, and in 2010 I graduated

18   from the National Forensic Academy in Tennessee,

19   which is an intensive ten-week training class.

20       Q.    Approximately how many murder crime scenes

21   have you processed, either you or with your fellow

22   crime scene unit investigators, since you've been a

23   member of the crime scene unit?

24       A.    I would say in the hundred range.

25       Q.    And that's obviously just in Bridgeport is

```
 1   what you respond to, correct?

 2       A.    Yes, yes.

 3       Q.    Drawing your attention back to 2005, August

 4   of 2005, at that time how long had you been a member

 5   of the crime scene unit?

 6       A.    About a year and a half.

 7       Q.    And at that time, back in 2005, do you

 8   recall approximately how many murder scenes you had

 9   processed in that year, year and a half?

10       A.    Murder scenes specifically?  Maybe 20, 25.

11       Q.    And approximately how many crime scenes

12   overall had you processed by, say, August of 2005?

13       A.    If I had to estimate, I'd say at least 50,

14   75, somewhere in that range.

15       Q.    Now, can you describe just in general terms

16   when you and the crime scene unit respond, you are

17   called out to a scene, when you go out, do you go

18   out yourself or do you go on a team?

19       A.    Well, normally we respond to the scene as a

20   team.

21       Q.    And when you respond to a scene, a crime

22   scene, do you respond in any special type of

23   vehicle?

24       A.    Yes, we have a crime scene van that has all

25   of the equipment that we need to process the scene
```

1  and collect the evidence.

2      Q.   And can you describe what some of those

3  special tools are and special equipment is that you

4  bring with you when you and your colleagues respond

5  to a crime scene.

6      A.   The van carries our lighting equipment,

7  photography equipment, videography equipment,

8  evidence collection equipment.   Different types of

9  protective gear for us to wear, actually.   Things of

10  that nature.

11      Q.   Now, when you process a crime scene, what

12  are the steps that you first take when you arrive at

13  the scene?

14      A.   When we initially arrive at the scene, we

15  are briefed just as to what was done prior to us

16  getting there.   The first responding officer, we

17  will try to talk to him or her briefly just to see

18  what they found upon their arrival and if anything

19  was done prior to our arrival, and then basically

20  just kind of what we have at the scene so we know

21  how to proceed from there.

22      Q.   And once you do that and you are briefed

23  and you know how to proceed, what steps do you take

24  at that point?

25      A.   Well, we decide -- we have a little meeting

1    among ourselves, the people in the crime scene unit,

2    and we determine who is going to be responsible for

3    what job at the scene and then how we're going to

4    attack the scene, how we're going to actually break

5    it down and get it processed and documented.

6         Q.   And you follow that procedure with each and

7    every crime scene you respond to?

8         A.   Generally, yes.

9         Q.   And when you get to the crime scene and you

10   start processing, can you describe, just generally,

11   what it is you are looking for and how it is you

12   collect that evidence if you, in fact, do find

13   evidence?

14        A.   Well, the first thing we do at a crime

15   scene when we arrive and we have our meeting, we

16   photograph the entire scene before anything is

17   touched, before anything is moved, just as we find

18   it.  And the same for the video, take a video of the

19   scene as it's found.  Then we begin with the

20   documentation, as far as written documentation is

21   concerned, and we look at possible pieces of

22   evidence that are in plain view, meaning they're

23   visible to you just as you look at the scene without

24   having to touch or move anything.

25             If something is identified as evidence,

1    then it is actually assigned a number for

2    identification, marked with that number, and then

3    photographed again before it's actually collected.

4    Then, depending on what the item is, it's collected

5    using, you know, obviously our hands, but we'll bag

6    it or put it in some sort of container to preserve

7    it.

8        Q.   And when you say first it's photographed,

9    the scene or the particular type of evidence you are

10   about to photograph, it's photographed without a

11   marker first?

12       A.   Yes, the scene is photographed when we

13   first arrive before it's even touched.

14       Q.   And when you say a "marker," that is police

15   markers you then place and then you take a

16   photograph with the marker, correct?

17       A.   Yes.

18       Q.   And drawing your attention to August 24,

19   2005, were you working on that day?

20       A.   Yes.

21       Q.   And that day were you called out to a scene

22   at 215 Charles Street, the morning hours of

23   August 24, 2005?

24       A.   Yes, we were.

25       Q.   Approximately -- if you recall,

1    approximately what time were you called out?

2         A.    I believe we were notified around 10:30 in

3    the morning.

4         Q.    And who were you working with that day?

5         A.    My partner that day was Detective Ricardo

6    Vargas.

7         Q.    And did you and Detective Vargas respond to

8    215 Charles Street after you were called out there?

9         A.    Yes, we did.

10        Q.    Did you go in your special crime scene

11   vehicle?

12        A.    We did take the crime scene van, yes.

13        Q.    And can you describe for the jury what it

14   was when you and the detective arrived, what you saw

15   when you got to 215 Charles Street?

16        A.    By the time we arrived at the scene, the

17   scene was already being secured by patrol, meaning

18   that the roadway was closed off to traffic and crime

19   scene tape, the yellow tape, was put up across the

20   road even to prevent pedestrian traffic in the area.

21   Police officers were posted at the intersections to,

22   again, prevent people or vehicles within the scene.

23   Scene access was limited.

24        Q.    And were there -- you mentioned there were

25   other police officers who were posted --

1      A.    Yes.

2      Q.    -- around the building.  Can you describe

3  then what you and Detective Vargas did once you

4  arrived at 215 Charles Street?

5      A.    Once we arrived at the scene, we spoke

6  briefly with our sergeant, who had been there

7  earlier than we had, and basically learned just

8  very, very basic information on what had been found

9  so far, and we did a brief walkthrough of the scene

10  just to get an idea of what we had to deal with.

11  And that's our initial activities when we arrived.

12      Q.    And when you say "we," was that you and

13  Detective Vargas?

14      A.    Initially it was Detective Vargas and

15  myself, yes.

16      Q.    Did somebody else join you that day or that

17  morning in the duties of processing the scene at 215

18  Charles Street?

19      A.    Yes, later that day Detective Paul Ortiz

20  and Detective Joseph Gallagher also assisted with

21  the scene.

22      Q.    And when we're talking about the scene,

23  what apartment -- did you go into specifically an

24  apartment in 215 Charles Street?

25      A.    Yes, apartment 101 on the first floor.

1    Q.   And can you describe what it was you saw

2    when you first went in, you said, just to get a

3    sense of what you were dealing with.  What did you

4    see at that time?

5    A.   Upon entering the apartment is a living

6    room area a little bit to the right, and there was a

7    sofa almost in the front of the doorway blocking

8    access a little bit.  The kitchen, small

9    galley-style kitchen, was almost a little bit into

10   the apartment and then straight ahead a little to

11   the left.  It didn't appear too much was amiss in

12   the living room or kitchen, but we were directed to

13   the bedrooms, which were in the rear of the

14   apartment.

15   Q.   And just to assist, I'm going to show you

16   what's been marked in evidence as Government's

17   Exhibit 101A-3.  And is that a layout of the

18   apartment, 101?

19   A.   Yes, it is.

20   Q.   And that's the scene you walked through and

21   then eventually began processing, correct?

22   A.   Yes.

23   Q.   And when you say you walked in, does this

24   fairly, this diagram, show what you saw as far as

25   how the furniture was placed and the layout of the

1  apartment when you went in there on that day,

2  August 24th?

3      A.   Generally.  Generally, yes.  I have a

4  recollection of a little bit of a different location

5  of a couple of pieces of furniture, but, generally

6  speaking, this is what we found.

7      Q.   With regard to the couch that was in the

8  living room area, was it generally in that area, or

9  is that one of the pieces of the furniture --

10     A.   That's one of the pieces.  In my

11  recollection it was closer to the table, the table

12  being the --

13     Q.   This table here?

14     A.   Yes.

15     Q.   The front of the -- the oval-shaped table?

16     A.   Correct.

17     Q.   So, the couch, as you recall, was closer to

18  that table, correct?

19     A.   Yes.

20     Q.   And what about with regard to this small --

21  this love seat, was that in the hallway leading back

22  to the bedrooms?

23     A.   Yes.  The love seat was in the hallway, but

24  the way it's depicted on the diagram, there is

25  actually -- that icon for the yellow sofa appears,

1    in my opinion, to be larger than the actual love

2    seat was because there was definitely room to walk

3    alongside of it towards.

4        Q.   So, you were able to get back to the back

5    bedrooms?

6        A.   Yes.

7        Q.   So, in the diagram here in the middle by

8    the yellow love seat it appears the love seat was

9    right up against this wall, but there was actually

10   more space there; is that what you are saying?

11       A.   Right along the right side of the love

12   seat.

13       Q.   So, you said that when you first walked

14   through you were directed to go back to the

15   bedrooms?

16       A.   Yes.

17       Q.   And those are the two rooms straight at the

18   end of the hallway, correct?

19       A.   Yes.

20       Q.   And can you describe what you saw when you

21   got there?

22       A.   Well, the first bedroom is the one -- the

23   first bedroom we went to is the one on the left, and

24   in that bedroom immediately noticeable was two

25   deceased victims on the floor.  There was a good

1   amount of blood-like substance, blood spatter in the

2   room.  The bed mattress was actually off of the box

3   spring.  The cushions from the sofa that was in the

4   room were off and on the legs of the female victim.

5   That's generally the scene in there.

6        Q.   And did you see anything in the bedroom

7   next to it on the other side?

8        A.   In the bedroom next to it, on the right in

9   this diagram, the third victim, a male, was on the

10  floor in this bedroom just as you walked in straight

11  ahead from you, and he, again, was deceased and

12  was -- had a blanket over his back.

13       Q.   So, once you walk in there with your

14  colleagues and you see what you have at that scene,

15  what did you do?  What steps did you take at that

16  point?  What was your next step?

17       A.   Well, the next step is we exited the scene

18  itself and secured it until a search warrant could

19  be obtained, and from there we decided -- or I

20  should say the captain decided that we would contact

21  the medical examiner's office and request their

22  response, as well as the Connecticut state lab, ask

23  them to come down also and assist.

24       Q.   When you say the "captain," which captain

25  was at the scene at that time?

1        A.    Captain Lynn Kerwin.

2        Q.    And do you know whether or not the ME's

3    office and the Connecticut forensic state lab were

4    contacted?

5        A.    Yes, they were.

6        Q.    And did they, in fact, respond to the scene

7    at 215 Charles Street?

8        A.    Yes, they both did.

9        Q.    Did you have one of those team meetings

10   then at that point to decide how you were going to

11   attack, as you say, apartment 101 as far as

12   processing it?

13       A.    Yes.

14       Q.    And who did you meet with?

15       A.    We met with primarily the medical

16   examiner's office, Dr. Ira Kanfer, and an

17   investigator, Alfredo Camargo, came down from the

18   OCME, and we met with them to determine as far as

19   the victims are concerned how we would handle

20   evidence associated with them so as to best preserve

21   it.

22       Q.    So, was your first area that you were going

23   to process and seize evidence from related to the

24   three victims that were inside the apartment?

25       A.    Yes.

1       Q.   And when you say "we" met with, that

2   included Detective Vargas and Detective Ortiz?

3       A.   Yes.

4       Q.   And did you at that time determine what

5   sort of -- what role each of you would play once you

6   began processing the scene?

7       A.   Yes.

8       Q.   And what was your role that day for the

9   processing of apartment 101?

10      A.   My job that day was going to be the crime

11  scene report.

12      Q.   And what does that mean?  What do you do if

13  that's your job at a crime scene, and what did you

14  specifically do in this case to prepare the crime

15  scene report?

16      A.   My job in doing the crime scene report is

17  to document the scene in words as we found it and

18  then how we -- whatever it is we collected, what it

19  is we collected, and if anything had changed.

20      Q.   With regard to Detective Vargas, what was

21  his role?

22      A.   Detective Vargas did the photograph at the

23  scene.

24      Q.   And with regard to Detective Paul Ortiz,

25  what was his role?

1    A.    Detective Ortiz was responsible for the

2    evidence collection.

3    Q.    And when you say "evidence collection,"

4    what specifically does that mean?  What would he

5    have to do as the evidence collector?

6    A.    The officer or the detective who is

7    assigned to evidence is ultimately responsible for

8    the decision of what's going to be collected and

9    then how it's going to be collected, and actually

10   collecting, seizing the items, packaging them and

11   turning them into the property room.

12   Q.    How many days total did you end up spending

13   at apartment 101 processing the scene?

14   A.    We were there for three days.

15   Q.    You mentioned before that when you -- after

16   you took your first walk through you went out and

17   the apartment was secured.  What exactly is done to

18   secure the apartment?

19   A.    The door to the apartment is closed and an

20   officer is posted at the door to the apartment to

21   make sure that no one goes in and nothing is

22   disturbed.

23   Q.    And when you first arrived at apartment 101

24   on August 24th, was there already a police officer

25   posted at the door?

1      A.    Yes, there was, the apartment was secured.

2      Q.    And you mentioned there was crime scene

3   tape surrounding the building on the outside of the

4   building, correct?

5      A.    Yes.

6      Q.    You said you were there three days.  What

7   steps, if any, do you take each day when you leave

8   apartment 101 when you are done for the day to

9   secure the apartment?

10      A.    Once we determine we're done for the day,

11   we go out of the apartment and close the door, and

12   then the evidence tape is actually used to seal the

13   door, meaning it's put over the opening of the door

14   and it's signed and dated.  An officer is posted at

15   the door.  We actually had I believe an officer at

16   the door and an officer outside until we returned

17   the following day.  And that was the same for both

18   days that we returned.

19      Q.    Now, you mentioned your job was to prepare

20   the crime scene report.  And did you, in fact,

21   prepare a report?

22      A.    Yes.

23      Q.    And do you recall how many pages that

24   report was?

25      A.    I think the initial report was probably ten

1    pages.

2        Q.    And did you eventually learn the identity

3    of the victims that were in apartment 101?

4        A.    Yes.

5        Q.    And who were the victims?

6        A.    The -- well, what we labelled, so to speak,

7    the first victim was Basil Williams.  That was the

8    gentleman in the bedroom to the right on the

9    diagram.  In the first bedroom, the one on the left,

10   James Reid was identified as the male victim and

11   Tina Johnson the female victim.

12       Q.    And you mentioned you labelled the victims

13   1, 2 and 3?

14       A.    The medical examiner's office determined

15   who would be given what number just in the way that

16   the evidence was taken from them, that's all.

17       Q.    So, Basil Williams, or Basil Williams, was

18   labelled Victim No. 1?

19       A.    Yes.

20       Q.    And he was the one who was alone in the

21   bedroom to the right.  And then the female victim

22   was Tina Johnson and the person in the room with her

23   was James Reid?

24       A.    Correct.

25       Q.    And Tina was victim No?

1      A.    3.

2      Q.    And the other male was 2; is that correct?

3      A.    Yes.

4      Q.    And that's how your report would read

5  throughout?

6      A.    Yes.

7      Q.    You mentioned that Detective Vargas was in

8  charge that day of photography.  And can you

9  describe, once you get in there, once all of you get

10  in there, if an item was seen, what he would have to

11  do, what he did with regard to photographing that

12  evidence or that potential evidence?

13      A.    Once the entire scene is photographed and

14  overall pictures are done of the entire scene, then

15  individual pieces of evidence are photographed in

16  relation to other things in the room so that you

17  have an idea of where that item of evidence is, and

18  then a close-up of that piece of evidence is taken,

19  first without placards and then with placards,

20  placards being the little numbered tents.

21      Q.    And is there any significance to the number

22  of the placard then?

23      A.    It's just an ID number so when we are

24  referring to a particular item, even on the diagram

25  you could see where that item is located, and each

1   item is given it's own number.

2       Q.   And did all three of you process the scene

3   together?

4       A.   Yes.

5       Q.   So, as things were being photographed and

6   collected, you were all there together, correct?

7       A.   Yes, because we all had our own individual

8   jobs to do for the scene.

9       Q.   Now, prior to going into the scene to begin

10  processing, did you have to put on any special

11  protective gear?

12      A.   Yes.

13      Q.   And can you describe what it was that you

14  put on and how that worked?

15      A.   We wear Tyvek suits, which are almost like

16  a plasticky (sic) material that completely covers

17  you from your feet up to your neck, and then head

18  covering and gloves as well.

19      Q.   So, you are completely covered?

20      A.   Yes.

21      Q.   And all three of you had those suits on?

22      A.   Yes.

23      Q.   And did you have those suits on the entire

24  time?

25      A.   No.

1    Q.   The entire time you were inside the

2  apartment?

3    A.   The first day, yes, and as the scene

4  progresses, then we determine what types of

5  protective gear are required for the type of

6  evidence we're collecting and the type of processing

7  that we're doing.

8    Q.   So, as the scene progresses, what happens,

9  are you collecting evidence and removing it from the

10  scene?

11    A.   Yes.

12    Q.   Okay.  And then the bodies obviously were

13  removed.

14    A.   That was the first thing, yes.

15    Q.   Can you describe how that happens?  Is that

16  the first thing you began doing?  And what was it

17  you did to process and remove the victims' bodies?

18    A.   After meeting with the medical examiner's

19  office, we determined that the way to preserve the

20  evidence on the victims was to remove evidence from

21  them at the scene before they're transported to the

22  medical examiner's office for autopsies.

23        So, working on one victim at a time,

24  Detective Ortiz and Investigator Camargo actually

25  removed each section of duct tape from the victims,

1    starting with Mr. Williams.  The duct tape was cut

2    off by Detective Ortiz under the supervision of

3    Investigator Camargo and Dr. Kanfer, and as the tape

4    was removed from the victims, it was placed into tin

5    cans, very similar to paint cans, and that is to

6    preserve the shape of the tape, and also the fact

7    that it's sticky, it won't stick to the can as it

8    would a bag.

9            We also decided at that time prior to

10   transport that the victims' shirts would also be

11   collected to preserve any blood patterns on the

12   shirts, and those were removed again by cutting, and

13   then they were folded and placed in paper bags.

14       Q.   And, again, putting up Government's Exhibit

15   101A-3.  So, when you first began processing the

16   inside of this apartment, you went first to this

17   bedroom that I'm pointing to?

18       A.   Yes.

19       Q.   And that was the bedroom with one victim,

20   Basil Williams, correct?

21       A.   Yes.

22       Q.   Victim No. 1.  And showing you what's

23   already in evidence as Government's Exhibit

24   No. 120-3, is that -- well, this placard that's

25   here, that shows a No. 1?

1      A.    Yes.

2      Q.    That was placed by you or your team?

3      A.    Detective Ortiz.

4      Q.    Detective Ortiz, okay.  And is this a

5   picture of -- well, why was that placed there and

6   can you describe what it was you did after it was

7   photographed with the placard and before the duct

8   tape was cut off.  Please describe that process.

9      A.    It was determined since we were going to

10  deal with Mr. Williams first, that the duct tape

11  that is around his head that you see in this photo

12  was going to be collected as item No. 1.  So, the

13  placard was placed there and the photograph taken

14  before the tape is actually cut off and removed and

15  packaged.

16     Q.    And when you -- were you present along with

17  the investigator from the ME's office and Detective

18  Ortiz when the duct tape was cut off?

19     A.    Yes.

20     Q.    And were there other placards placed

21  alongside Victim No. 1, Basil Williams's body before

22  the duct tape was removed?

23     A.    Yes.

24     Q.    And showing you what I'll mark Government's

25  Exhibit 120-4.  And this is not in evidence yet.

1    Let me just show you.  Okay, I don't think there is

2    an objection, but this picture, 120-4, shows placard

3    No. 2 and also at the top placard No. 1 and placard

4    No. 3?

5         A.   Yes.

6              MS. REYNOLDS:  Your Honor, we would

7    offer as a full exhibit Government's Exhibit 120-4.

8              MR. BUSSERT:  No objection, your Honor.

9              THE COURT:  There being no objection,

10   it's a full exhibit.

11        Q.   And, again, in this photograph taken by

12   Detective Vargas, this shows at the top here you can

13   still see placard No. 1, which was corresponding to

14   the duct tape from the head of Basil Williams,

15   correct?

16        A.   Yes.

17        Q.   And the picture is focused on placard No.

18   2.  Was that corresponding to the shirt of Basil

19   Williams?

20        A.   Yes.

21        Q.   And then placard No. 3 is corresponding to

22   the duct tape wrapped around his hands and arms,

23   correct?

24        A.   Yes.

25        Q.   And then --

1          MS. REYNOLDS:  Just one minute, your

2    Honor.

3      Q.   And did you also -- all right.

4          MS. REYNOLDS:  Sorry, your Honor, we're

5    having difficulty finding one of our photographs,

6    120-5, which I think was already put in evidence.

7      Q.   In any event, was Mr. Williams, Basil

8    Williams, did he also have duct tape on his ankles?

9      A.   Yes.

10     Q.   And once you photographed marked with

11   placards all of that duct tape and the victim's

12   shirt, did you then begin to collect that evidence?

13     A.   Yes, one piece at a time.

14     Q.   And you said you were there when the duct

15   tape was cut off?

16     A.   Yes.

17     Q.   Could you tell whether it was easy to cut

18   that duct tape off of Mr. Williams's body?

19     A.   It appeared to be a little bit difficult to

20   get the scissors underneath the tape because it

21   was -- it appeared to be pretty tight around his

22   body.

23     Q.   And were the -- was Detective Ortiz and the

24   ME and all of you able to, in fact, remove the duct

25   tape from Mr. Williams' body?

1        A.    Yes.

2        Q.    And then showing you Government's

3    Exhibit 120A and 120A-1.

4                MS. REYNOLDS:  Your Honor, may I

5    approach?

6                THE COURT:  Yes.

7        Q.    Showing you Government's Exhibit --

8    starting with 120A, do you recognize what that is?

9        A.    Yes.

10       Q.    And what is that?

11       A.    This is the can that Exhibit 1, the duct

12   tape which was removed from Mr. Williams' head was

13   placed in at the scene.

14       Q.    And, again, that's what is seen here with

15   the marker 1, correct?

16       A.    Yes.

17       Q.    And how is it that you are able to

18   recognize that paint can?

19       A.    The can is labeled with the Bridgeport

20   Detective Bureau ID sticker.

21       Q.    And does it have information as to what's

22   contained in there?

23       A.    Yes, the label lists the case number and

24   the crime and the date, the description of the

25   evidence and the location it was seized from, along

1    with times.

2         Q.    And who prepares those labels as you

3    collect the evidence and seize it?

4         A.    The detective whose assignment is evidence

5    prepares all of the labels.  So, in this case it was

6    Detective Ortiz.

7         Q.    But you were present when that item was

8    seized, correct?

9         A.    Yes.

10        Q.    And you were present later when it was

11   taken back to the precinct and then prepared --

12   processed further?

13        A.    Yes.

14        Q.    And then showing you Government's

15   Exhibit 120A-1, do you recognize that exhibit?

16        A.    Yes.

17        Q.    And prior to testifying here today, did you

18   have occasion to meet with members of the FBI and

19   your fellow crime scene unit investigators and

20   prepare some of these exhibits so that they could be

21   used in court?

22        A.    Yes.

23        Q.    And so when you seized this evidence

24   initially, you and your colleague seized it, he

25   didn't put it in this plastic bag?

1    A.   No.

2    Q.   You put it directly into the paint can?

3    A.   Directly in the paint can, yes.

4    Q.   And then it was removed and the process is

5    to then heat seal it into a package?

6    A.   Yes.

7    Q.   And then label it, correct?

8    A.   Yes.

9         MS. REYNOLDS:  Your Honor, at this time

10   I would move as a full exhibit subject to connection

11   -- I've discussed this briefly with Mr. Bussert,

12   subject to connection of Detective Ortiz, who

13   actually seized them and put them in here, but I

14   would move them subject to that connection 120A and

15   121A-1 as exhibits, full exhibits.

16        THE COURT:  All right, subject to that,

17   there is no objection.

18        MR. BUSSERT:  Could I just voir dire

19   briefly?

20        THE COURT:  Yes.

21   VOIR DIRE EXAMINATION

22   BY MR. BUSSERT:

23   Q.   Detective, when you say you were present

24   when this tape was removed, I think you testified a

25   moment ago that there was Detective Ortiz, correct?

```
 1        A.    Yes.

 2        Q.    Detective Vargas?

 3        A.    No.

 4        Q.    Who else?

 5        A.    Detective Ortiz, Investigator Camargo.

 6        Q.    And yourself?

 7        A.    And myself.

 8        Q.    Where was Detective Vargas when this was

 9   taken?

10        A.    He may have been in the room, but not up

11   close.  I was there to take notes while this was

12   being done, so I was a witness to it.

13        Q.    And when you were just asked were you

14   present when -- you said that the tape was put in

15   the can, correct?

16        A.    Yes.

17        Q.    Then transported back to the precinct?

18        A.    Yes.

19        Q.    The precinct being the Bridgeport police

20   headquarters?

21        A.    Yes, our office.  Yes.

22        Q.    You said you were present when it was

23   transported?

24        A.    Yes.

25        Q.    In the vehicle with the can?
```

1          A.   All of the evidence is from transported at

2     the same time at the end of the day.

3          Q.   Was it put in the van?

4          A.   Yes.

5          Q.   And so you were in the van when it went

6     back?

7          A.   Yes.

8          Q.   And you logged it into evidence, or did

9     somebody else do that?

10         A.   Detective Ortiz would actually put it into

11    evidence, yes.

12              MR. BUSSERT:   Your Honor, we have no

13    objection to full admission.

14              THE COURT:   All right, 120A and 120A-1

15    are full exhibits.

16              MS. REYNOLDS:   Thank you, your Honor.

17         Q.   And then, Detective, showing you 120B, do

18    you recognize what's contained in this package?

19         A.   Yes.

20         Q.   Okay, and what is that?

21         A.   This is Mr. Williams' shirt, Exhibit No. 2.

22         Q.   And how is it that you are able to

23    recognize that exhibit?

24         A.   Again, it's labeled with a Bridgeport

25    Detective Bureau ID label.

1      Q.    Okay.

2            MS. REYNOLDS:  Your Honor, I would move

3      as a full exhibit Government 120B.

4            MR. BUSSERT:  No objection, your Honor.

5            THE COURT:  Full exhibit.

6      Q.    Now, Detective, we obviously have two very

7      different containers here as far as how the

8      evidence, once it was seized, how it was packaged.

9      And starting first with 120A, the paint can, can you

10     describe for the members of the jury why it was that

11     once the duct tape was cut off of Mr. Williams' head

12     it would be placed in a container such as that paint

13     can.  What was the purpose of that?

14     A.    We felt that a paint can would better

15     preserve the shape of the tape that was removed,

16     which again was going to be sent to the lab.  So

17     it's important for them to get an idea of the shape,

18     and the nature of the can would kind of help the

19     tape not sticking to, as for instance a paper bag it

20     would be very difficult to package it without having

21     it stick to the bag itself.

22     Q.    And then, again, with regard to

23     Government's Exhibit 120B, this paper bag the shirt

24     is contained in, why would you use a paper bag once

25     you seize and collect the shirt from Mr. Williams?

1    A.   The clothing from Mr. Williams, in this

2    case his shirt, was cut off of him at the scene and

3    then packaged temporarily in a paper bag because it

4    contained a blood-like substance, and because that's

5    biological evidence, it can't be put into plastic or

6    some non-breathable material.  So, it was

7    transported in a paper bag back to the police

8    department where it was air dried completely before

9    being packaged in that paper bag and labeled and

10   sealed.

11       Q.   And then showing you what's been demarked

12   Government's Exhibit 120C and 120C-1.

13            MS. REYNOLDS:  And, again, your Honor, I

14   conferred with Mr. Bussert, he has no objection, so

15   at this time, your Honor, we would move in as full

16   exhibits Government 120C, which is the paint can,

17   and 120C-1.

18       Q.   Let me just hand those up to you.

19            THE COURT:  All right, they are full

20   exhibits.

21       Q.   What was contained in 120C?

22       A.   This is the duct tape which was removed

23   from Mr. Williams' hands and arms.

24       Q.   And then, again, taking a look at 120C-1,

25   was that same procedure you described before as to

1    the removal of the duct tape and then the heat

2    sealing into these plastic bags, was that used for

3    120C and C-1?

4        A.   Yes.

5        Q.   So, what is 120C-1?

6        A.   This is the actual duct tape that was

7    originally placed in the can.  It had been removed

8    and repackaged in this plastic bag.

9        Q.   As you look at that duct tape, does it

10   appear different than it did when you first cut it

11   off?

12       A.   Yes.

13       Q.   Okay, and what's different about it?

14       A.   Well, in this case in the package it

15   appears that the duct tape is actually folded and in

16   some cases separated and stained.

17       Q.   And do you know what happens with these

18   exhibits after you collect them, or you and

19   Detective Ortiz and Detective Vargas collect them

20   and process them and package them, where were they

21   sent?

22       A.   The exhibits were sent, submitted to the

23   state forensic lab for processing.

24       Q.   Just showing Government's Exhibit 120C-1,

25   this contains the tape that was around Mr. Williams'

1    hands and wrist, correct?

2        A.   Yes.

3        Q.   And then showing you Government's

4    Exhibit 120 and 120D-1, do you recognize

5    Government's Exhibit 120 -- 120D, sorry.

6        A.   Yes.

7        Q.   And what was contained in there?

8        A.   This can contained the duct tape that was

9    removed from Mr. Williams' ankles.

10       Q.   And then showing you 120D-1, is that the

11   actual duct tape?

12       A.   Yes.

13       Q.   And, again, these were all processed and

14   sent up to the Connecticut lab for further testing?

15       A.   They were packaged by us and then submitted

16   to the lab for further testing.

17               MR. BUSSERT:  No objection, your Honor.

18               MS. REYNOLDS:  I'm sorry, I would move

19   as full exhibits then Government's Exhibit 120D and

20   120D-1, your Honor.

21               THE COURT:  Full exhibits without

22   objection.

23       Q.   Now, we're going to go a little out of the

24   order here, just go back to the room that Mr.

25   Williams was in.  Again, this room to the right of

1    the diagram.  And I'd ask you if eventually -- you

2    mentioned that you processed the scene in stages,

3    and that the first stage was, as you said, the

4    victims and -- any evidence from the victims' bodies

5    and then removal of the victims.  Eventually did you

6    find a few other items inside Mr. Williams' room

7    that were seized as evidence?

8        A.   Yes.

9        Q.   And showing you first -- I'll just have you

10   take a look at your monitor there.  Do you see

11   Government's Exhibit 143?

12       A.   Yes.

13       Q.   And do you recognize what that is?

14       A.   Yes.

15       Q.   Okay.  And was that -- well, what is that

16   and how are you able to recognize it?

17       A.   It is a photograph of a light bulb with

18   blood-like stains on it on the floor of Mr.

19   Williams' bedroom.

20       Q.   And do you recognize seizing that from his

21   bedroom on that day or on one of the days when you

22   processed the scene?

23       A.   Yes.

24            MS. REYNOLDS:  Your Honor, I would move

25   first as a full exhibit the photograph which is

1    Government 143.

2              MR. BUSSERT:  If I can ask Ms. Reynolds

3    one question.

4         Q.   I'm just going to show you what's marked

5    Government 143-1.  Do you see that up on your screen

6    there?

7         A.   Yes.

8         Q.   And is that the light bulb photographed

9    with the evidence marker?

10        A.   Yes.

11             MS. REYNOLDS:  Your Honor, at this time

12   I think what we would just do is just move one of

13   the photographs, which is Government's

14   Exhibit 143-1.

15             MR. BUSSERT:  No objection as to that,

16   your Honor, the photo with the marker.

17             THE COURT:  All right, that will be a

18   full exhibit then.

19        Q.   And, again, just taking a look at the

20   screen now that the jury can see that, these are the

21   evidence markers that are placed there by you and

22   your team, correct?

23        A.   Yes.

24        Q.   And then the item is photographed first in

25   place without the marker?

1      A.    Correct.

2      Q.    And then with the marker, correct?

3      A.    Yes.

4      Q.    And does anyone pick it up or remove it or

5 change it, or is it as you found it in that room?

6      A.    It's as we found it.  It's not moved until

7 it's time to collect it.

8      Q.    And then showing you Government's

9 Exhibit 143A, do you recognize what that is?

10     A.    Yes.

11     Q.    And what is contained in Government's 143A?

12     A.    This is Exhibit 21, the light bulb from the

13 floor of Mr. Williams' bedroom.

14           MS. REYNOLDS:  Your Honor, I would move

15 as a full exhibit Government's 143A.

16           MR. BUSSERT:  No objection.

17           THE COURT:  Full exhibit.

18     Q.    And then, in addition to those items, the

19 light bulb and obviously the items from the victim,

20 do you recall if you also seized from Mr. Williams'

21 room any other evidence?

22     A.    Yes.

23     Q.    I'm handing you what's marked 123A.  Do you

24 recognize what that is?

25     A.    Yes.

1    Q.   And what's contained in Government's 123A?

2    A.   This is Bridgeport Exhibit No. 22, which is

3  white plastic bag and a blue plastic bag that were

4  stuck together with duct tape.

5    Q.   And showing you Government's 123-1, do you

6  see that up on your monitor there?

7    A.   Yes.

8    Q.   And is that a photograph with the placard

9  next to those items that are contained in 123A?

10    A.   Yes.

11    Q.   And is that a fair and accurate photograph

12  of those -- fair and accurate depiction of those

13  items as they were prior to your seizing them?

14    A.   Yes.

15         MS. REYNOLDS:  Your Honor, at this time

16  I would move as a full exhibit Government's 123-1

17  and 123A.

18         MR. BUSSERT:  No objection, your Honor.

19         THE COURT:  Full exhibits.

20    Q.   So, taking a look first at the photograph,

21  and again this is Government's Exhibit 123-1, can

22  you describe what this part of the exhibit is, the

23  white bag?

24    A.   It's a white plastic bag.

25    Q.   And then there is a blue plastic bag --

1      A.    Yes.

2      Q.    -- also.  And what was connecting the two

3    bags, if you can see?

4      A.    A piece of duct tape.

5      Q.    And all of this was seized, correct, with

6    the duct tape?

7      A.    As one exhibit, yes.

8      Q.    And do you know whether or not these bags

9    as well as the piece of duct tape connecting the two

10   bags were sent up to the Connecticut forensic lab

11   for further testing?

12     A.    Yes, they were.

13     Q.    And then just taking a look then at the

14   diagram and at the bedroom where Mr. Williams was

15   found, these blue dots with the numbers in it, these

16   correspond to these placards in the photographs and

17   to the numbers that Bridgeport PD gave to those

18   pieces of evidence, correct?

19     A.    Yes they do.

20     Q.    So, when we're talking about No. 22, that

21   bag was found, those two bags with the duct tape was

22   found in this area of the bedroom, correct?

23     A.    Yes.

24     Q.    And that goes for all of the other numbers

25   in that diagram, correct?

1    A.    Yes.

2    Q.    And showing you on your monitor there

3  Government's Exhibit 160, do you recognize what

4  that's a photograph of?

5    A.    Yes.

6    Q.    And what is that?

7    A.    It's a blood-like stain on the carpet.

8    Q.    And was that blood-like stain marked with a

9  police marker?

10   A.    Yes.

11   Q.    And what number?

12   A.    26.

13   Q.    And that was found in Basil williams's

14  room, correct?

15   A.    I believe so.

16       MS. REYNOLDS:  Your Honor, at this time

17  I would mark as a full exhibit Government's

18  Exhibit 160.

19       MR. BUSSERT:  No objection.

20       THE COURT:  Full exhibit.

21   Q.    And, again, just showing that to the jury

22  now, here on the carpet there was a blood-like

23  stain, correct?

24   A.    Yes.

25   Q.    And so the marker is placed next to it and

1    then it's photographed, correct?

2        A.    Yes.

3        Q.    And just going back to the diagram

4    Government's Exhibit 101A, that blood-like stain was

5    in this area where the 26 is on the diagram,

6    correct?

7        A.    Yes.

8        Q.    Now, you described that eventually -- was

9    all of the duct tape removed from Mr. Williams?

10       A.    Yes.

11       Q.    And what happened after the duct tape and

12   the shirts were removed, it was collected into the

13   paint cans with regard to Mr. Williams's body?

14       A.    After -- well, after we collected the

15   evidence from Mr. Williams, then we moved on to the

16   other two victims.

17       Q.    So, when you say the "other two victims,"

18   you then went to the next room, correct?

19       A.    Yes.

20       Q.    And did you follow that same process as far

21   as when the ME investigator was still there?

22             THE COURT:   When you say "ME," you mean

23   medical examiner.

24             MS. REYNOLDS:   Medical examiner, yes.

25   Thank you, your Honor.

1    Q.   Was the medical examiner investigator still

2  with you and your team at that time when you went to

3  the second bedroom to the remove the duct tape from

4  Tina Johnson and James Reid?

5    A.   Yes.

6    Q.   And did you follow the same procedure of

7  photographing the duct tape with the marker --

8  without the marker and then with the marker and then

9  cutting it off the victims?

10    A.   Yes.

11    Q.   So, moving then to Tina and James's room

12  and showing you first some photographs.  Showing you

13  first Government's Exhibit 121-1, can you see that

14  up on your monitor?  It's kind of hard to see, but

15  is that a photo of the entryway?  Well, what is that

16  a photo of, if you can see on your monitor?

17    A.   It appears to be from the hallway.  The

18  photograph is from the hallway looking into

19  Ms. Johnson's, Mr. Reid's room.

20    Q.   Let me just hand it up to you because the

21  resolution is kind of lost.  121-1.  If you can't

22  see it, that's fine, we'll move on to another.

23    A.   No, it's the first bedroom on the diagram.

24  It's the bedroom to the left.

25    Q.   And the photograph is taken from the --

1    A.    From the hallway looking into the bedroom.

2    Q.    Showing you then -- let's see if we can see

3    anything once we put it up on the big screen here.

4              MS. REYNOLDS:  We would offer 121-1,

5    your Honor, as a full exhibit.

6    Q.    And, again, it's just -- this is a photo

7    just taken from outside the bedroom of Tina and

8    James, correct?

9    A.    Yes.

10   Q.    And then once you get in there you start

11   processing the scene, processing the duct tape.  Let

12   me just show you.

13             MS. REYNOLDS:  Your Honor, do we have an

14   afternoon recess today or -- approximately what time

15   is that going to be?

16             THE COURT:  We're just going to go to

17   three.

18             MS. REYNOLDS:  We're just going to go

19   straight through?  Okay.

20   Q.    All right, showing you on your screen then

21   Government's Exhibit 121-5, do you see that on your

22   monitor there?

23   A.    Yes, thank you.

24   Q.    And do you recognize that photograph?

25   A.    Yes.

1    Q.    And what's depicted in that photograph?

2    A.    This is a photograph taken in the bedroom

3 where Mr. Reid and Ms. Johnson were showing

4 Ms. Johnson's -- the lower half of Ms. Johnson's

5 body with the sofa cushions partially on her legs,

6 and yellow placard 6 and 7.

7         MS. REYNOLDS:  And, your Honor, I would

8 move as a full exhibits Government's Exhibits 121-5.

9         THE COURT:  121-5 a full exhibit.

10    Q.    And, again, just taking a look at that

11 photograph, again this has the placards starting

12 with placard No. 6.  Was that corresponding to Tina

13 Johnson's shirt?

14    A.    I believe so, yes.

15    Q.    And then placard No. 7 corresponding to the

16 duct tape on her ankles?

17    A.    Correct.

18    Q.    And did you follow that same procedure then

19 once the duct tape was cut off?

20    A.    Yes.

21    Q.    The packaging it into the paint cans?

22    A.    Yes.

23    Q.    So, starting then first with the shirt, did

24 you also take and package and process Tina Johnson's

25 shirt?

1        A.   The shirt was recovered in a similar

2    respect as Mr. Williams' shirt, was cut from her

3    body and then folded and packaged in paper.

4        Q.   So, handing you 121B --

5             MS. REYNOLDS:  Your Honor, I would move

6    as a full Exhibit 121B.  There appears to be no

7    objection.

8             THE COURT:  All right, it's a full

9    exhibit.  121-5 is also a full exhibit.

10            MS. REYNOLDS:  Thank you, your Honor.

11       Q.   So, handing you 121B, is that the shirt

12   that was removed from Tina Johnson's body?

13       A.   Yes.

14       Q.   And that has the Bridgeport label on it and

15   it describes what's contained in the package, where

16   it was found and removed from?

17       A.   Yes.

18       Q.   Now, handing you -- in addition to duct

19   tape on her ankles, did Tina Johnson have duct tape

20   on other parts of her body?

21       A.   Yes, she did.

22       Q.   And all of that duct tape was removed,

23   correct?

24       A.   Yes.

25            MS. REYNOLDS:  Your Honor, at this time

1    I'm going to move as full Exhibit -- I showed it to

2    Mr. Bussert, he has no objection -- 121A, which is

3    the paint can, and 121A-1 which is what was in --

4    the contents of the paint can.

5              THE COURT:  All right, full exhibits.

6         Q.   Just handing you first Government's 121A,

7    do you recognize that paint can?

8         A.   Yes.

9         Q.   Okay, does that have a label on it saying

10   what was contained in there?

11        A.   Yes.

12        Q.   And what was contained in Government's

13   121A?

14        A.   This can originally contained the duct tape

15   that was removed from Tina Johnson's face and head.

16        Q.   And then again showing you Government's

17   121A-1, was this actually the duct tape that was

18   contained before inside of Government's 121A, the

19   paint can?

20        A.   Yes.

21        Q.   And was this duct tape also sent up to the

22   forensic lab for further testing?

23        A.   Yes, it was.

24        Q.   And, again, this is the duct tape from her

25   face and head area?

1        A.    Yes.

2        Q.    And then showing you Government's

3   Exhibit 121C and 121C-1, do you recognize what's

4   contained in this?

5        A.    Yes.

6        Q.    And what was contained in that exhibit?

7        A.    This can contained the duct tape that was

8   removed from Ms. Johnson's ankles.

9        Q.    And that's what we see in the photograph

10  with the marker No. 7, correct?

11       A.    Yes.

12       Q.    And, again, just for the purposes of

13  completeness of the record, 121C-1, is that the

14  actual duct tape that was removed, so it could be

15  shown to the jury?

16       A.    Yes.

17       Q.    And also this duct tape, do you know

18  whether or not it was sent up to the lab for further

19  testing?

20       A.    Yes, it was.

21       Q.    So, was all of the duct tape sent up to the

22  lab?

23       A.    Yes, it was.

24       Q.    And what appears different as you look at

25  the duct tape in 121C-1 than when it was seized at

1    the crime scene?

2         A.   Well, as the tape appears in the plastic

3    bag in front of me, it's actually folded plastic

4    neatly now and appears to be stained.

5         Q.   And are you familiar with what that stain

6    could be from?

7         A.   Yes.

8         Q.   And based on your training and experience

9    in your processing of scenes, what could that stain

10   on the duct tape be from?

11        A.   Well, different stains are used to detect

12   latent evidence on items and that stain appears to

13   be consistent with them.

14        Q.   Are you trained in fingerprint

15   identification as well as all your other training?

16        A.   Yes.

17        Q.   When you say "other latent evidence," is

18   that what you are referring to, other evidence?

19        A.   Yes, it could be latent fingerprints.  Any

20   evidence that is not immediately visible to the

21   naked eye can be enhanced, and it appears that's

22   what was done with that tape.

23        Q.   But you, yourself, in the crime scene unit,

24   you don't conduct the testing, it's done at the lab,

25   correct?

1    A.    Correct.

2    Q.    And, again, the tape as it appears here is

3 smooched down.  When you first seized it, it didn't

4 appear that way, did it?

5    A.    No, when it was first seized from the

6 victim we attempted to try and maintain the shape as

7 it was removed.

8    Q.    And did Ms. Johnson also have duct tape

9 around her hands and wrist area?

10   A.    Yes.

11   Q.    And showing you --

12         MS. REYNOLDS:  I'm sorry, I would move

13 as a full exhibit Government's Exhibit 121C and

14 121C-1.

15         THE COURT:  Absent objection --

16         MR. BUSSERT:  Can I voir dire?

17         THE COURT:  Yes.

18 VOIR DIRE EXAMINATION

19 BY MR. BUSSERT:

20   Q.    Ma'am, you were just asked about the source

21 of the staining on this tape, correct?

22   A.    Yes.

23   Q.    Do you have any personal knowledge of what

24 the source of the staining is?

25   A.    Based on my training I do, yes.

1      Q.    Based on your training.  Were you present

2  when these stains occurred on the tape?

3      A.    On this evidence, no.

4      Q.    So, when you took the tape off the body,

5  were these stains that appear in this exhibit, were

6  they present like this?

7      A.    The dark-colored like blackish stains were

8  not, no.

9      Q.    So, in your training you know that there's

10 methods or things that could be done to cause stains

11 like this, correct?

12     A.    Yes.

13     Q.    But you did not actually cause the stain to

14 occur?

15     A.    Correct.

16     Q.    You did not test this tape?

17     A.    No.

18            MR. BUSSERT:  With that understood, no

19 objection, your Honor.

20            THE COURT:  All right, 121C and C-1 are

21 full exhibits.

22            MS. REYNOLDS:  Thank you, your Honor.

23 CONTINUED DIRECT EXAMINATION

24 BY MS. REYNOLDS:

25     Q.    And then finally handing you Government's

1    121D and 121D-1, and starting with the paint can,

2    121D, do you recognize what that is?

3        A.    Yes.

4        Q.    And what is 121D?

5        A.    This is the can that contained the duct

6    tape that was removed from Ms. Johnson's hands and

7    wrists.

8        Q.    And then showing you 121D-1, do you

9    recognize this?

10       A.    Yes, that's the duct tape that was

11   originally contained in the can.

12             MS. REYNOLDS:  Your Honor, I would move

13   as a full exhibit Government's 121D and 121D -1.

14             MR. BUSSERT:  Again, if I can voir dire,

15   your Honor.

16   VOIR DIRE EXAMINATION

17   BY MR. BUSSERT:

18       Q.    Ma'am, with respect.

19             MR. BUSSERT: Actually, can you put that

20   on the ELMO.

21       Q.    Ma'am, with respect to this tape, are you

22   aware, were there any items actually removed from

23   this bundle of tape and tested separately?

24       A.    I believe there were items that were

25   tested.  I don't know if they were actually removed

1   from it, but I know there were items tested as a

2   result of this piece of evidence.

3       Q.    When you say "items," there was a piece of

4   a latex glove; is that correct?

5       A.    Yes.

6       Q.    Now when you removed the tape, did you

7   actually physically see that latex glove?

8       A.    Yes.

9       Q.    You did?

10      A.    A piece of latex.  I can't say it was a

11  glove.

12      Q.    You saw a piece of latex?

13      A.    It appeared to me to be latex consistent.

14      Q.    Did you flag that at the time you removed

15  it?

16      A.    We commented on it.

17      Q.    And that was contained in your report?

18      A.    I don't know if it was in the report.

19      Q.    Well, you didn't actually physically remove

20  the tape, correct?

21      A.    Detective Ortiz did, yes.

22      Q.    Under the supervision of the inspector from

23  the medical examiner's office?

24      A.    Correct.

25      Q.    Okay.  And so a piece of latex was

1    observed.

2        A.   Yes.

3        Q.   And you were standing there and you were

4    taking a written -- you were taking written notes

5    and prepared a written report about the crime scene?

6        A.   Yes.

7        Q.   And you don't know whether or not you

8    included in that report reference to a possible

9    piece of evidence inside of this duct tape?

10       A.   No, I wouldn't get that detailed because

11   the evidence was going to be sent to the lab for

12   examination, so anything more detailed would be done

13   by the lab.

14       Q.   And you found the latex, or you observed

15   it, it wasn't the lab that saw it for the first

16   time?

17       A.   I personally saw it, yes.

18           MR. BUSSERT:  No objection, your Honor.

19           THE COURT:  121D and D-1 are full

20   exhibits absent objection.

21           MS. REYNOLDS:  Thank you, your Honor.

22   CONTINUED DIRECT EXAMINATION

23   BY MS. REYNOLDS:

24       Q.   Now, I'm going to ask you to take a look at

25   your monitor again and take a look at the photograph

1    in Government's 122-2.  Do you recognize what that's

2    a photograph of?

3         A.   Yes.

4         Q.   And what is depicted in that photograph?

5         A.   This is a photograph of James Reid on the

6    floor of the bedroom.  At this point no evidence has

7    been collected yet.  It shows placards 9, 10, 11 and

8    12.

9              MS. REYNOLDS:  Your Honor, I would move

10   as a full exhibit Government's 122-2.

11             MR. BUSSERT:  No objection, your Honor.

12             THE COURT:  Full exhibit.

13        Q.   So, taking a look then at 122-2, and

14   starting with the marker No. 9, does that marker

15   correspond to the duct tape that was around James's

16   head?

17        A.   Yes.

18        Q.   And then the marker that's No. 10, is that

19   corresponding to the shirt?

20        A.   Yes.

21        Q.   And then No. 11, that marker corresponds to

22   the duct tape that was wrapped around Mr. Reid's

23   hands and wrists?

24        A.   Yes.

25        Q.   And then, finally, it's hard to see in this

1   photograph, but do you recall whether there was also

2   duct tape around Mr. Reid's ankles?

3      A.   Yes.

4      Q.   And that's?

5      A.   No. 12.

6      Q.   Corresponds with No. 12.  And taking a look

7   at Government's Exhibit 122-3, is that a close-up of

8   marker No. 9 and the duct tape on Mr. Reid's head?

9      A.   Yes.

10          MS. REYNOLDS:  Your Honor, I would move

11  as a full exhibit Government's 122-3.

12          MR. BUSSERT:  No objection.

13          THE COURT:  Full exhibit.

14     Q.   And, again, is this the duct tape that's

15  right under -- at the base of his head and under

16  marker 9 that was eventually removed by you and your

17  colleagues?

18     A.   Yes.

19     Q.   And then showing you Government's

20  Exhibit --

21          MS. REYNOLDS:  Your Honor, I would move

22  as a full exhibit as well Government's 122C.  There

23  is no objection to this photograph.

24          THE COURT:  All right, full exhibit.

25     Q.   And is this a close-up, Detective, of

1  marker 11 and the duct tape that was wrapped around

2  James Reid's ankles -- not his ankles, his arms and

3  wrist?

4      A.   Yes.

5      Q.   And just handing you -- starting with duct

6  tape on his head, handing you 122A and 122A-1.

7           MS. REYNOLDS:  And there is no objection

8  to these your Honor.  I would move these as a full,

9  Exhibit 122A and 122A-1.

10          THE COURT:  Very well, they're full

11 exhibits.

12     Q.   Starting with 122A, is that the paint can

13 that contains the duct tape removed from Mr. Reid's

14 head area?

15     A.   Yes.

16     Q.   And then 122A-1, is that the duct tape as

17 it was prepared to be shown in court?

18     A.   Yes, the duct tape that was originally in

19 this can.

20     Q.   And, again, you were present when the duct

21 tape was removed from all of the victims, correct?

22     A.   Yes.

23     Q.   And do you recall -- and I think you

24 mentioned this before, it was difficult to cut it

25 off.  Could you tell how much duct tape and how

1   tightly it was wrapped around the victims?

2       A.   In most of the cases there appeared to be

3   quite a bit of duct tape.  It seemed like it had

4   been wrapped around many times, and it was, as I

5   said, relatively tight.  It appeared there was

6   difficulty getting the scissors underneath the duct

7   tape to actually cut it.

8       Q.   And as the duct tape was being cut off, you

9   were all still wearing the protect gear?

10      A.   Oh, yes.

11      Q.   And what steps were taken by you and your

12  colleagues, Detective Ortiz and Detective Vargas, to

13  avoid moving or stepping in anything else,

14  particularly in the second room where Tina and James

15  were?

16      A.   As best as possible.  You know, we are

17  wearing full protective gear, so we're not adding

18  anything to the scene, and to avoid any type of

19  further contamination within the scene you try to

20  avoid what you can as best as possible.  Being as it

21  was a tight area and obviously several people needed

22  to be in there to process the scene, you know, we

23  did the best we could without touching anything

24  until it became absolutely necessary to do so.

25      Q.   And other than you and Detective Ortiz and

1    Detective Vargas and the medical examiner

2    investigator, when you were still processing

3    evidence from the victims, was anybody else in the

4    apartment at that time?

5        A.    At the time that the victims were being

6    processed?

7        Q.    Yes.

8        A.    No.

9        Q.    And then throughout your time in the crime

10   scene in apartment 101 as you were processing it,

11   other than you and Detective Ortiz and Detective

12   Vargas, were there times that anybody else was

13   there?

14       A.    Detective Gallagher was there the first day

15   I believe, and Sergeant Remley, who is in charge of

16   the crime scene unit.  He was not there the entire

17   time, but came in periodically to check our progress

18   and supervise what we were doing.

19       Q.    But other than that, nobody -- any members

20   of the public or other people were not allowed

21   inside the crime scene, correct?

22       A.    No.

23       Q.    Showing you then Government's Exhibit 122B,

24   do you recognize that?

25       A.    Yes.

1     Q.   And is that the shirt from Mr. Reid?

2     A.   Yes.

3          MS. REYNOLDS:  Your Honor, I would move

4     as a full Exhibit 122B.

5          MR. BUSSERT:  No objection.

6          THE COURT:  Full exhibit.

7          It's now three o'clock.  Is this a good

8     place for you to stop.

9          MS. REYNOLDS:  Yes, your Honor.

10         THE COURT:  You can get organized for

11    tomorrow.

12         All right, ladies and gentlemen, thank

13    you.  Please leave your notebooks here, please

14    remember do not discuss the case.  We'll commence

15    again tomorrow at nine o'clock.  Thank you.  Have a

16    pleasant afternoon.

17              (Jury exited the courtroom.)

18         THE COURT:  All right, Detective Devan,

19    we'll see you tomorrow at nine o'clock.  Please

20    don't discuss your testimony with anyone.

21         THE WITNESS:  Yes, ma'am.  Thank you.

22         THE COURT:  You are excused.

23         Please be seated.  Mr. Bussert, did you

24    want to discuss further 101, the scale model.

25         MR. BUSSERT:  Just to reiterate what I

1    said.

2              THE COURT:  You said you didn't have the

3    blueprints.

4              MR. BUSSERT:  Also, no opportunity to

5    question the witness who actually created the model,

6    which I think is our right if they're seeking to

7    admit it as a full exhibit.  It's a colleague of the

8    prior witness.

9              THE COURT:  But this model is not

10   exactly testimonial, is it?  It is, in fact, a

11   model.  She's described how it was created.  It

12   doesn't purport to be direct evidence, if you will,

13   and she's gone.

14             MR. BUSSERT:  I don't think that the

15   government could admit it through her regardless.  I

16   don't think she would be appropriate.

17             THE COURT:  Ms.  Reynolds?

18             MS. REYNOLDS:  If -- I'm not sure I

19   understand the objection to it.

20             THE COURT:  This is, in essence, an

21   exhibit like what is the 1001 compilation of many

22   other documents.

23             MS. REYNOLDS:  A summary chart.

24             THE COURT:  Made in a more simple form

25   for the jury's assimilation.  To do that, the

1   underlying documents from which it was prepared are

2   supposed to be produced to opposing counsel.

3          MS. REYNOLDS:  Well, your Honor, just so

4   the record is clear, the model has been available

5   for him to view for years, for at least months since

6   the last trial, and he was clearly aware it was

7   introduced at the last trial and he saw Ms.

8   Holliday's testimony from the last trial.  So, it

9   was available for him to view and we invited him to

10  view it numerous times.  So, that's clear.

11         MR. BUSSERT:  That's not true and I'll

12  take exception to that, okay, just because I don't

13  appreciate Attorney Reynolds representing what I

14  know or did or anything else.  Several weeks ago I

15  was invited to view physical evidence.  I took that

16  opportunity and did it.  At that time Agent Dillon

17  had advised me the model was available, it wasn't

18  present at that time, that I would be contacted.  I

19  was not.

20         But, again, I think that goes above and

21  beyond the fundamental objection.  So that whole

22  point is irrelevant as to the underlying issues with

23  respect to our objection, it wasn't the appropriate

24  witness to bring it in and what went into actually

25  creating that model.

1              THE COURT:  Why don't we do this:  Why

2     don't we leave 101 for ID for now and see if there

3     is either some supplementation that the government

4     wishes to make, if there are some materials that can

5     be provided to Mr. Bussert to satisfy him that this

6     is, in fact, to scale, a three dimensional to-scale

7     representation of what the blueprints said.  I don't

8     think we're in a rush for its admission, are we?

9              MS. REYNOLDS:  No, your Honor, that's

10    fine, we can provide -- there was testimony that

11    they went there and took measurements as well.

12    Perhaps I can get those documents, the measurements

13    they took and all of the blueprints and I can

14    provide those to counsel and see if that satisfies

15    his objection.

16             THE COURT:  Why don't we hold on that

17    then and see how that develops.  There is one thing

18    I need, which is the defendant's proffer agreement,

19    or agreements.

20             MS. REYNOLDS:  Check.  We gave them both

21    to --

22             THE COURT:  All right, check.  Is there

23    anything else before we adjourn for the day?  Oh, I

24    want to know who your witnesses are for tomorrow

25    please.

```
1              MS. REYNOLDS:  We will continue
2    obviously with Detective Devan.  We will call -- if
3    we need to, we'll call Detective Ortiz to finish up
4    any evidence that may not come in direct fully
5    through her, and/or Detective Vargas, and then, as
6    we indicated before, Jackie Bryant will be our first
7    cooperating witness, and then after that it would
8    probably be Officers Simpson and Rosado.  So,
9    basically after all of the crime scene is completed,
10   we're going to turn then to some of the drug dealing
11   activity in apartment 211.
12             THE COURT:  All right, so those five
13   witnesses will fill out tomorrow.
14             MS. REYNOLDS:  I think so because we
15   still have a lot of evidence.  We still have fairly
16   long to go with Detective Devan.
17             THE COURT:  All right.  Well, you know
18   the cardinal rule, we've got to make maximum use of
19   our jury's day until three o'clock.  I don't take an
20   afternoon break because between 1:30 and 3:00 isn't
21   very much time.
22             MS. REYNOLDS:  I didn't remember that.
23   I wasn't sure, and I thought we were going until
24   3:30.
25             THE COURT:  Only on Fridays we go 9:30
```

```
1    to 3:30.

2              MS. REYNOLDS:  Those witnesses will be

3    here.  It's not --

4              THE COURT:  That's fine.  Thank you very

5    much.

6              Anything, Mr. Bussert?

7              MR. BUSSERT:  No, your Honor.

8              THE COURT:  Thank you very much.  See

9    you tomorrow.

10             (Proceedings concluded 3:07)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2    WITNESS                                 PAGE

 3    MARIA GAUDAGNO

 4    Direct Examination by Ms. Reynolds       94

 5    Cross-Examination by Mr. Bussert        102

 6

 7    ROSANNA MENDOZA

 8    Direct Examination by Mr. Markle        105

 9    Voir Dire Examination by Mr. Bussert    142

10    Continued Direct by Mr. Markle          143

11    Cross-Examination by Mr. Bussert        150

12    Redirect Examination by Mr. Markle      157

13    Recross-Examination by Mr. Bussert      158

14

15    SANDRA HOLLIDAY

16    Direct Examination by Ms. Reynolds      162

17    Cross-Examination by Mr. Bussert        174

18    Redirect Examination by Ms. Reynolds    185

19

20    JOETTE DEVAN

21    Direct Examination by Ms. Reynolds      187

22    Voir Dire Examination by Mr. Bussert    214

23    Continued Examination by Ms. Reynolds   236

24    Voir Dire Examination by Mr. Bussert    237

25    Continued Examination by Ms. Reynolds   239
```

1

2          I certify that the foregoing is a

3    correct transcript from the record of proceedings in

4    the above-entitled matter.

5

6                                   2/9/12

7                                    Date

8

9                          /S/   Sharon Montini

10                           Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25