UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff*,<br><br>v.<br><br>AZIBO AQUART,<br>    *Defendant*. | Civil No. 3:06cr160 (JBA)<br><br><br><br>February 21, 2012 |

RULING ON DEFENDANT'S MOTION FOR A MISTRIAL

Defendant Azibo Aquart moves for a mistrial on the ground that the Government committed prosecutorial misconduct in its rebuttal summation during the guilt phase proceedings of his trial. He argues that the Government prosecutor repeatedly stated her personal opinion as to the guilt of the defendant and referred to facts that were not in evidence. As a result, Mr. Aquart asserts that his right to a fair trial was violated and a mistrial should be declared. The Government defends its conduct as properly responsive to Defendant's summation. For the reasons discussed below, Defendant's Motion [Doc. # 829] will be denied.

I. Discussion

    A. The Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. However, it is a "rare case" in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required. *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be

determined whether the prosecutor's conduct affected the fairness of the trial. *United States v. Young,* 470 U.S. 1, 11 (1985). "An aggrieved party must show more than mere trial error to secure reversal; he must demonstrate misconduct so egregious that, when viewed in the context of the entire trial, it substantially prejudiced him." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004) (citing *United States v. Shareef,* 190 F.3d 71, 78 (2d Cir. 1999)).

The Supreme Court has counseled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction" *Berger v. United States*, 295 U.S. 78, 88 (1935), but has also made clear that the adversary system permits the prosecutor to "prosecute with earnestness and vigor." *Id.* In other words, "while he [or she] may strike hard blows, he [or she] is not at liberty to strike foul ones." *Id.* While a prosecutor is generally prohibited in closing argument from offering personal beliefs or opinions to the jury, *see United States v. Rivera*, 22 F3d 430, 437 (2d Cir. 1994), even the expression of an opinion may be permissible if it "clearly communicate[s] nothing more than a comment on the evidence." *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995).

A prosecutor is also precluded from vouching for the credibility of the Government's witnesses, because "[v]ouching may prejudice a defendant by suggesting to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility," *see United States v. Newton*, 369 F.3d at 680, and because the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. *United States v. Young,* 470 U.S. at 18–19. In *Newton*, the Second Circuit found that most of the statements that defendant challenged did not qualify as vouching. For example, statements in which the prosecutor "submitted" certain credibility conclusions for jury consideration,

such as "We submit to you . . . that [Ms. Wright] testified truthfully," did not amount to vouching. *Id.* at 681–82. (Citing *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)) (approving the use of "I submit" to urge the jury to reach certain conclusions without impermissibly interjecting the prosecutor's personal beliefs into the case). The Second Circuit found that other statements, such as the prosecution's assertions that "[t]hese are credible witnesses" and "[t]hey came in here and told the truth," did raise a vouching concern, but concluded that none of the prosecutor's statements were so prejudicial as to warrant reversal. *Id.* at 682.

### B. The Challenged Statements

As support for his prosecutorial misconduct claim, Defendant cites to large portions of the Government's rebuttal summation to argue that the prosecutor expressed her personal opinion or belief that Defendant was guilty. Citing the "fair response" doctrine, the Government responds by arguing that its rebuttal summation "appropriately responded to defense counsel's arguments and was based entirely upon evidence in the trial record." (Gov't Opp'n [Doc. # 852] at 3.) Under the "invited" or "fair response" doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal. *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("Each of the challenged statements in the prosecution's rebuttal were fair responses to the defense summation. Defendant cannot now complain about the issues raised and the atmosphere created by his own making through the defense summation. To the extent that any of the comments could be labeled improper, none were so egregious as to infect the proceedings in such a manner as to deprive defendant of due process of the law.").

3

### 1. The Statement that "this is his fault"

In the first statement that Defendant challenges, but made no contemporaneous objection at trial, AUSA Tracy Dayton argued:

> This is not the victims' fault, this is his fault. He did this. He planned this. He targeted Tina, he bought everything he needed to kill them, he picked his crew, he went over to their house, he broke their door down, and he bludgeoned them to death. He brutally murdered the victims. That is his fault, no matter how you look at it.

(Tr. 172–173.)

Read without context, this statement could constitute an expression of AUSA Dayton's personal opinion. However, in the Defendant's summation, defense counsel implied that the victims, by engaging in drug trafficking and working out of the Charles Street apartment, had placed themselves in harm's way. For example, during his summation, Defense counsel reminded the jury of Judith Rivera's testimony, arguing,

> We did learn a couple of things from Ms. Rivera. Charles Street was not an exclusive two–apartment drug operation. It was not [just apartments] 101 and 211. She said on the morning of the murders she went to 101 to see if she could get drugs, but no one answered the door. And then she went to Boozine's apartment next door and asked to get drugs. . . She then goes up to 211. She goes up to the third floor. There [are] plenty of places in Charles Street to get drugs. This is not this exclusive operation. That building was a 24–hour drugstore that was wide open and was a target. Any of those apartments were targets for anybody looking for drugs, cash, or both.

(Tr. 158:12–14.) Earlier in the summation, Defense counsel referenced another witness's testimony, in which the dangers of the "drug world" were discussed: "But we did learn something from Ms. Hopkins, something about the drug world, just how common robberies are." (Tr. 146:4–6.)

Standing alone, the statement that "this is his fault" could be improper, as it treads too closely to an expression of the prosecutor's personal opinion. However, considered within the context of the defense's summation, it is clear that the prosecutor was responding to defense counsel's insinuations that the victims put themselves in danger because of their involvement with the "drug world" and that they knew that the apartment building was a dangerous location. *Tocco*, 135 F.3d at 130 ("the defense summation may open the door to an otherwise inadmissible prosecution rebuttal").

### 2. *The Statement that the Police Are Supposed to "catch the guilty guy"*

Next, Defendant challenges as improper the prosecutor's argument that "I mean, isn't that what the police are supposed to do, catch the guilty guy?" (Tr. 173:9–11.) In context, the prosecutor said:

> Now, the defense has made much of the fact that the police focused on the defendant from the outset of this case, as if it's somehow horrible that law enforcement would focus on the person that all of the evidence suggested from the get–go was responsible for these murders. I mean, isn't that what the police are supposed to do, catch the guilty guy?

(Tr. 172:4–11.) To innoculate the potential that jurors might construe this statement as an expression of the prosecutor's opinion of Defendant's guilt, the Court reminded the jury, "The jury understands that the jury will decide whether the government has proved [guilt] beyond a reasonable doubt. That is your determination, and yours alone, and I will ask Ms. Dayton to continue." (Tr. 172:17–21.) Further, viewed in its entirety, this argument is responsive to the Defense's argument that the police had improperly focused their attention on Mr. Aquart from the beginning. At the beginning of his summation, Defense counsel argued,

> The police developed a suspect and then they developed the evidence. The police knew there was a drug operation at 215 Charles Street, specifically in apartment 211. They'd been there three times in the past year in raids. The investigators also learned that Ms. Johnson was selling drugs from apartment 101. And when the investigators came to believe that Mr. Aquart was the one who controlled apartment 211, they had a suspect.

(Tr. 122:22–123–6.)

### 3. *The Statement that "It is the Government's responsibility to investigate thoroughly"*

Defendant next objected to the Government's remark in the underlined portion of the following statement:

> MS. DAYTON: Counsel has also made much of the fact that the government met with several witnesses on several occasions. We've heard the litany of dates that these witnesses were met with. Yes, the government does not shy away from that fact. We bear the burden of proof in this case and <u>it is the government's responsibility to investigate thoroughly</u> and to prepare the case and the witnesses for trial. And in a case of this magnitude where the defendant brutally murdered three people, it is truly the government's responsibility, and you should hold the government to its responsibility, to meet its burden of proof.
>
> MR. SHEEHAN: Again I'm objecting to counsel's characterization. Counsel is not characterizing the evidence, she's stating her opinion.
>
> THE COURT: I have instructed that it is the government's burden of proof beyond a reasonable doubt on each element of each crime. That is your job, that is your responsibility, and that is your responsibility alone. No matter what counsel may say one way or another, it is your responsibility, and that is the standard to which the government is held. I think you understand that.

(Tr. 175:5–176:4.) The Government's statement responds to Defendant's summation challenging the meaning of many of the cooperating witnesses' meeting and being extensively interviewed by the government:

> And we're left with the testimony of the cooperating witnesses. Now, the thing about the cooperating witnesses is that their testimony was really, in a way, like the DNA results. That's what you saw when they testified here. You saw the end result, the final polished product. What you truly did not get to see, what the Government did not show you, was the process. We tried to explore that process. Myself or Mr. Sheehan would ask many of these witnesses whether they made a particular statement to a particular agent, particular person at a particular time, and the government would often ask these same witnesses the same things.
>
> Did they tape that interview, Mr. Hodges? Did they have you sign a statement, Mr. Womble? Did they ask you to view the report for accuracy, Mr. Taylor? The answer was always no. Why not? Why not record the interview? Why not sign the statement? Why not have the witness review the report for accuracy? What don't you know about what happened in those meetings? Sometimes six, seven, eight, nine meetings per witness. If they're telling the truth why that many meetings? What don't you know? Why don't you know it?

(Tr. 167:20–168:18.)

Even if the Government's statements constitute a form of self–vouching, they were not made in a vacuum and the Court focused the jury on its responsibility to determine that the Government met its high burden of proof. In the Court's view, the Government's remarks were insufficient to cause jurors to abdicate their responsibilities and instead rely on the government's self–confidence in its case. *United States v. Young,* 470 U.S. 1, 18–19 (1985).

### 4. The Statement Regarding Fingerprint and DNA Evidence in the CODIS Database

Defendant also challenges AUSA Dayton's statement during rebuttal summation where she rhetorically asked: "Why ask the lab to perform a DNA comparison against John Taylor's DNA in 2010 when *we* had known for years that the defendant's DNA profile was

7

already on that item?" (Tr. 180:1–4 (emphasis added).) In the full context of the statement, the Government's argument followed a reference to the forensic science examiner Christine Roy's expert testimony that she conducted testing over the course of five years against several known submissions of DNA, not just the Defendant's, stating:

> She told you that—she testified over the course of the last five years she repeatedly re–analyzed evidentiary samples against new submissions of known DNA at the government's request. She even analyzed the evidence against the victims' DNA even though it's very clear the victims didn't kill themselves. Why would the government continue to make such requests if we were only trying to get the defendant? . . . Why ask the lab to perform a DNA comparison against John Taylor's DNA in 2010 when we had known for years that the defendant's DNA profile was already on that item?

(Tr. 179:14–22; 180:1–4.)

Defense counsel objected immediately, arguing, "The way counsel is arguing in the context of this 'we' that she is using, it's clear that she's identifying her position as counsel for the government." (Tr. 180:5–8.) The Court responded, "I think the jury understands it's the government, and I'll ask that that be the way that it be phrased from now on." (Tr. 180:12–14.)

Next, Defendant argues that it was improper for the Government to "allude to facts outside the record" when AUSA Dayton "disparag[ed] the fact that the lab never compared the samples with Rodney Womble's DNA profile." (Def.'s Mot. for Mistrial at 2.) There, the Government argued,

> The defense has also brought up the fact that Womble's DNA was not submitted for testing. Well, first of all, you know Womble is a convicted felon, and you know from Christine Roy that Womble—excuse me, that the CODIS database is made up of the DNA of convicted felons.

8

(Tr. 180:16–21.) Defense counsel objected to these statements, arguing that "Counsel is . . . alluding to facts that are not in evidence," and that "We do not have, and have never had, and are not allowed, any access to the CODIS database. That is not available, and the implication of her question is that it is." (Tr. 181:9–14.) In response, the Court instructed the jury, "I just wanted to clarify, in case there was any confusion, the CODIS database is a database only available to law enforcement." (Tr. 182.)

The Government argues that this statement was made in response to many statements made by the defense during summation that questioned the accuracy of DNA evidence and that argued that another person, Rodney Womble, could have committed the murders instead of the Defendant. For example, Defense counsel stated: "And Rodney Womble, we don't know what happened with Womble, but we know by the time the testing began he was cooperating and his DNA profile was never provided to the lab." (Tr. 135:22–136:1.)

The Government's statements, viewed in the context of Defendant's summation, appear to be a proper response to the defense's argument that evidence was incomplete and that Rodney Womble was a possible alternate suspect. Further, these statements which followed a reference to the DNA examiner's testimony that she had conducted testing over the course of five years against several known submissions of DNA, not just Defendant's DNA, was based on the facts in evidence: that (1) Womble is a convicted felon, (2) that the CODIS database is made up primarily of the DNA profiles of convicted felons, and (3) the CODIS database had detected Efrain Johnson's profile on an evidentiary item submitted to CODIS by Ms. Roy. Given these facts, it was not improper for the Government to respond to Defendant's argument by reasoning to the jury that CODIS *could* have detected Womble's

DNA profile, as it had detected Johnson's, if Womble's DNA profile had in fact been present on the evidentiary items.

Defendant also challenges the statements made by the prosecutor when discussing fingerprint evidence. The prosecutor had stated,

> Look, the fact that Pleckaitis found both the defendant and his brother's fingerprints on the bloody bag next to Basil's crushed skull is no one's fault but their own. Obviously they weren't careful enough with their latex gloves. And moreover, the issue about the movement of the bag, this bag, there has been so much talk about this blue bag in this bag. It's a red herring, . . . It's not as if they took this bag, went over to Lashika Johnson's house, said to the defendant, hey, would you be so kind as to put your fingerprints on this bag right on the duct tape, that would be good, and then brought it back to the scene. The evidence was Detective Gallagher picked it up, realized he shouldn't have picked it up, and put it back down. Okay, it's not ideal, but it doesn't make the defendant innocent.

(Tr. 178:6–10.)

As the Government argues, this, too, was an invited response to the defense's summation challenge to the Government's evidence. Defense counsel had argued that "[t]he limitations of fingerprint technology and examination do not tell us when that fingerprint was deposited on the duct tape. The limitations of fingerprint examination do not tell us where that duct tape was when the fingerprint was deposited." (Tr. 124:12–23.) He had also maintained that the Government had handled the evidence in the case poorly: "the journey of this bag tells us how the evidence was treated. You can follow it through the pictures, at least through the pictures supplemented by the defense, to those provided by the government. And this raises doubts as to how the crime scene was processed and the evidence was collected, especially when you see photos that were not offered by the government." (Tr. 125:13–21.) Defense counsel also noted that there was a seven–minute

10

period of unfettered access to the apartment, arguing "We don't know if someone else went in there, took something, touched some things. We just don't know, but it is possible." (Tr. 141:17–20.) On these bases, Defense counsel concluded his summation, arguing that "the physical evidence has failed to rise to the level of proof beyond a reasonable doubt and that the records similarly fail to rise to the level of proof beyond a reasonable doubt." (Tr. 141:21–25.)

The Government's rhetoric responds to the arguments made in challenging the Government's evidence and procedures and was not out of bounds. *Tocco*, 135 F.3d at 130 (citing *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir.1992)) ("The prosecutor's remarks were legitimate responses to counsel's arguments that Rivera had, in essence, been framed by the cooperating witnesses and the government. The challenged statements were an attempt to focus the jury's attention upon the evidence and away from defense counsel's claims.").

### 5.   *The Statement that "This was not random, this was personal"*

Finally, Defendant challenges specific sections of the Government's rebuttal summation to which defense counsel did not contemporaneously object, in which the prosecutor asserted that: "You can also examine the photos more closely, both the crime scene photos and the autopsy photos, and see some of the defendant's handiwork, the horrifying things he did to these victims," and that "Look, the defense would like you to believe that this was some random act of violence. Take a look at this crime scene. Does this look random to you? He targeted Tina because she stood up to him, and he beat them to death with baseball bats. This is not random, this was personal." (Tr. 193:12–21.)

11

During the defense summation, defense counsel emphasized that "anyone" could have gotten into Apartment 101, arguing "This building was wide open. Anyone could get in any time, day or not [sic]" (Tr. 146:16–17), and that the "building was a 24–hour drugstore that was wide open and was a target. Any of those apartments were targets for anybody looking for drugs, cash or both" (*id.* 158:12–17). Viewing the specific challenged portions of the Government's concluding statements in their full context, the prosecutor was responding to Defendant's insinuations that the murders could have been random acts of violence, and suggesting to the jury the specific inferences they could draw based on the evidence presented. For example, in the same concluding section of her rebuttal summation, AUSA Dayton argued

> The evidence suggests that after Azikiwe Aquart, Efrain Johnson and John Taylor had left the apartment, the defendant then turned his attention and his bat to Basil Williams, and he crushed Basil Williams' skull like an egg shell.
>
> The defendant then went into the front room and he drilled the door shut getting Basil's blood on the front door lock in the process. The defendant entombed the victims in their own apartment ensuring that nobody could save them. About that, there is no reasonable doubt. And the government asks you to return the only verdict that is demanded by the evidence in this case, and that is a verdict of guilty on all charges.

(Tr. 195:6–21.) "The government had broad latitude in the inferences it may reasonably suggest to the jury during summation," *Edwards*, 342 F.3d at 181, including when responding to arguments made in the defense summation, and here, these statements did not exceed the scope of permissible latitude.

In sum, that the Court interposed directions to the jury in response to certain Government statements reflected the Court's impression at the time that a cautionary note

was useful for both the prosecutor and the jury. However, the Court finds that none of the Government's arguments, alone or collectively, could be seen to have resulted in unfair or substantial prejudice to the Defendant. Where an objection with some potential merit was made, the Court gave a curative instruction designed to mitigate any ill–effects and restore the jury's focus. The Court concludes that a contextual assessment of the challenged statements shows them to have responded to the Defense's own summation, without substantial prejudice to Defendant. *See Newton*, 369 F.3d at 680.

II.	Conclusion

For the reasons discussed above, Defendant's motion [Doc. # 829] for a mistrial on the guilt phase of his trial is DENIED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of February, 2012.