UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>    *Plaintiff,*<br><br>    v.<br><br>AZIBO AQUART<br>    *Defendant.* | Civil No. 3:06CR160(JBA)<br><br><br><br>February 24, 2012 |

RULING ON DEFENDANT'S MOTION FOR MISTRIAL AS TO THE PENALTY
PHASE

Defendant Azibo Aquart moves [Doc. # 952] the Court for a new penalty proceeding, arguing that the Government's penalty phase summations unconstitutionally undermined the jury's consideration of his mitigation evidence. The Government opposes, maintaining the propriety of its summations. For the reasons that follow, Defendant's motion will be denied.

I.      Brief Procedural Background

The penalty proceedings began one week after a jury found Mr. Aquart guilty of six counts of murdering Tina Johnson, Basil Williams, and James Reid, in aid of racketeering under 18 U.S.C. § 1959(a)(1), conspiracy in aid of racketeering under § 1959(a)(5), and drug–related murders under 21 U.S.C. § 841, as well as one count of conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base under 21 U.S.C. § 846. During the penalty proceedings, the Government and the Defendant each presented approximately three days of penalty phase material. As to each of the three capital murders, the government presented the jury with five statutory aggravating factors: (1) heinous, cruel and depraved conduct, 18 U.S.C. § 3592(c)(6); (2) procurement by payment, 18 U.S.C. § 3592(c)(7); (3) pecuniary gain, 18 U.S.C. § 3592(c)(8); (4) substantial planning and

premeditation, 18 U.S.C. § 3592(c)(9); and (5) multiple victims, 18 U.S.C. § 3592(c)(16), as well as two non–statutory aggravating factors: (1) continuing pattern of acts of violence and (2) victim–impact. Mr. Aquart presented the jury with 28 mitigating factors [Doc. # 936]: (1) other participants in the homicide offense would not be sentenced to death (factor one); (2) the victims chose to engage in illegal drug–trafficking (factor two); (3) if not sentenced to death, Aquart would spend the rest of his life imprisoned (factors three, four, and 27); (4) Aquart's execution would cause others to suffer grief and loss (factor five); (6) Aquart's childhood, education, and family background (factors six–26 ); (7) Mr. Aquart's life had value (factor 28).

Prior to the penalty phase summations, the Court charged the jury on the law that would apply to their penalty deliberations, providing each juror with a written copy. The Court instructed the jury that it must "consider and weigh any aggravating and mitigating factors proved in this case." (Tr. 5569.) The Court then instructed the jury:

> A mitigating factor is not offered to justify or excuse the defendant's conduct with respect to the offense of conviction. Instead, a mitigating factor is a fact about the defendant's background, record or character, or about the circumstances surrounding the capital offenses, or anything else relevant that would suggest in fairness that a sentence of life imprisonment without the possibility of release is a more appropriate punishment than a sentence of death in this case.

> The law does not require that there be a connection between the mitigating evidence and the crime committed. It is not necessary, for example, for the defense to establish that evidence of a bad childhood led to the commission of the offense. Thus, whether or not the mitigating factors have a direct connection to the crimes does not affect their status as mitigating circumstances that you are required to consider.

(Tr. 5598.) The Court also explained that the Defendant bore a lower burden of proof with

respect to mitigating factors than the Government bore with respect to aggravating factors:

> Unlike aggravating factors which you must find proved beyond a reasonable doubt, in order for you to consider them in your deliberations, the law does not require unanimity with respect to mitigating factors. Any one juror persuaded of the existence of a mitigating factor must consider it in his or her sentencing decision. It is the defendant's burden to establish any mitigating factors by a preponderance of the evidence as I previously defined that term on page 4. This lesser standard of—this is a lesser standard of proof under the law than proof beyond a reasonable doubt which is the standard for which the government is held.

(Tr. 5598–99.)

The Court further directed that "even a finding that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death does not require that you impose a sentence of death. There is never any requirement that the death sentence be imposed." (Tr. 5607–08).

The jury unanimously found that the Government had proven the five statutory aggravating factors and the two non–statutory aggravating factors beyond a reasonable doubt as to each of the three victims. (Verdict Form [Doc. # 936] at 3–5.) The jury also unanimously found that Aquart had proven by a preponderance of the evidence 25 of the 28 mitigating factors that he presented and unanimously found an additional mitigating factor, that "The defendant Azibo Aquart has a child." (*Id.* at 6–10.) In addition, 9 out of 12 jurors found that Aquart had proven two remaining mitigating factors (#9, that throughout his childhood, Mr. Aquart lacked adequate parental supervision; and #10, that Mr. Aquart was exposed to emotional and physical abuse inflicted on his mother), and 2 out of 12 jurors found that Aquart had proven a final mitigating factor (#20, that from the time of his mothers death, Mr. Aquart had not meaningful adult supervision)  by a preponderance of the evidence.

II.     Discussion

This Court has authority under Federal Rule of Criminal Procedure 33(a) to order a new trial "if the interest of justice so requires." The ultimate question for the district court in ruling on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson* (Ferguson I), 246 F.3d 129, 133, 134 (2d Cir. 2001). Rule 33 gives a court broad discretion to "set aside a verdict and order a new trial to avert a perceived miscarriage of justice." *Id.* at 133. In spite of this broad discretion, courts must exercise their Rule 33 authority "sparingly and in the most extraordinary circumstances." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008).

The Federal Death Penalty Act instructs that in death–eligible homicide cases, the jury must respond sequentially to three inquiries, and imposition of the death penalty requires unanimity on each. *Jones v. United States*, 527 U.S. 373, 407–08 (1999) (Ginsburg, J., dissenting). First, the jury must determine whether there was a killing or death resulting from the defendant's intentional engagement in life–threatening activity. *See* 18 U.S.C. § 3591(a)(2). Second, the jury decides which, if any, of the Government–proposed aggravating factors, statutory and nonstatutory, were proved beyond a reasonable doubt. *See id.* § 3593(d). Third, if the jury finds at least one of the statutory aggravators asserted by the Government, the jury then determines whether the aggravating factors "sufficiently outweigh" the mitigating factors to warrant a death sentence, or, absent mitigating factors, whether the aggravators alone warrant that sentence. *Id.* § 3593(e). The mitigating factors, seven statutory and any others tending against the death sentence, are individually determined by each juror by a 'preponderance of the evidence,' unlike aggravating factors, on which the jury must unanimously agree under a 'beyond a reasonable doubt' standard. Further, "any member of the

jury who finds the existence of a mitigating factor may consider such factor established . . . regardless of the number of jurors who concur that the factor has been established." *See id.* §§ 3592(a), (c), 3593(d). "The weighing is not numeric; the perceived significance, not the number, of aggravating and mitigating factors determines the decision." *Jones*, 527 U.S. at 408 (Ginsburg, J., dissenting).

Defendant's motion is based largely on what he argues were improper comments made by the Government during its closing and rebuttal summations. Where a defendant argues that either the jury instructions or a prosecutor's comments in summation unconstitutionally precluded the jury from considering his mitigating evidence, "the proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the [jury instructions] in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).[1] The Second Circuit has circumscribed the situations in which improper statements would merit a new trial, albeit in a non-capital case context:

> [i]t is a "rare case" in which improper comments . . . are so prejudicial that a new trial is required. Such comments do not amount to a denial of due process unless

---

[1] In *Boyde*, the defendant had presented mitigating evidence relating to his childhood and character, and the jury was not expressly told to consider that evidence, but instead was given a potentially "ambiguous" instruction to consider anything that "extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Id.* at 381, 384. However, because the defendant had presented substantial testimony about his background and character, the Supreme Court concluded that it was "unlikely that reasonable jurors would believe the court's instructions transformed all of this favorable testimony into a virtual charade," and held that there was no error in the instructions. *Id.* at 383. The jury there was instructed that it "shall consider all of the evidence which has been received during any part of the trial of this case," and the Supreme Court found that "reasonable jurors surely would not have felt constrained by the [instruction at issue] to ignore all of the evidence presented by petitioner during the sentencing phase." *Id.* Here, Defendant has made no separate challenges, either during trial or in post-trial motions, to the Court's final penalty-phase instructions to the jury, other than his generalized incorporation of all prior motions.

they constitute "egregious misconduct." In assessing a claim, we consider: (1) "the severity of the misconduct"; (2) "the measures adopted to cure it"; and (3) "the certainty of conviction in the absence of the misconduct."

*U.S. v. Ferguson* (Ferguson II), --- F.3d ---, 81, 2011 WL 6351862, *15 (2d Cir. Dec. 19, 2011) (alterations in original) (citations omitted).

A.      Whether the Government's Penalty Phase Summations Undermined Mr. Aquart's Mitigating Evidence

Mr. Aquart argues that the Government's penalty phase summations unconstitutionally undermined his mitigation evidence and asserts that the Government's comments created a risk that the jury would refuse to consider mitigating evidence. Mr. Aquart challenges "the manner in which the prosecutors addressed [his] mitigation" (Def.'s Mem. Supp. [Doc. # 952] at 2), and argues that "the prosecutors repeatedly urged the jurors to dismiss Mr. Aquart's mitigating factors out of hand, because they did not excuse the murders or make them less heinous" (*id.* at 3). Defendant contends that "the defense case for life rested entirely on Mr. Aquart's mitigation evidence, proffered as reasons for the jurors to extend mercy to him," and maintains that the effect of the prosecutor's summation arguments was for the jury to not consider this mitigation evidence. The Court finds Defendant's arguments unpersuasive.

It is well settled law that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). The Eighth Amendment prohibits capital sentencing schemes in which the sentencer is "precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Abdul–Kabir v. Quarterman*,

550 U.S. 233, 247–48 (2007) (internal citations omitted) (emphasis in original). The defendant may proffer mitigating evidence whether or not it has any "nexus" to the offense. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004).

On the other hand, the Government is permitted to argue to the jurors its view of the weight that should be given to the mitigation factors, so long as it does not encourage the jurors to disregard the factors. *See, e.g.*, *United States v. Whitten*, 610 F.3d 168, 184 n.6 (2d Cir. 2010) (though the government's summations "deprecated the weight of the mitigating evidence, explained why a life sentence is insufficient, and argued that the victim impact evidence militated against mercy," the Second Circuit found that "the government's summations did not urge the jury to ignore mitigation and repeatedly instructed the jury to consider every mitigating factor," and that "the verdict form evidences the jury's active consideration of the mitigating evidence"). However, "the sentencer may not give [such evidence] no weight by excluding such evidence from their consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982).

The defendant in *Boyde* challenged the prosecutor's statements to the jury that the evidence about his background "did not suggest that [petitioner's] crime is less serious or that the gravity of the crime is any less" and that "[n]othing I have heard lessens the seriousness of this crime." *Id.* at 385. The prosecutor had argued that while much of the mitigation evidence was factually true, "if you consider the weight that goes against it, it is not even close." *Id.* at 385–86. The Supreme Court found no constitutional error, emphasizing that "arguments of counsel generally carry less weight with a jury than do instructions from the court" and while "it is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, . . . they are not to be judged as having the same force as an instruction from the court." *Id.* at 384–85.

1. *Mitigating Factors Regarding a Life Sentence: "If not sentenced to death, Mr. Aquart would be sentenced to life in prison"* and *"Life in prison is a harsh punishment"*

Mr. Aquart first challenges the Government's arguments in its opening summation, regarding mitigation factors three, four, and 27—that if not sentenced to death, Mr. Aquart would be sentenced to life in prison: "[t]he government submits that does absolutely nothing to mitigate the defendant's vicious crimes in this case." (Tr. 5636.) When defense counsel objected, the Court instructed and reminded the jury that a mitigator "does not have to relate to the crimes. The jury will consider this as argument only." (*Id.*) Thus, while the Government's urging that this evidence lacked weight because it did not relate to the crimes of conviction was impermissible, a corrective instruction was immediately given. *Fell*, 531 F.3d 197 (considering the instructions to the jury, the court concluded: "No juror could have reached such conclusions while believing that to qualify as a mitigating factor, that factor need have a nexus to the crime.")

In relation to mitigating factor number four—life imprisonment is serious punishment—the Government argued in opening summation:

> Second, the defendant states that life imprisonment is severe punishment. What you learned about life imprisonment you learned from the defendant's expert, Mark Bezy, and from Anthony Armstead. What you heard is that the cell doors open at 5:00 a.m. and they stay open until approximately 9:00 p.m. During that time period the inmates can work, attend classes, play basketball, play[] handball, shop in the commissary, go to the law library, go to the yard, hang out in common areas, watch TV, talk and play cards. Inmates can write letters, talk on the phone, and receive visitors. They're fed.
>
> So is prison restrictive? Yes. But the government submits that, again, does not mitigate the fact that the defendant callously and viciously murdered three human beings.

(Tr. 5636–39.) Defense counsel objected immediately, and at side bar, the Court stated

the mitigator has been that life in prison is harsh. [AUSA Dayton] is taking the evidence that has been adduced that may bear against a finding that that mitigator has been proved or that it mitigates. I do not understand her argument to be implying that the jury should consider the cost of food, shelter and so forth, . . to the extent she limits it to the harshness as opposed to claiming that it would not be sufficient justice . . . I don't think that the objection should be sustained so long as [the argument is] confined to rebutting that mitigator.

(Tr. 5638.) The Court instructed the jury: "the objection is overruled, the argument is focused only on the mitigator related to 'life imprisonment is harsh' and for no other reason." (Tr. 5639.) This instruction brought the focus back to the mitigation factor at issue, and in the Court's view, there was no reasonable likelihood that the jurors would have felt constrained from considering that mitigating, "constitutionally relevant" evidence. *Boyde*, 494 U.S. at 380.

### 2. *Mitigating Factors Six though Twenty Six: Evidence Concerning Defendant's Childhood, Education, and Family Background*

Defendant argues that the Government was positing that mitigating evidence about Mr. Aquart's childhood, although properly before the jury, was inferior *per se*, and thus should be considered of reduced significance in the weighing process. Defendant also asserts that the Government attacked his mitigation defense by "repeatedly suggesting that the defendant was blaming his involvement with drug–selling and murder on others," thereby undermining Mr. Aquart's exercise of his "Sixth Amendment right to present a defense" at the penalty phase. (*See* Mem. Supp. at 6.)

Specifically in the Government's summation, AUSA Dayton argued "[a]nd then there are 19 proposed mitigators that all appear to be varying ways of saying the defendant had a difficult childhood. Let's examine those." (Tr. 5640.) The Government acknowledged that some of the factors had been proven: "Yes, [Richard Aquart, Defendant's father] was a drug dealer," and "When [the

Defendant] was 12 his mother tragically drowned," and Defendant's brother "joined a gang, was shot at 16." (Tr. 5640–42, 5645.) AUSA Dayton concluded by arguing:

> In fact, while the defense has presented 28 factors that he claims amounts to mitigation, you must remember what is important is not the quantity of factors, but, as the Judge told you, the quality. And what the government submits is that when you scrutinize these factors, really take a look at them, you'll see that these so–called mitigators actually carry and deserve no true weight.

(Tr. 5647.)

The defense summation reviewed the evidence of Mr. Aquart's difficult childhood and the negative influence that his father's drug dealing had on him and the family. (Tr. 5651–56.) Defense counsel showed the jury a family photo and argued, "What you don't see in this picture is the vulnerability of all of these children. And you don't see the fragility of their situation, undocumented without any social service system to help them." He further argued that "Azibo did not fall into the sea, he was thrown into it. And the life that once held promise and future and hope for the future has now been reduced to dying in prison." (T. 5657.) He also urged:

> You found that Azibo committed these crimes and that is a fact. But the fact is that Azibo's life was marred by tragedy. Sonia [Defendant's mother] was an amazing woman and her loss is one we can appreciate. Do the circumstances of Azibo's childhood excuse the crime? That's never been the question. Do they weigh in favor of a sentence of life imprisonment? The answer is yes.

(Tr. 5684.)

In rebuttal, AUSA Dayton argued,

Now, Mr. Sheehan has told you and has discussed with you again the testimony you heard about what happened after the defendant's mother tragically passed away. He told you about Azizi [Defendant's brother], and you heard Azizi testify. He took guardianship of his brothers, and he tried his best. . . . Mr. Sheehan told you today in his argument and went on about all of the people who tried to help the defendant along the way. And there were numerous people. Sonia's friends, you heard from

many of them who tried to give the defendant a second chance, tried to help him when he was a child. But the defendant threw all of those second chances away as well.

(Tr. 5690–91.)

He chose to live a life of violence and a life of crime. Those were his choices. It is not the fault of Azizi that the defendant made those choices when he became an adult. It is not the fault of the City of Bridgeport that the defendant made those choices when he became an adult. It is not the fault of Jonathan Davis, his juvenile probation officer, or the GED teacher. Those were his choices. In the end he acted, he chose.

(Tr. 5691–92.)

Defendant asserts that by these arguments, the prosecutor improperly denigrated the mitigating factors associated with his life before the murders as deserving no weight: "[Mr. Aquart's] mitigation catalogued life experiences that, although not excusing the murders in any way, could be used as a basis for jurors to extend him mercy." (Def.'s Mem. Supp. at 6.) However, the Government's argument that childhood–related mitigators "carry and deserve no true weight" does invoke a weighing process as opposed to telling jurors to disregard their consideration. While distinction between according evidence no weight and not considering the factor at all may well be lost on jurors, this Court's clear instruction to the jury was to consider all aggravating and mitigating factors in rendering its decision. In *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), the Second Circuit found that even though the prosecutor may have impermissibly suggested that the jury should disregard the mitigating evidence of defendant's childhood because it did not connect to the charged crimes, "it is extremely unlikely that the jury felt constrained in its consideration of Fell's mitigating evidence" in light of the district court's "thorough instructions." *Id.* at 223 (citing

*Boyde*, 494 U.S. at 384).[2] The Second Circuit also found support from the verdict form itself for its conclusion that the jury had been able to consider Fell's mitigating evidence, as the

> jury unanimously found eight background mitigating factors, including that Fell was sexually and physically abused as a child, that he was treated and institutionalized on several occasions due to mental health problems and that his parents were violent alcoholics who abandoned him. Significantly, ten individual jurors found additional mitigating factors not expressly provided by the defense.

*Id.* at 224.

Here, all of the mitigating factors that Mr. Aquart presented were found proved: the jurors unanimously found that he had proven 25 of the 28 mitigating factors, nine of out twelve jurors found the remaining three mitigating factors, and as in *Fell*, the jury found an additional mitigating factor—in this case, that Mr. Aquart had a child. Thus, there is no indication that the jury felt precluded from considering mitigating factors, including those related to Mr. Aquart's childhood and background, which the jury's verdict form announced as having been proved.

### 3. *Mitigating Factor Two: the Victims' Conduct*

Defendant argues that the Government mischaracterized the mitigator relating to the victims' conduct, that is, "One or more victims chose to engage in illegal drug trafficking activities, a circumstance that contributed to their deaths." In opening summation, the Government argued, "The defense tried to mitigate this horrible crime by claiming . . . that the victims had it coming. But they didn't. They didn't deserve to die." During rebuttal summation, the prosecutor then urged

---

[2] Defendant contrasts *Fell's* observation that "the amount of time and attention devoted to Fell's early life experiences by both parties and the fact that the prosecutor's comments formed a very brief part of his summation and *were not repeated during his rebuttal*," 531 F.3d at 223, with the fact that here the Government returned to the theme of Defendant's difficult childhood, and its dubious value as a mitigating factor, in its rebuttal summation. Whatever degree of distinction may exist, the holdings in *Fell* remain applicable here.

that the jury should give "absolutely no weight to [defense counsel's] suggestion" (Tr. 5693) that "somehow Tina and James' use of crack cocaine and Tina's sale of small amounts of crack cocaine was so dangerous an activity that it contributed to their own murders" (*id.*). The prosecutor went on to argue that it was not as if the victims were involved in a dangerous activity on the night they were killed, "like engag[ing] in some running gun battle through the streets of Bridgeport with Tina's crew shooting at the defendant's crew," and that instead, "[t]hey were at home asleep." (Tr. 5693–94.)

Defendant asserts that "this mischaracterization served to cast the mitigation defense in an unfavorable light, and deflect attention from its worth." (Def.'s Mot. at 7.) The Government notes that the Defendant failed to object to these arguments during summation, and where a defendant does not object to allegedly improper remarks below, plain error review applies.[3] The Government also maintains that its rejoinder about the victims' conduct was proper and responsive to the defense's own argument at summation. (Gov't Opp'n at 25.)

In this case, one of the mitigation themes for the jury's consideration was that the victims imperiled themselves by choosing to engage in drug trafficking. During Defendant's opening statement at the guilt phase of the trial, he argued,

What we also expect you will find after listening carefully to all of the testimony of

---

[3] *See* Fed. R. Crim. P. 52(b); *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir.), *cert. denied*, 131 S. Ct. 675 (2010) (where defense counsel did not object to AUSA's statement that "the jury could trust [the Government's witness] 100 percent" the court applied the plain–error test and found that it had not been met). "Before an appellate court can correct an error not raised at trial, there must be (1) 'error,'' (2) that is 'plain,' and (3) that 'affect [s] substantial rights.'" *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)) "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect [s] the fairness, integrity, or public reputation of judicial proceedings." *Id.*

> these witnesses is that the drug trade is a dangerous one, and that people who engage in the drug trade do so at their own peril. There are risks involved when you decide to deal drugs. There is the risk of arrest and being put in prison, the risk of being robbed, and the risk of violence. And people who engage in those risks then, including the victims in this case, as tragic as this is, did so at their own peril. They assumed those risks.

(Tr. 52–53.) Defendant returned to this theme at the penalty phase by submitting mitigating factor number two to the jury, and arguing that one or more of the victims was engaged in dealing drugs, thus putting themselves at risk of associated violence:

> One of the other things that you are also required to consider is the fact that one or more of the victims were engaged in drug dealing. Understanding no one is saying that it is okay to kill drug dealers, but what we are saying, however, is that in deciding to deal drugs people do take on risks. And the reason they take on the risks is because of the benefits. The benefits that they're seeking are making money that they would not have otherwise made. That's why people sell drugs. And one of the risks is the risk of violence.

(Tr. 5660.)

This mitigating factor is a variant of a statutory mitigating factor recognized under the Federal Death Penalty Act, 18 U.S.C. § 3592(a)(7), which provides, "The victim consented to the criminal conduct that resulted in the victim's death." In context, the Government's statements about the mitigating factors related to the victims' conduct were made in response to Defendant's theme that the victims "took on . . . the risk of violence." (Tr. 5660.) While Defendant is undoubtedly correct that these statements were intended to cast his mitigation argument in "an unfavorable light," the question is whether the rhetorical excess that this mitigator deserved "absolutely no weight," "so infected the trial with unfairness" as to result in a denial of due process to Mr. Aquart. *Donnelly*, 416 U.S. 637, 643 (1974). The Court thinks not. The jury unanimously found that Defendant had proved this mitigating factor and it is illogical to conclude that the jury

simultaneously disregarded this factor during their consideration of the mitigation evidence. *See, e.g.*, *Whitten*, 610 F.3d at 184 n.6 (finding that the verdict form "evidences the jury's active consideration of the mitigating evidence").

### 4. *Statements about Mercy*

Defendant's argument that the government's rebuttal summation "improperly suggested that the defense bore the burden of establishing that life was the appropriate sentence" (Def.'s Mem. at 8) by telling the jurors that Aquart was not "entitled" to their mercy (Tr. 5648–49) is considered in the context of the Court's instruction to the jury that "no juror is ever required by the law to impose a death sentence. The decision is yours as individuals to make. Any one of you may decline to impose a death sentence. You do not have to give a reason for your decision. The law has given each of you the discretion to temper justice with mercy." (Tr. 5608.)

The defense summation eloquently concluded with a call for mercy:

> [E]ach of you has been given by the law the discretion to temper justice with mercy. Maybe that's not fair, maybe we shouldn't put that responsibility on you, but the fact is that we do. The government has argued to you that Azibo is not entitled to mercy. Look at what he did in this case, they've argued. But that's not really what mercy is about. Mercy is not something that is earned. Nobody is entitled to mercy. Nobody really has a right to it. Mercy really is our response to tragedy, it's our recognition of potential, it's our expression of hope. It's our willingness to say that death is not the answer, to say that there is an opportunity for rehabilitation and redemption if his life is spared. That act of mercy is really the redemption for all of us.
>
> There has been, no doubt, too much killing. That killing has to stop, and it can stop here with us, and it can stop now, and life imprisonment, for that reason, is the appropriate sentence in this case. . . . Please, I ask you, let the killing stop with you.

(Tr. 5685–5687.)

During the Government's rebuttal summation, AUSA Dayton stated:

> They have asked you for mercy, and again, there is no doubt that you are all capable of mercy. The law, as Mr. Sheehan pointed out in the slides, and as the Judge instructed you, the law entitles you to temper justice with mercy, but it does not require you to do so.

(Tr. 5702–03.) The prosecutor continued, "What about this defendant entitled him to any mercy? What about what the defense has presented entitles the defendant to your mercy? Nothing." (Tr. 5703.)

Defendant claims that the Government's implication that life was an inappropriate sentence, was contrary to the FDPA's "presumption that life imprisonment is the appropriate sentence for a capital conviction." (Def.'s Mem. at 7); *cf. Kansas v. Marsh*, 548 U.S. 163, 178–79 (2006) (finding that the Kansas death penalty statute made life the "default sentence," since if the aggravators did not outweigh the mitigators, a life sentence must be imposed).

The Government contends that it did not argue that Mr. Aquart "did not deserve mercy as a *matter of law*, rather, that it argued that Aquart did not deserve mercy as a *matter of fact*,"and thus that it did not "shift the burden" to Defendant. (Gov't Opp'n at 22 (emphasis in original).) The Government also states that its arguments were made "in direct response" to the defense's statement that no one can "earn" mercy. (*Id.*)

Viewing the arguments and the Court's instructions, it is difficult to see how reasonable jurors would have misunderstood that a death sentence was the "default" here. The jury was clearly instructed by the Court, which was reiterated by defense counsel, that they were under no obligation to impose a death sentence, and the Government's statements were not such as to overbear that instruction.

In sum, while the Government's summation arguments"deprecated the weight" of Mr. Aquart's mitigating evidence, sometimes veering into improper linkage to the crimes or

imprudently using phrases like "no weight," the Government's summations did not "urge the jury to ignore mitigation." *Whitten*, 610 F.3d at 184 n.6. The Court, Government, and defense counsel all told the jurors that they were to consider all of the mitigating and aggravating evidence during their deliberations, which was reinforced by the exercise of completing the verdict form. After careful consideration of Defendant's challenges to the statements made during the Government's summation and rebuttal summation, the Court concludes that they are unavailing.

      B.      Whether Certain Evidence of Other Specific Acts of Violence Should Have Been Excluded from the Government's Aggravating Factors

Defendant also asks the Court to reconsider its rulings allowing two aggravating factors to be submitted to and weighed by the jury over defense's objection. Without citing to additional case law, evidence, or analysis, Mr. Aquart argues that these aggravators should have been dismissed as a matter of law, and that their consideration by the jury added unfounded weight to the death side of the sentencing scale.[4]

      1.      *Whether the Non–Statutory Aggravating Factor Should Have Been Limited to Acts of Violence that Posed a Serious Threat to the Life of Persons*

"In deciding whether to admit information regarding aggravating factors at sentencing, the Court must ensure that it is relevant, reliable and less prejudicial than probative. At the same time, it should lean in favor of admitting as much information as possible to allow the jury to make an

---

[4] His motion for a new penalty phase proceeding incorporates by reference all denied motions for penalty phase relief, including his motions to strike the "procurement by payment" aggravator and to dismiss the "unadjudicated acts of violence aggravator," the defense objections to the government's opening and rebuttal summations at the penalty phase, and the oral motions for mistrial that defense counsel made. Defendant has provided no additional briefing on these matters, though Attorney Beverly Van Ness addressed some of these issues at oral argument on these motions.

individualized determination of whether the defendant merits the death penalty." *United States v. Basciano*, No. 05-CR-060(NGG), 2011 WL 114865, *47 (E.D.N.Y. Jan. 12, 2011) (citing *United States v. Cisneros*, 363 F. Supp. 2d 827, 835 (E.D. Va. 2005)); *See also United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009)("Courts have noted that the FDPA "erects very low barriers" of admissibility given that "the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase."). An act of violence must be sufficiently serious to be considered in support of a death sentence, and the penalty phase should "be focused on those acts relevant to the jury's decision and [ ] not be permitted to become a forum to try dozens of alleged, past, uncharged crimes." *Basciano*, 2011 WL 114865 at *47; *United States v. Gilbert*, 120 F. Supp. 2d 147, 153–54 (D. Mass. 2000) ("[I]t is clear that to be a relevant aggravating factor in favor of the death penalty, prior misconduct must at least be a crime, and a grave one at that.").

Defendant Azibo Aquart objected to the admission of evidence of his assaults on Venro Fleming, Juanita Hopkins, John Sullivan, Frank Hodges, Jacqueline Bryant, and Anthony Armstead,[5] asserting that such assaults did not pose a serious threat to life, and therefore, were not "particularly relevant" to the question of whether a person should live or die. *See Gregg v. Georgia*, 428 U.S. 153, 192 (1976). The Government offered this evidence in support of the non–statutory

---

[5] Mr. Aquart moved separately [Doc. # 836] to exclude evidence of the 2009 assault on Mr. Armstead, committed while Mr. Aquart and Mr. Armstead were incarcerated at Wyatt Correctional Facility. In that motion, Mr. Aquart argued that evidence of the Armstead assault would be unfairly prejudicial, and would "explicitly and squarely" raise the issue of "future dangerousness," even though the Government had not alleged future dangerousness as an aggravating factor. The Court denied Defendant's motion in limine [Doc. # 872] as to the Armstead assault, because it shared characteristics of the other acts of being unprovoked and serious, such that some or all of the acts could have been found to constitute a pattern of violent conduct, although not life threatening.

aggravating factor that acts by the Defendant constituted "a continuing pattern of violent criminal conduct." In his Motion for Various Relief Concerning Government's Non–Statutory Aggravating Factor of Other Specific Acts of Violence [Doc. # 835], Defendant argued that the jury must be required to find, beyond a reasonable doubt, "both that any act offered in support was committed by the defendant and that three or more such acts constituted 'a continuing pattern of violent criminal conduct.'" (Def.'s Mot. for Various Relief at 12.) The Court granted the motion in part, directing that "The Government may present evidence during the penalty phase of the seven assaults it noticed in its Memorandum in Opposition [Doc. # 860], and the *assaults must individually be proven beyond a reasonable doubt.*" (Endorsement Order [Doc. # 872] (emphasis added).)

In *United States v. Basham*, the defendant argued that the district court should not have admitted evidence of his behavior toward female prison employees (which included verbal threats and exposing himself) and evidence of a "scuffle" in the courtroom between him and the United States Marshals. 561 F.3d at 315. Balancing the force of the evidence of the crime of conviction with this evidence of his conduct, the Fourth Circuit concluded "[g]iven the heinousness of the acts committed by Basham during his escape [from prison], we find it unlikely that this evidence would particularly inflame the jury."[6] *Id.* at 332 (citing *Lee*, 274 F.3d at 494 (finding unfair prejudice did not outweigh probative value of future dangerousness evidence because "none of the evidence elicited . . . was likely to inflame the jury as much as testimony about [the defendant's] involvement in the murder"). Here, while the acts of violence for which the Government gave notice, § 3593(c),

---

[6] In *Basham*, the non–statutory aggravating factor, which is not claimed here, was "future dangerousness," defined as evidence that a defendant is "likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others." *Id.* at 330 (citing *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002)).

were serious, they paled in degree of savagery compared to the grisly murders for which Defendant was convicted, and were unlikely to have "inflamed" the jury.

"So long as the evidence introduced and the arguments made at the pre–sentence [penalty phase] hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes a sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 203 (1976). Here, as in *Basham*, the evidence of these non–lethal assaults were highly unlikely to have prejudiced Mr. Aquart, given the testimony about the baseball–bat skull smashing murders that Defendant had orchestrated and committed, particularly where additionally there were five statutory aggravating factors, and the jury unanimously found all of them proved.

### 2. *Procurement by Payment Statutory Aggravator*

Finally, Defendant challenges the statutory aggravator of "procurement by payment." In its Notice of Intent to Seek the Death Penalty, the Government provided notice of this statutory aggravating factor:

> 2. Procurement of the Offense by Payment. The defendant procured the commission of the homicide offense by payment, or promise of payment, of anything of pecuniary value. 18 U.S.C. § 3592(c)(7).

(Notice of Intent to Seek the Death Penalty [Doc. # 228 ] at 3.) Defendant objected, arguing that Government could not prove "that the defendant promised to pay at least one of the three other men involved in the crimes . . . in exchange for their agreement to commit murder. (Def.'s Mot. to Strike [Doc. # 826] at 1.) Defense counsel at oral argument also maintained that "the way the aggravator is worded in the Federal Death Penalty Act it requires that the Defendant had to have procured the commission of the actual murder," as compared to applying the aggravator in a circumstance where the defendant "solicits anybody else to provide help in this plan to kill even if that third party doesn't

know what his goal is." (Nov. 22, 2012 Tr. [Doc. # 1013] 4:1–3.)

Defendant reasons that the "offense" referred to in the procurement aggravator is murder, and that "the third party must be commissioned to commit the homicide and promised payment in exchange for committing that offense and no other." (Def.'s Reply to Mot. to Strike [Doc. # 882] at 2.) Defendant also maintains that "the third party must have actually committed the homicide, as either a principal . . . or an accomplice acting with the intent to kill." (*Id.*) Defendant argues that John Taylor was not promised anything to commit murder, and that his trial testimony shows that Defendant told Taylor that he was going to set him up in the Charles Street building as part of Aquart's organization, but that he needed Taylor to help him "move some people out" and took Taylor to commit what Taylor believed would be a robbery, not murder. (Tr. at 2291.)

The Government responds that, as with all statutory aggravating factors, the focus is on the conduct and intent of the defendant, writing, "[t]he factor applies if the defendant promised anything of pecuniary value to a person for his assistance in the homicide offense." (Gov't Opp'n to Def.'s Mot. to Strike [Doc. # 862] at 2.) As some guidance, the Eighth Circuit's pattern jury instructions lack the limitations Defendant seeks:

> To establish that the defendant procured the commission of the offense by [payment] [promise of payment] of anything of pecuniary value, the government must prove, in essence, that the defendant arranged to have someone else commit the offense or assist in committing it. [There is no requirement that the government prove that something of pecuniary value actually changed hands.] To "procure commission of the offense" means to obtain it or bring it about. The words "payment or promise of payment" should be given their ordinary, everyday meaning which includes giving or offering compensation in return for services. "Anything of pecuniary value" means anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

Manual of Model Criminal Jury Instructions for the District Courts of the 8th Circuit, § 12.07G (2002).

Even if Taylor did not understand Defendant Azibo Aquart's intent as intent to murder, the Defendant's intent was to recruit Taylor to assist him in committing the murders to eliminate drug competitors by promising Taylor something of value, that is, to bring him into his enterprise and give him a "spot" in his building. (Tr. at 2285; 2299–300.) The plain language of 18 U.S.C. § 3592(c)(7) supports that theory of liability, that "the defendant procured the commission of the offense by payment or promise of payment." Nothing in the statute limits its scope to a murder–for–hire scenario as argued by Defendant. *See United States v. Walker*, 910 F. Supp. 837, 848 (N.D.N.Y. 1995) (Construing the "pecuniary gain" aggravator, the district court rejected the defendant's argument that the pecuniary gain aggravator "can only apply to murder–for–hire or murder in anticipation of an inheritance or insurance proceeds"*)*. The statutory language focuses on the actions and intent of the defendant, and it is sufficient if the Defendant is proved to have procured assistance of others to enable him to carry out his planned homicide offenses unbeknownst to Taylor by the promise of payment of something of pecuniary value—a spot in the drug enterprise after the victim–competitors were gone. On this basis, the Court declined, and continues to decline, to strike the Government's aggravator.

Even if the Court's interpretation of this aggravator is incorrect, the Court seriuosly doubts that if this aggravator had not been submitted for the jury's consideration, the penalty phase outcome would have been different, given that the jury unanimously found that the Government had proved all four of the remaining statutory aggravators—heinous, cruel and depraved conduct, substantial planning and premeditation, multiple victims—and unanimously found two non–statutory aggravating factors: (1) continuing pattern of acts of violence and (2) victim–impact.

22

III.     Conclusion

For the reasons discussed above, Defendant's motion for a mistrial as to the penalty proceedings [Doc. # 952] is DENIED.


IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of February, 2012.