UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA, | Criminal No. 3:06cr160(JBA) |
|---|---|
| v. | |
| EFRAIN JOHNSON, *Defendant*. | July 8, 2013 |

**RULING ON POST-TRIAL MOTIONS**

Defendant Efrain Johnson moves [Doc. # 1119] pursuant to Federal Rule of Criminal Procedure 29 for judgment of acquittal, or in the alternative, pursuant to Rule 33 to vacate his conviction and for a new trial. For the following reasons, Defendant's motion for judgment of acquittal is GRANTED.

**I.  Summary**

In 2011, a Grand Jury returned a Fifth Superseding Indictment [Doc. # 951] in *United States v. Aquart et al.*, 3:06cr160, charging Defendant Efrain Johnson with conspiracy to commit murder in aid of racketeering (Count One), and the commission of murder in aid of racketeering in violation of 18 U.S.C. § 1959, for the killing of Tina Johnson (Count Two), James Reid (Count Three), and Basil Williams (Count Four). Defendant Johnson was tried separately from co-defendant Azibo Aquart. The other co-defendants Aziwike Aquart and John Taylor pled guilty prior to Mr. Johnson's trial.

Prior to trial, the Court heard argument on Defendant's motion to dismiss the Indictment, in which Defendant argued, in essence, that his crimes were at most state law felony murder crimes, and that the conduct charged in the Indictment did not constitute a violation of 18 U.S.C. § 1959. The Court denied Mr. Johnson's motion to dismiss (*see*

Ruling on Defendant's Motion to Dismiss [Doc. # 1034]), holding that a challenge to the sufficiency of the Government's evidence was premature at that stage.

On February 24, 2012, following a ten-day trial, the jury returned a verdict convicting Mr. Johnson of Counts Two, Three and Four, under a theory of felony murder pursuant to Conn. Gen. Stat. § 53a-54c, with burglary as the underlying felony applicable to all three counts, and kidnapping as an additional underlying felony as to Count Two. Mr. Johnson was acquitted of Count One, conspiracy to commit murder in aid of racketeering.

## II.  Legal Standard

"A Rule 29 motion [for a judgment of acquittal] should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotations omitted). The Court must view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in its favor." *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008). "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 99 (quoting *United States v. Guandagna*, 183 F.3d 122, 129 (2d Cir. 1999)). "The Court must give full play to the right of the jury to determine credibility." *Id.* "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotations and citations omitted).

Under Federal Rule of Criminal Procedure 33, the Court has the discretion to grant a new trial "if the interest of justice so requires," particularly where there is "a real

2

concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005). "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses," *Cote*, 544 F.3d at 101, but "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). While courts have broader discretion to grant a new trial under Rule 33 than to grant an acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary of circumstances." *Id.*

**III.    Discussion**

Defendant's arguments in support of his motions for judgment of acquittal and/or a new trial are: (1) because the jury returned a verdict of not guilty on Count One, the co-conspirator statements introduced through the Government's cooperating witness John Taylor were inadmissible; (2) because there was insufficient evidence to show that the murders of James Reid and Basil Williams were related to the charged enterprise the convictions on Counts Three and Four must be vacated, and (3) there was insufficient evidence to prove elements three and five required to sustain a conviction under the violent crime in aid of racketeering ("VCAR") statute, 18 U.S.C. § 1959.[1]

---

[1] Defendant also raises two arguments previously considered and rejected by the Court in its Ruling on Defendant's Motion to Dismiss: first, that as applied, 18 U.S.C. § 1959 violates the Commerce Clause because the charged predicate murders are the same as the alleged racketeering activity, and second, that the "independent contractor" motive violates the Commerce Clause. Because the Court concludes that Mr. Johnson's VCAR conviction should be vacated due to insufficient evidence, the Court does not revisit these Commerce Clause challenges in this ruling.

**A. Violent Crimes in Aid of Racketeering**

Section 1959, which was "enacted to complement RICO," *United States v. Concepcion*, 983 F.2d 369, 380 (2d Cir. 1992), provides in pertinent part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished.

18 U.S.C. § 1959(a).

"Section 1959 punishes defendants who commit violent crimes in aid of racketeering activity, and it contains a motive requirement." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Under § 1959, a "[d]efendant's motive must be receiving payment or promise of payment of anything of pecuniary value from the racketeering enterprise or 'gaining entrance to or maintaining or increasing position' in the enterprise." *Id.* In the 1983 Senate Judiciary Committee Report on "miscellaneous violent crime amendments" which included sections 1958 (interstate murder-for-hire) and 1959 (VCAR), the Committee addressed the common goals and differences between sections 1958 and 1959:

> This Part of [the amendments] proscribes murder and other violent crimes committed for money or other valuable consideration *or* as an integral aspect of membership in an enterprise engaged in racketeering. . . . The offenses set forth in this Part are related but distinct. The first [§ 1958] is limited to murder and punishes the travel in interstate or foreign commerce or the use of the facilities of interstate or foreign commerce . . . as consideration for the receipt of anything of pecuniary value, with the intent that a murder be committed. *The second [§ 1959] extends to murder, kidnapping, or serious assault committed for anything of pecuniary value* or

4

for the purpose of gaining entrance into or maintaining or increasing one's position in an organized crime group.

S. Rep. No. 98-225, at 304 (1983), *reprinted in* 1984 U.S.C.C.A.N. at 3483 (emphasis added).

At the close of evidence, the Court instructed the jury that in order to find Defendant guilty of the VCAR Counts (Two, Three, and Four), the Government had to prove each of the following five elements of the offense beyond a reasonable doubt:

(1) an enterprise existed that on or about the date charged (August 24, 2005) affected interstate commerce;
(2) the enterprise was engaged in racketeering activity;
(3) the Defendant knowingly and intentionally associated himself with the enterprise;
(4) the Defendant murdered another individual, either by felony murder and/or by knowingly and intentionally aiding and abetting murder;
(5) the Defendant's purpose was as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity.

(Jury Instructions [Doc. # 1092] at 19.) Defendant argues that as to Counts Two, Three, and Four, the evidence failed to satisfy elements (3) and (5) and was thus insufficient to support his convictions under § 1959.

**B. Insufficiency of the Evidence as to Element Three: Knowing and Intentional Association with the Enterprise**

Defendant contends that the Government failed to prove that he knowingly and intentionally associated himself with the charged enterprise,[2] as required under § 1959. As to this element, the Court instructed the jury as follows:

---

[2] The enterprise was described in the Fifth Superseding Indictment as follows:
 [T]he "Aquart Enterprise" or the "enterprise," [and its] members and associates engaged in various acts of criminal activity including murder, conspiracy to murder, assault and narcotics trafficking. The

5

The Government does not claim that Mr. Johnson was a member of the enterprise, or that he held or was seeking a position in the enterprise, or that he knew of the existence of the enterprise.

This element is satisfied if the Government proves that Mr. Johnson knowingly and intentionally associated himself with the enterprise in some way at the time he is alleged to have committed the crimes charged. At the time of the murders alleged, the Defendant must have been connected to the enterprise in some meaningful way so as to actively promote its illegal activities in some way. It is insufficient for the Defendant to merely be doing business with the enterprise or merely associating with Azibo Aquart for personal matters.

---

> Aquart Enterprise operated primarily within the Charles Street Apartments located at 215 Charles Street, Bridgeport, Connecticut. . . .
> Azibo Aquart founded and was the leader of the enterprise whose members and associates distributed cocaine base, primarily in Bridgeport, Connecticut. . . . Azikiwe Aquart was employed by Azibo Aquart to supervised and maintain control over the activities of the street-level dealers. Azibo Aquart also recruited and employed . . . [John] Taylor to act as "lookout[]" to warn members and associates of the enterprise of police activity in and around the Charles Street Apartments, as well as of the trafficking activity of rival drug dealers that threatened the vitality of the Aquart Enterprise. Defendant Efrain Johnson associated with, and was recruited by, Azibo Aquart to participate, and he did participate, in the murders of Tina Johnson, James Reid and Basil Williams . . . as consideration for a promise and an agreement to pay anything of pecuniary value from the enterprise.

(Fifth Superseding Indictment ¶¶ 1–3.) The "Goals and Purposes of the Enterprise" were described as follows:

> The members and associates of the Aquart Enterprise sought, among other things, to:
> a. Preserve and protect the power, territory and profits of the Aquart Enterprise through the use of intimidation, violence and threats of violence;
> b. Promote and enhance the criminal activities of the Aquart Enterprise and its members and associates; and
> c. Generate income for members and associates through the sale and distribution of narcotics.

(*Id.* ¶¶ 4a–4c.)

6

(Jury Instructions at 23.)

The parties acknowledge that this instruction was appropriate, and was the product of a considerable effort to craft an instruction that accounted for one of the singular challenges in this case; that is, that Mr. Johnson was not charged with knowing about or being a member of Azibo Aquart's drug enterprise, or with committing violent crimes "as an integral aspect of membership" in the Aquart enterprise,[3] but was only tried under the theory that he assisted with the murders as "consideration for . . . the receipt of anything of pecuniary value." 18 U.S.C. § 1959(a).

Though the Modern Federal Jury Instructions provided that the third element required to be proved in a typical VCAR prosecution is that the "defendant had (*or* was seeking) a position in the enterprise," *see* 3 L. Sand *et al.*, Modern Federal Jury Instructions—Criminal § 52-39, such an instruction was clearly inapplicable here, where the Government did not claim that Defendant was a member of, or ever sought to become a member of, or even knew of the Aquart Enterprise. However, the Modern Federal Jury Instructions also recognize that membership in the charged enterprise is not a requirement for a VCAR conviction, as "[t]he Second Circuit has suggested that the 'consideration for receipt of anything of value' provision is intended for independent contractors *who are not members of the organization* but who commit violent crimes to promote the interests of the enterprise." *Id.* § 52.41 Cmt. (emphasis added).

With these issues in mind, the Court devised a formulation that sought first, to address that Defendant was not claimed to be a part of the enterprise and second, account

---

[3] Though Defendant was originally charged under both VCAR theories—the "maintain or increase position" and "as consideration for . . . anything of pecuniary value," the Government withdrew its "maintain or increase position" charge before the close of evidence in the case.

7

for the claimed legislative purpose of VCAR—that is, to proscribe "murder . . . when done as consideration for the receipt of or a promise or agreement to pay 'anything of pecuniary value' from an enterprise engaged in racketeering activity," S Rep. No. 225, at 306. As such, the Court's instructions required the jury to find that Defendant "knowingly and intentionally associated himself with the enterprise . . . in some meaningful way so as to actively promote its illegal activities" in order to find element three proved. (Jury Instructions at 23.)

In making its findings as to this "knowing and intentional association" element, the jury was entitled to consider the following evidence presented at trial. Defendant testified that that he first met Azibo Aquart in the summer of 2005 through a mutual friend (Trial Tr. ("Tr.") Vol. X at 2271–72) and he knew him as "Dreddy" or the "Piff Man," for the "high-grade weed" he would buy from him. (*Id.*; *see also id.* at 2274.) After he learned that his sister, "Shika," was romantically involved with Dreddy, he continued to buy marijuana from Dreddy "once or twice a week" (*id.* at 2276), but did not hang out with him, or get high with him (*id.* at 2277). However, in the days prior to the incident, Defendant testified that Azibo Aquart "asked me would I do him a favor" and gave Defendant "an extra two jars" of marijuana, worth about forty dollars. (*Id.* at 2280–81.) Defendant testified that he did not know what the "favor" was, but that "[h]e asked me like he wanted me to go to the store with him or something . . . [and] it didn't seem like nothing serious." (*Id.* at 2281.)

The jury heard evidence of Defendant, John Taylor, Azibo Aquart, and Azikiwe Aquart's home invasion "attempt" a few evenings prior to the killings, where they met in a diner parking lot in the early morning hours and equipped themselves for violent criminal activity with baseball bats, latex gloves, and masks. Taylor's testimony described

8

their presence in the parking lot as explained by Azibo Aquart who told them, "I got a problem with some people in this building . . . they was selling drugs out of his building."[4] (Tr. Vol. VII at 1637.) Defendant's sister's testimony corroborates this timeline: she testified that a few nights before the murders, Defendant left to "handle something with Dreddy," and that he and Dreddy "came back pretty fast" from wherever they had gone. (Tr. Vol IX at 2033.)

The jury also heard evidence that on the night of the murders, Azibo called Lashika Johnson while she was eating with Defendant at Denny's, asking for and speaking with Defendant on the telephone. (*See id.* at 2031.) From Defendant's trial testimony, the jury heard Defendant acknowledge that he drove Azibo to Charles Street in his own rental car that night (*see* Tr. Vol. X at 2391), and Taylor testified that Defendant again brought baseball bats to the Charles Street building, and again wore gloves and a mask. (Tr. Vol. VII at 1661–62, 1666.) "Acting like a cocaine customer or a crack cocaine customer" (Tr. Vol. VIII at 1959), Defendant burst into Tina Johnson's apartment, wrapped her wrists and ankles with duct tape, and stood near the door of the second

---

[4] At trial, the Court concluded that the Government had met its preliminary burden of proving that a conspiracy to commit murder in aid of racketeering existed by a preponderance of the evidence (Tr. Vol VII at 1618), and allowed John Taylor to testify as to statements made by co-conspirator and separately tried co-defendant Azibo Aquart over Defendant's objection. In his motions for acquittal and for a new trial, Defendant argues that given the jury's verdict of acquittal on Count One—conspiracy to commit murder in aid of racketeering—out-of-court statements made by Azibo Aquart and offered through John Taylor pursuant to Federal Rule of Evidence 801(d)(2)(E) should not have been admitted and considered by the jury for the remaining counts. Though the Court does not find that this testimony was improperly admitted, as discussed in this section and the next, the Court concludes that even with the admission of this testimony, a judgment of acquittal is warranted as to the three VCAR counts based on insufficient evidence.

9

bedroom while the Aquart brothers killed James Reid and Tina Johnson with bats. (*See* Tr. Vol. VII at 1682.)

A defendant acted "knowingly" if he "acted voluntarily or intentionally and not by mistake, accident, ignorance of the facts, or for other innocent reason." *United States v. Hopkins*, 53 F.3d 533, 537 (2d Cir. 1995). Even considering all of the evidence described above, the Court finds that there was no evidence offered to enable a reasonable juror to conclude that when Defendant "associated" with Azibo Aquart on the nights of the attempt and the killings, that he was "voluntarily and intentionally" associating with Aquart as the head of the charged Aquart Enterprise, as opposed to with Aquart as the "Piff Man," from whom he bought personal use quantities of marijuana, and who had asked Defendant to do him an unspecified "favor." There is nothing in the record to show that Defendant's association with Azibo Aquart that night was more than a personal association.

In *United States v. Conception*, the Second Circuit considered a sufficiency of the evidence challenge to a defendant's VCAR conviction under the "maintain or increase position" motive, where the defendant claimed that the evidence failed to show that he was acting as anything more than an independent contractor. In analyzing the defendant Aponte's argument, the Second Circuit noted, "in passing," that

> § 1959 is sufficiently inclusive to encompass the actions of a so-called independent contractor, for it reaches *not only* those who seek to maintain . . . their positions within a RICO enterprise, but also those who perform violent crimes "as consideration for the receipt of . . . anything of pecuniary value" from such an enterprise.

983 F.2d at 384 (emphasis added). Though the court held that there was sufficient evidence to sustain the defendant's conviction under the "maintain or increase position" theory, the court also concluded that "even as an independent contractor he could have

been prosecuted for a violation of . . . § 1959," because there was evidence that the defendant Aponte "received a diamond Rolex watch and $10,000" for "killing Robert." *Id.*

Though the Government has relied heavily on this reasoning in prosecuting Mr. Johnson's case,[5] the Court finds that this limited guidance—i.e., that "§ 1959 is sufficiently inclusive to encompass the actions of a so-called independent contractor," *see id.*— provides an insufficient legal basis for upholding Mr. Johnson's conviction. In *Concepcion*, the defendant Aponte, whether identified as an independent contractor or as a member, clearly knew about the charged racketeering enterprise, and knowingly associated with it when he was given $10,000 and a diamond Rolex in exchange for committing a murder. Here, however, no reasonable juror could have concluded that Mr. Johnson was connected in a "meaningful way" to the Aquart Enterprise, even though he brought the bats, heard Aquart complain about "people selling drugs in his building," and duct-taped Tina Johnson's wrists, because he did not even know that the Aquart Enterprise existed, and thus the evidence could only show that he was voluntarily and

---

[5] In the parties' briefs and at oral argument, the Government and Defendant agreed that, aside from *Concepcion*, VCAR case law is not particularly instructive for the facts of Mr. Johnson's case, because most VCAR cases, including *Concepcion*, charged the defendant at issue with being a member of the enterprise who committed the charged violent crime with a primary purpose to "maintain or increase his position" in the enterprise. At minimum, the issue of a defendant's knowledge of the racketeering enterprise has never been in question in those cases. *See, e.g., United States v. Ferguson*, 246 F.3d 129, 133–34 (2d Cir. 2001) (defendant was charged and tried under both a "maintain or increase position" and a "pecuniary value" motive); *United States v. Polanco*, 145 F.3d 536, 540 (2d Cir. 1998) (conviction reversed for defendant, who was not a member of the Red Top Crew but sold the Red Top Crew weapons, because he was charged only under a "maintaining or increasing position in an enterprise" theory); *United States v. Thai*, 29 F.3d 785, 818 (2d Cir. 1994) (defendant charged only with conspiring to bomb the Pho Bang under the motive of "maintain or increase position in the enterprise.").

intentionally associating himself with Azibo Aquart the Piff Man individually, rather than with Azibo Aquart as the head of his drug enterprise at 215 Charles Street.

To set aside a jury verdict on the ground that there was insufficient evidence to establish the elements of a criminal offense, a defendant must demonstrate that there was no evidence from which a reasonable mind "'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993). For the reasons set forth above, the Court concludes that Defendant has met this burden here, and that no reasonable juror could find that Defendant "knowingly and intentionally associated himself" with the Aquart Enterprise when he participated in the murders on Charles Street because, as the Government acknowledged during trial, he had no knowledge of its existence.

### C. Insufficiency of the Evidence as to Element Five: Acting as Consideration for Something of Pecuniary Value from the Enterprise

Defendant also challenges the sufficiency of the evidence as to the fifth element required to prove a violation of § 1959: that Defendant's purpose was "as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity." (Jury Instructions at 19.) The jury was instructed that in order to find this fifth element proved,

> the Government must prove beyond a reasonable doubt . . . that Defendant's purpose in committing felony murder or aiding or abetting murder was as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from the enterprise. The statute defines "anything of pecuniary value" as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage."

12

> The term "consideration for" means a mutual understanding that something of value will be exchanged. Proof that Defendant expected or received something of pecuniary value, without proof of such a mutual understanding between the Defendant and the enterprise, is insufficient to establish beyond a reasonable doubt that the Defendant committed murder "as consideration for" anything of pecuniary value from the enterprise. . . .
>
> Though it is not necessary for the Government to prove that Mr. Johnson was himself a member of the enterprise, to convict the Defendant of any of these three counts, you must unanimously agree that the Government has proved beyond a reasonable doubt that one of the Defendant's motives for the murder was as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity. Evidence that the Defendant received payment, or was promised payment, from a person acting as an agent of the enterprise, is sufficient to establish the requisite payment from an enterprise. Evidence that the Defendant received payment, or was promised payment, from a person acting in a personal capacity, is insufficient.

(Jury Instructions at 38–39.)

In support of his motions for acquittal or a new trial as to this element, Defendant argues that although he "accepted a thing of value from Azibo Aquart, he did so unaware of the fact that Azibo distributed crack cocaine at Charles Street or what Azibo expected of him." (Def.'s Mem. Supp. at 22.)

As discussed *supra*, no case law addresses the circumstances at issue here, where a defendant is tried under a "consideration for the receipt of anything of pecuniary value" motive as an independent contractor only and cannot be proved to be a member of, or to have even known of, the racketeering enterprise. However, even with *Concepcion*'s acknowledgment that VCAR liability could attach to the independent contractor who "perform[s] violent crimes 'as consideration for the receipt of . . . anything of pecuniary value' from such an enterprise," *Concepcion*, 983 F.2d at 384, the Court finds that the

evidence does not support a finding that Mr. Johnson's receipt of two jars of marijuana satisfies the "anything of pecuniary value" requirement.

Based on the evidence educed at trial in support of the "pecuniary value" element, the jury could have reasonably concluded that a few days prior to the killings, Defendant was asked to help Azibo with an unidentified "favor" in exchange for two jars of marijuana, worth approximately $40. Defendant also testified that Azibo told him that he would "hit you off later," which Defendant understood to mean that he "would give me something later on . . . it could have been anything," but that he "d[id]n't know what the favor was." (Tr. Vol X at 2389–90.) On the evening of the killings, he did not have "any idea why [Azibo] wanted [him] to knock on that door." (*Id.* at 2425.)

When asked "[i]s weed of value to you?" (*id.* at 2390), Defendant responded, "No, it's something I like to indulge in," though he admitted that he did have to pay money for marijuana whenever he bought it (*id.*). Defendant testified that, to him, the "value of two jars of marijuana" was "[j]ust something to smoke." (*Id.* at 2428.)

The Senate Judiciary Committee, in its report on the Comprehensive Crime Control Act of 1983, noted that "[t]he Committee intends that 'anything of pecuniary value [in § 1959]' have the same meaning as in section [1958]," which defines it as "money, a negotiable instrument, a commercial interest, or *anything else the primary significance of which is economic advantage*." S. Rep. No. 98-225, at 306 n.6 (emphasis added). The jury instructions incorporated this definition. (*See* Jury Instructions at 38.)

While "[n]ot only money, but drugs, insurance policies, and real estate can constitute consideration for the purpose of satisfying this element," *United States v. Richeson*, 338 F.3d 653, 657 (7th Cir. 2003), there was insufficient evidence at trial to conclude that the two jars given to Defendant in exchange for a "favor" were intended

14

primarily for Defendant's economic advantage, rather than for his own personal consumption. In *United States v. Washington*, 318 F.3d 845, 854 (8th Cir. 2003), the Eighth Circuit considered whether a payment of two and one-half ounces of heroin—worth approximately $2,500—was sufficient to constitute consideration under § 1958, and held that "[p]ayment of this amount of heroin, normally associated with distribution and sale, is sufficient to meet the requirements of Section 1958(b) that payment be "a commercial interest" or "anything else the primary significance of which is economic advantage." In contrast, here, there was no evidence introduced as to the actual quantity of marijuana that Azibo Aquart gave Mr. Johnson, only that it would be valued at approximately $40 and fit into two small jars. (*See* Tr. Vol. X at 2273; Gov't's Ex. 200B.)

Further, that the marijuana was offered in exchange for an unspecified, future "favor," is also problematic, as it fails to show evidence of mutual understanding between Azibo Aquart and Defendant. In *United States v. Frampton*, 382 F.3d 213, 219 (2d Cir. 2004), the Second Circuit held that the district court did not err when it entered judgments of acquittal under § 1958 where the evidence only showed a promise of a future, unspecified, "favor" in exchange for killing someone. At Frampton's trial, when pressed about what this "favor was," the witness said, "Anything. Anything he need." In finding this evidence of pecuniary value insufficient, the Second Circuit reasoned, "there must be some evidence to establish that at the time the agreement was formed, the consideration was something the 'primary significance' of which lay in its 'economic advantage.'" *Id.*

Here, while there was testimony that Defendant bought marijuana from Azibo Aquart in sufficient quantities to share his purchase with other people in order to get a "deal," e.g., "[m]aybe two jars for 35 or three jars for 50," while one jar actually sells for

15

twenty (*see* Tr. at 2277), there was no evidence offered to show that forty dollars' worth of marijuana is an amount "normally associated with distribution and sale," *see Washington*, 318 F.3d at 854, nor that the 'primary significance' of the two jars of marijuana offered was its "economic advantage" to Defendant. *Frampton*, 382 F.3d at 219.

Finally, the evidence did not evince any meeting of the minds between Azibo and Defendant, and instead revealed that Defendant did not understand what the "favor" would be, testifying that he thought it would be "like he wanted me to go to the store with him or something." (Tr. at 2281.) Thus, the evidence of Defendant's acceptance of a small quantity of marijuana given to him in exchange for a "favor," and Defendant's subsequent participation in the murders cannot constitute proof beyond a reasonable doubt that he committed the charged violent crimes "as consideration for . . . the receipt of anything of pecuniary value." *Compare United States v. Muyet*, 994 F. Supp. 501, 519 (S.D.N.Y. 1998), *aff'd*, 225 F.3d 647 (2d Cir. 2000) (finding sufficient evidence to support defendant Feliciano's conviction under the "pecuniary" motive where the jury heard testimony from Corona, a witness, that he "overheard John Muyet discuss hiring the 'freelancers' to 'take care of' the Salcedos. . . . [and] overheard John Muyet discuss the payment to Feliciano," and concluding that "[v]iewed in the light most favorable to the Government, the evidence presented was sufficient to allow a reasonable jury to determine that Feliciano was promised or received payment for his role in the Salcedo shootings."), *with United States v. Ferguson*, 49 F. Supp. 2d 321, 329 (S.D.N.Y. 1999) ("No evidence was offered as to any discussions—preceding, contemporaneously, or after the payment—as to what the money was for. . . . The payment could just as easily have been for an innocent purpose or even for a criminal purpose unrelated to the murder of Gregory Ayala. The payment could have been by Guzman for a personal reason or made on behalf of Power Rules.

Neither of these purposes (innocent purpose or criminally unrelated purpose) would support a conviction of Ferguson for violating 18 U.S.C. § 1959."), *aff'd*, 246 F.3d at 137 ("That sort of connecting evidence [in *Muyet*] is absolutely absent here and supports [the district court's] conclusion that blind deference to the jury verdict is unwarranted."). Accordingly, the Court concludes that Mr. Johnson is also entitled to a judgment of acquittal based on insufficient evidence as to the fifth VCAR element.

IV.  **Conclusion**

In sum, the Court concludes that the evidence at trial did not rise to the level of proof beyond a reasonable doubt that Defendant knowingly and intentionally associated with Aquart's racketeering enterprise when he participated in the killings, or that he participated as consideration for the receipt of anything of pecuniary value, as required under § 1959. While there may be ample evidence, much of it based on Defendant's own testimony, to support a felony murder conviction, there was no evidence at trial to show that Mr. Johnson was part of, or knowingly associated with, an "organized criminal enterprise" sufficient to bring him within the ambit of § 1959. *See* S. Rep. No. 98-225 at 306 ("Section [1959] proscribes contract murders and other violent crimes by organized crime figures.").

The Court's decision is based on its conclusion that there was insufficient evidence to support Defendant's conviction under § 1959. As such, this precludes the granting of a new trial on the VCAR counts. That the parties do not object to the jury instructions further supports the Court's conclusion that a new trial would be an inappropriate form of relief, because a retrial on the VCAR counts, with the same lack of evidence and the same instructions, would not address the deficiencies of proof that the Court has identified.

Accordingly, for the reasons discussed above, Defendant's motion [Doc. # 1119] for judgment of acquittal under Rule 29 is GRANTED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of July, 2013.